**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| RONALD EGANA, SAMANTHA EGANA, and TIFFANY BROWN, on behalf of themselves and those similarly situated,<br><br>      Plaintiffs,<br><br>v.<br><br>BLAIR'S BAIL BONDS, INC., NEW ORLEANS BAIL BONDS, L.L.C., BANKERS INSURANCE COMPANY, INC., BANKERS SURETY SERVICES, INC., BANKERS UNDERWRITERS, INC., A2i, L.L.C., ALTERNATIVE TO INCARCERATION, INC., and ALTERNATIVE TO INCARCERATION NOLA, INC.,<br><br>      Defendants. | Case No. 2:17-cv-5899<br><br>**COMPLAINT**<br><br>**JURY DEMAND**<br><br>**CLASS ACTION** |

## I.  PRELIMINARY STATEMENT

1.     Plaintiffs institute this action against Blair's Bail Bonds, Inc., New Orleans Bail Bonds, L.L.C., Bankers Insurance Company, Inc., Bankers Surety Services, Inc., and Bankers Underwriters, Inc. (collectively, "Bonding Defendants"); and A2i, L.L.C., Alternative to Incarceration, Inc., and Alternative to Incarceration NOLA, Inc. (collectively, "A2i"), to redress injuries suffered as a result of abusive and exploitative actions taken by Defendants in furtherance of their commercial bail bonding business, including kidnapping and extortion to collect illegal fees.

2.     In June 2016, Plaintiffs Ronald Egana and his close friend, Tiffany Brown, and mother, Samantha Egana, signed a contract and payment agreement with the Bonding

Defendants providing that in exchange for a $3275 premium to be loaned to Plaintiffs and paid back in installments, Defendants would post bail for Mr. Egana. Unbeknownst to Plaintiffs, the contract and payment agreement violated state and federal law by failing to disclose key terms of the loan and charging above the limit placed by state law on bail bond premiums. Defendants demanded that Mr. Egana wear an ankle monitor although none was ordered by any court or provided for in the contract and charged him $10 *per day* in further illegal "ankle monitoring" fees. Since then, Defendants have threatened and harassed Mr. Egana by sending armed men to kidnap him from his home, workplace, and on his way to court and hold him against his will, in an effort to extort money from him, Ms. Brown and Ms. Egana. And when Defendants were satisfied that they could not extract further money from Plaintiffs, they arrested and surrendered Mr. Egana back to jail. After a year of this abuse, Plaintiffs paid over $6000—an amount well above what they originally contracted to pay, most of which consists of charges that violate state law and were not provided for in the contract. To meet this expense, Plaintiffs have borrowed money, spent down their savings, and fallen behind on household bills. After Mr. Egana's surrender for nonpayment of the bail premium, this money was never refunded, even though state law requires it be so.

3.      Plaintiffs bring this action against Defendants to remedy multiple violations of the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.*, (hereinafter "TILA"), and Regulation Z, 12 C.F.R. § 1026, promulgated pursuant thereto; the federal Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 (hereinafter "RICO"), because of underlying acts of simple and aggravated kidnapping, extortion, extortionate collection of extension of credit, and the collection of unlawful debt; the Louisiana Racketeering Act, La. Stat. Ann. § 15:1351 *et seq.* (hereinafter "state RICO"); and the state laws of false imprisonment; conversion; and state

contract laws. Plaintiffs seek to represent others who are similarly situated, and to obtain damages, equitable relief, attorneys' fees, and costs.

## II.        JURISDICTION AND VENUE

4.      The Court has jurisdiction over this action pursuant to the Truth in Lending Act, 15 U.S.C. § 1640(e); the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1964(c); and 28 U.S.C. §§ 1331 and 1337.

5.      The Court has supplemental jurisdiction of claims arising under state law under 28 U.S.C. § 1367.

6.      Venue is proper pursuant to 28 U.S.C. § 1391(b)(2) because a substantial part of the events and omissions giving rise to Plaintiffs' claims occurred in this District.

## III.        PARTIES

7.      Plaintiff Ronald Egana resides in the Greater New Orleans Metropolitan Area.

8.      Plaintiff Samantha Egana resides in the Greater New Orleans Metropolitan Area.

9.      Plaintiff Tiffany Brown resides in the Greater New Orleans Metropolitan Area.

10.      Defendant Blair's Bail Bonds, Inc. ("Blair's") is a domestic corporation duly licensed under the laws of the state of Louisiana with its principal place of business at 2767 Tulane Avenue, New Orleans, LA 70119.

11.      Defendant New Orleans Bail Bonds, L.L.C. ("New Orleans Bail Bonds") is a domestic company duly licensed under the laws of the state of Louisiana with its principal place of business at 2767 Tulane Avenue, New Orleans, LA 70119.

12.      Defendant Bankers Insurance Company, Inc. is a corporation domiciled in Florida with a principal place of business at 11101 Roosevelt Blvd. N., St. Petersburg, FL 33716.

13.      Defendant Bankers Surety Services, Inc., is a corporation domiciled in Florida

with a principal place of business at 11101 Roosevelt Blvd. N., St. Petersburg, FL 33716.

14.     Defendant Bankers Underwriters, Inc. is a domestic corporation duly licensed under the laws of Louisiana with its principal place of business at 11101 Roosevelt Blvd. N., St. Petersburg, FL 33716, and its principal business establishment in Louisiana at 501 Louisiana Ave., Baton Rouge, LA 70802.

15.     Defendant A2i, L.L.C. is a domestic company duly licensed under the laws of Louisiana and domiciled at 315 Austin St., Bogalusa, LA 70427.

16.     Defendant Alternative to Incarceration, Inc. is a domestic corporation duly licensed under the laws of Louisiana with its principal place of business at 315 Austin St., Bogalusa, LA 70427.

17.     Defendant Alternative to Incarceration NOLA, Inc. is a domestic corporation duly licensed under the laws of Louisiana with its principal place of business at 2741 Tulane Avenue, New Orleans, LA 70119. It is currently inactive by action of the Secretary of State. Its last filing date with the Secretary of State was May 6, 2015.

18.     Defendants Bankers Insurance Company, Inc., Bankers Surety Services, Inc., and Bankers Underwriters, Inc., are referred to collectively in this Complaint as "Bankers."

19.     Defendants Blair's Bail Bonds, Inc., New Orleans Bail Bonds, L.L.C., and Bankers are referred to collectively in this Complaint as "Bonding Defendants."

20.     Defendants A2i, L.L.C., Alternative to Incarceration, Inc., and Alternative to Incarceration NOLA, Inc. are referred to collectively as "A2i."

## IV.     STATEMENT OF FACTS

**Background**

4

21.     In the majority of misdemeanor and felony cases in the Greater New Orleans area, courts set monetary conditions of bail that must be satisfied to secure a person's release from jail.[1]

22.     In cases where a monetary condition of bail is set, those who cannot afford to post the full amount must purchase a bail bond from a licensed agent to secure their release. These are surety bonds, offered by local bail agents and backed by an insurance corporation as surety. The surety agrees to be indebted to the State in the amount of the bond if the defendant fails to appear, though State law also allows the bail agents to discharge this obligation by bringing the defendant before the court within a certain amount of time.

23.     Bail agents and sureties charge a bail premium and administrative fee (collectively "bail fees") to provide this surety bond. Unlike a cash or property bond posted with the court, which is returned to the defendant at the end of the case, bail fees paid are nonrefundable, even if the defendant appears for every court hearing as required and even if he or she is ultimately found not guilty of any crime. However, if the bail agent elects to return, or "surrender," the defendant because the defendant did not pay the premium in full, in that limited circumstance the bail agent is required to refund money that was paid toward the premium. La. Stat. Ann. § 22:1585; 37 La. Admin. Code Pt. XIII, § 4913.

24.     These premiums are set by law at 12% in all parishes except Jefferson, where it is set at 12.5%. La. Stat. Ann. §§ 22:1443, 13:718(I)(2)(a). Louisiana law also allows a $25 administrative fee. *Id.* § 22:855(B)(2)(b).

---

[1] The City of New Orleans has recently enacted an ordinance that will eliminate bail for most defendants charged with nonviolent misdemeanors. Sec. 54-23, Ord. No. 27232, § 1 (Jan. 12, 2017).

25.     The law imposes these premium rate limits on the surety company. The surety obtains the premium or a percentage of the premium from its agent, the bail bond company.

26.     When individuals seeking release are unable to pay the full cost of the bail fees up front, some bail agents and sureties will extend the bond immediately with a down payment, while extending credit for the remainder of the bail fees owed to be paid over time.

27.     A recent study focused on Orleans Parish provides some information about money bail and the prevalence of bail bonds. There, median bail for those facing felony charges is $10,000. Over the year studied, 97% of those facing felony charges who were able to secure their release pretrial did so by buying a commercial bail bond.[2] In total, these commercial bail bonds allowed bail agents and sureties to collect $6.4 million. Of this amount, a portion went to government entities, but the vast majority—more than $4.7 million—was kept by commercial bail bond agents and sureties.[3]

**Background on Defendants' Practices**

28.     Blair's is a bail bonding company that arranges for the provision of bail bond services to individuals who have been jailed in and around the Greater New Orleans area, including at least Orleans Parish, Jefferson Parish, and St. Bernard Parish.

29.     Blair's has an office in Orleans Parish, which is located across the street from the Orleans Parish Criminal Court and a block away from the New Orleans Municipal Court.

30.     Blair's shares a principal place of business with New Orleans Bail Bonds. The office is labeled only as Blair's, and employees identify themselves as Blair's employees.

---

[2] Mathilde Laisne, *et al.*, Vera Institute of Justice, *Past Due: Examining the Costs and Consequences of Charging for Justice in New Orleans* 6 (Jan. 2017), goo.gl/p6KnKx.

[3] Christian Henrichson, *et al.*, Vera Institute of Justice, *The Costs and Consequences of Bail, Fines and Fees in New Orleans* 23–24 (Jan. 2017), goo.gl/CtzSNA.

31.     When Blair's arranges for bail to be posted for the release of a jailed individual, or "principal," Bankers acts as the surety. Blair's acts in its own name and through its alter ego New Orleans Bail Bonds, and serves as an agent of Bankers. Together, the Bonding Defendants issue hundreds of bail bond contracts each year.

32.     Bonding Defendants charge a premium that is calculated at 12% to 13% of the total value of the bond. They also charge an "administration fee," "jail fees," and other unexplained fees. These fees frequently total hundreds of dollars.

33.     The Bonding Defendants require that additional people sign as indemnitors to every bail bond agreement they enter. Indemnitors are required to sign a contract for payment of all bail fees and for the full amount of the bond should the principal's bond be forfeited.

34.     These indemnitors are typically family members and close friends of the principal who are not otherwise involved in the relevant criminal case.

35.     If the principal and the indemnitors are unable to pay all of the Bonding Defendants' charges immediately, Bonding Defendants will require an initial down payment and extend credit to cover any remaining balance owed on the bail fees, allowing them to defer payment of the debt and repay the debt in installments.

36.     As a condition of such installment payment arrangements, if the principal has a preexisting balance with Blair's, the principal and indemnitors also are required to consent to having their payments applied to the preexisting balance, not just the amounts owed under the current bail bond agreement, and to waive all rights to any refunds that may be due to them until all preexisting balances are paid on behalf of the principal. This requirement appears in Bonding Defendants' standard contracts.

37.     Many of the Bonding Defendants' clients who cannot pay all of the charges immediately are low-income individuals who enter into installment payment agreements with more than four installment payments to repay the debt.

38.     As a condition of the extension of credit, Bonding Defendants also frequently require principals to wear a GPS monitor on their ankle after their release from jail, even when there has been no court order mandating location monitoring.

39.     In these cases, Bonding Defendants work with Defendant A2i to install ankle monitors.

40.     Bonding Defendants and A2i impose an additional fee for the ankle monitor, of $10 per day, which constitutes around $300 per month. Bonding Defendants do not disclose ankle monitoring as a condition of bail in the paperwork it signs with the principal and indemnitors, frequently waiting until the individual's release to disclose this term and the associated costs.

41.     Together, Bonding Defendants enter into agreements to defer payment of the balance of the bail fee and allow installment payments at least 26 times per year where either the installment payment agreement is payable in more than four installments or the extension of credit is conditioned on payment of ongoing fees for a GPS ankle monitor.

**Obtaining the Bond**

42.     On or about May 24, 2016, Plaintiff Tiffany Brown contacted Defendant Blair's to ask about securing a commercial surety bond for her close friend, Ronald Egana, who was in jail in St. Bernard Parish. She spoke to Marcel Compass, a Blair's employee, who instructed her to pay Blair's $865. After she brought this money to the Blair's office, Mr. Compass then told

her she would have to pay more money, or wait for Mr. Egana's bond reduction hearing in order for Blair's to arrange bail for Mr. Egana.

43.     On June 14, 2016, Mr. Egana's bail was reduced by the court from $50,000 to $26,000. The court imposed no special conditions of bail such as ankle monitoring.

44.     On June 17, 2016, Ms. Brown and Mr. Egana's mother, Samantha Egana, went to the Blair's office and signed as "indemnitors" on a number of form contract documents that Blair's employees gave to them.

45.     These include references to and obligations that concern Blair's, New Orleans Bail Bonds, and Bankers.

46.     Blair's facilitated the transaction as the agent of the surety, Bankers, and as an alter ego of New Orleans Bail Bonds. It facilitated the transaction for the benefit of all Defendants, who all received payments pursuant to the agreement.

47.     The Bonding Defendants charged Plaintiffs a nonrefundable bail fee of $3,275, which was comprised of a 12% bail premium, a $25 administration fee, and $130 of undisclosed charges.

48.     Ms. Brown paid approximately $750 on about June 17, 2016.

49.     Plaintiffs could not afford to pay the remaining $1,660 owed. The Bonding Defendants extended credit to the Plaintiffs for the remaining bail fee and told Plaintiffs that they would either have to post real property as collateral or Mr. Egana would have to wear an ankle monitor. They did not tell Plaintiffs that they would be charged for the ankle monitor.

50.     On or around June 18, 2016, Mr. Egana was released from jail on the bond.

51.     On June 20, 2016, Mr. Egana went to the Blair's office and signed the form contract documents. Mr. Compass told Mr. Egana that he was required to wear an ankle monitor

and, for the first time, said Mr. Egana would be charged $10 per day for its use. Mr. Compass said that Mr. Egana could have the ankle monitor removed after he had paid $3000. Mr. Egana was not provided paperwork regarding the ankle monitor at this time. The ankle monitor was provided by Defendant A2i.

### The Contract Documents

52.     The contract documents included a "Payment Arrangements" agreement, an "Application for Bail Bond," a "Bail Bond Agreement, an Indemnity Agreement, a Contract of Guarantee," a "Promissory Note," a "Conditions of Bond" document, an "Attention All Customers" page, a "Confidential Location Addendum for Indemnitor," and a "Confidential Location Addendum for Bail Bond" (collectively, "Contract Documents").

53.     Bonding Defendants agreed to post Mr. Egana's $26,000 bond with the court.

54.     The Bail Bond Agreement required Mr. Egana to return to court when required and to submit to a number of other conditions, and provided that if Mr. Egana did not report to court as required and the $26,000 bond was forfeited, then Mr. Egana, Ms. Egana, and Ms. Brown would pay the Bonding Defendants the full amount of the bond.

55.     It also provided that "[t]he Defendant and the Indemnitor(s) further understand and agree that the Company, as surety, shall have control and jurisdiction over the Defendant during the term for which the bond is executed, and that the Company has the right to surrender the Defendant on this bond at any time the company so desires, in accordance with the law."

56.     The "Attention all Customers" document stated in capital letters that customers must notify the Bonding Defendants if the person is on probation or parole, because, if there is a probation or parole hold, "THE SHERIFF WILL NOT RETURN THE BOND OR THE MONEY PAID TO THE COURT AND STATE LAW WILL NOT ALLOW US TO GIVE A

REFUND." In smaller letters below, it also provided that "any money paid on behalf of this defendant shall be applied to any and all outstanding or previous balances owed on this bond or any previous bonds posted for this defendant[,]" and purported to "waive all rights to any refund that maybe [sic] due until all outstanding balances are paid on behalf of this defendant."

57. The Payment Arrangements agreement listed the remaining balance owed, for which Bonding Defendants extended credit. It required Plaintiffs to "acknowledge that the balance due on *this bond* needs to be paid" and that "the payments on *this balance due* will be made in the following manner: $300 payable . . . bi-weekly, until paid in full, with the next payment due on _____." (Emphasis added.) No date was entered in the blank space.

58. Neither the Payment Arrangements agreement nor any other document disclosed any of the following clearly or conspicuously in writing, segregated from everything else and in a form that the Plaintiffs could keep: the identity of the creditor, any finance charge, the amount financed, a separate itemization of the amount financed, the payment schedule, and a statement that the consumer should refer to the appropriate contract document for information about nonpayment, default, the right to accelerate the maturity of the obligation, and prepayment rebates and penalties.

59. Plaintiffs were not given any copies of the Contract Documents at the time of signing. They obtained a copy from Mr. Compass in April 2017. Before Mr. Compass gave them a copy, they saw Mr. Compass editing parts of the document.

60. A copy of the "Payment Arrangements" agreement, as it was presented by Defendant Blair's when Plaintiffs were able to obtain a copy in April 2017, appears below:

*NEED 3rd Indem*

## BLAIR'S BAIL BONDS, LLC

**DEFENDANT'S NAME** Ronald Egana

**DATE** 05-24-16  **ISSUED BY** MLC  **RECEIPT NO.** 107660

*St. Bernard Bond*

| | |
|---|---|
| BOND AMOUNT | 26000 |
| PREMIUM @ 13.0% | 0 |
| PREMIUM @ 12.5% (JEFFERSON PARISH ONLY) | 0 |
| PREMIUM @ 12.0% | 3120 |
| ADMINSTRATION FEE | 25.00 |
| JAIL FEE | |
| TRANSFER FEE (IF APPLICABLE) | |
| TOTAL DUE | 3275 |
| AMOUNT PAID | 100 + 865 + 650 |
| INTL. 5E  BALANCE DUE | 1660 |
| CASH COLLATERAL (IF APPLICABLE) | 0 |

*Def has multiple balances*
*Previous Balance $3800*
*200.00 w/ 1010/10;*
*bal 1-1-13;*
*bal 1625.00 &*
*Bma at 7/6/14*
*1,975.00*
*Total 3,800.00*

**PAYMENT ARRANGEMENTS:**

I hereby acknowledge that the balance due on this bond needs to be paid, and verify that no once has promised me and reduction in the charges shown on the face of this bond calculation sheet.

I agree that the payments on this balance due will be made in the following manner:

$ 300 payable [ ] weekly [X] bi-weekly, until paid in full, with the next payment due on _____ *Samentha Egana*

I understand that in the event the above arrangements are not met by either the defendant or the indemnitor(s), and it has been thirty days since the defendant's release the defendant will be considered to be in violation of either his bond condition or perceived to be a flight risk.  This may result in the apprehension and surrender of the defendant.

*R Egana*
**Defendant**

*Tiffany B*
*Ronal Smith*
**Indemnitor**

*Samentha Egana*

**WARNING:** ANY PERSON WHO KNOWINGLY AND WITH INTENT TO INJURE, DEFRAUD OR DECEIVE ANY INSURER, FILES A STATEMENT OF CLAIM OR AN APPLICATION CONTAINING ANY FALSE INCOMPLETE OR MISLEADING INFORMATION IS GUILTY OF A FELONY OF THE THIRD DEGREE

61.    Blair's has also represented to Plaintiffs that Mr. Egana had previously entered into three additional bonding agreements with Bonding Defendants, in October 2010, May 2013, and July 2016. Mr. Compass represented to Mr. Egana that the contract documents from each bond were substantially similar. He stated that Mr. Egana owed $3800 on those bonds.

**Actions by Defendants to Collect Money**

62.     Mr. Egana was unable to make payments on the bail bond fee because his entire income was spent supporting his family and paying for costs associated with his legal cases.

63.     On September 27, 2016, Mr. Egana was doing contracting work at a private residence for his employer when a bounty hunter employed by Blair's named Alroy Allen came onto the front porch armed with a gun while a second armed bounty hunter circled around to the back of the house. They put Mr. Egana in handcuffs and arrested him. However, instead of surrendering Mr. Egana to the jail or court, Mr. Allen took Mr. Egana to the Blair's office where he was kept in handcuffs. Mr. Allen then told Mr. Egana to call his mother and told her on speakerphone that if she did not bring $800 to the Blair's office, her son would go to jail. Several hours later, Ms. Egana arrived at Blair's with $800. Mr. Compass then demanded an additional $1500 to free Mr. Egana. Ms. Egana returned with the additional $1500. In exchange, Blair's released Mr. Egana.

64.     According to receipts of the transaction, at least $800 was applied towards "GPS system fees," though Ms. Egana did not sign any paperwork consenting to pay for Mr. Egana's ankle monitor.

65.     With these payments, Mr. Egana and his indemnitors had paid a total of $3815 to Blair's—$540 more than the $3275 bail bond fee that the Payment Arrangements agreement required them to pay. Nevertheless, his ankle monitor was not removed and Blair's continued to harass and threaten them. Because Mr. Egana was arrested while at work and had to wear an ankle monitor, he was fired from his job.

66.     On December 26, 2016—the day after Christmas—Mr. Egana was sleeping at home when his ankle monitor started beeping. Two of Blair's bounty hunters were wandering

around Mr. Egana's neighbor's property, looking for Mr. Egana. When they came to his house, they handcuffed him in front of his nieces and nephews. In their car, they had Mr. Egana call his mother and put her on speakerphone, and they told her that she had three hours to bring them money or they would take him to jail.

67.     The bounty hunters took Mr. Egana to the Blair's office again where they kept him in handcuffs.

68.     While they were waiting, the bounty hunters discovered that Mr. Egana had an outstanding warrant in Orleans Parish for missing a court date after his notice was sent to the wrong address. They contacted the bail bond company for that case, which picked up Mr. Egana and turned him over to the Orleans Justice Center.

69.     Prior to handing Mr. Egana over to the other bail bond company, Blair's removed Mr. Egana's ankle monitor.

70.     Mr. Egana was subsequently released from the Orleans Justice Center.

71.     On March 31, 2017, Mr. Egana was entering the Orleans Parish courthouse to appear at a hearing for his Orleans Parish charge when Mr. Allen grabbed him as he was going through the metal detector. Mr. Egana insisted he needed to go to his hearing in Orleans, but Mr. Allen refused to release him and replied that Mr. Egana would now "have a warrant in Orleans Parish." Mr. Allen dragged Mr. Egana down the steps of the courthouse to the Blair's office, saying, "We're going to see how much money you can bring today."

72.     Mr. Allen told Ms. Egana over the phone, "We have your son here in handcuffs, and he's going to jail unless you can bring me the money." Ms. Egana was forced to borrow $1500 from a friend to get Mr. Egana released from the Blair's office.

73.     While he was detained at Blair's, Mr. Compass told Mr. Egana that he would have to wear the ankle monitor again. Mr. Egana pointed out that he, Ms. Egana, and Ms. Brown had already paid over $3000, which was the amount required to have the ankle monitor removed. Mr. Compass replied that the insurance company had changed its mind and would require the ankle monitor until an outstanding bench warrant from a court date Mr. Egana had missed in September in his underlying case was lifted.

74.     Mr. Compass required Mr. Egana to sign a contract bearing the heading "Alternative To Incarceration." The contract provided for a $10 per day "monitoring cost" and a $75 "additional hook up" fee for participation in the "Alternative To Incarceration Electronic Monitoring Program."

75.     Neither Ms. Egana nor Ms. Brown signed this contract or were told of its existence, even though Ms. Egana's payments had already been applied to the "monitoring costs" that it provided.

76.     Mr. Allen reinstalled the ankle monitor on Mr. Egana. Mr. Allen told Mr. Egana he had to pay an "installation fee" of $100 and an additional $500 in two days or risk being arrested again.

77.     Around the same time, Mr. Egana also received calls stating that he had an overdue balance of $357 for use of the ankle monitor. Plaintiffs made some payments directly to A2i.

78.     After Mr. Egana obtained counsel and had the bench warrant from his underlying case removed, he asked Blair's to remove the ankle monitor. Mr. Compass said he had to consult with the insurance company first.

79.     The next day, Mr. Egana returned to Blair's office and Mr. Compass told him the insurance company would not allow the ankle monitor to be removed. The daily charges for the ankle monitor continued to accrue.

80.     Mr. Egana also asked Mr. Compass where the money that had been paid was going and was told that the payments could have been applied to the $3800 debt owed from three earlier bail contracts he had signed with Blair's.

81.     On May 16, 2017, Mr. Allen was getting out of his car when he spotted Mr. Egana and Ms. Brown leaving the Orleans Parish courthouse. Mr. Allen yelled to Mr. Egana that he would be "coming to get [him]" because he had not made payments. Ms. Brown went inside the Blair's office and spoke to a different employee and convinced them not to arrest Mr. Egana that day.

82.     On May 23, 2017, Mr. Egana was doing landscaping work for a client when Mr. Allen and another Blair's employee came across the client's lawn wearing bulletproof vests and guns visibly holstered. They arrested Mr. Egana and took him straight to the St. Bernard Parish jail. No one from Blair's called Ms. Egana or Ms. Brown to ask for money or tell them they were surrendering Mr. Egana. They did not let Mr. Egana make a phone call.

83.     When Ms. Egana called Blair's the next day to ask why he was taken to jail, a Blair's employee said it was "because the insurance company decided they don't want to have anything to do with [Mr. Egana] anymore." When Ms. Egana called a second time, another Blair's employee told her Mr. Egana had been surrendered "because of the payments."

84.     From September 21, 2016, until May 2, 2017, Mr. Egana had an outstanding bench warrant for failing to appear for a hearing in St. Bernard Parish. However, rather than surrendering him to the court, the Bonding Defendants instead opted to detain Mr. Egana in the

Blair's office to force more payments from Ms. Egana and Ms. Brown. When they finally surrendered Mr. Egana on May 23, 2017, he had obtained a lawyer and appeared in court.

85.    Because of the money she gave to the Defendants, Ms. Brown missed rent and car payments. Ms. Egana, who is disabled and on a fixed income, spent her and her partner's savings, borrowed money from friends, and was unable to pay household bills. She is still paying back the money she borrowed.

86.    After surrendering Mr. Egana, Blair's did not return any of the money that he, Ms. Egana, or Ms. Brown had paid, even though they had paid Blair's at least $6,000—well over the $3275 bail bond fee.

## V.    CLASS ALLEGATIONS

87.    Plaintiffs seek to certify classes for damages and equitable relief as follows:

88.    Plaintiffs Ms. Egana, Ms. Brown, and Mr. Egana seek to certify a class for damages pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The class is defined as: All individuals who entered into an agreement with the Defendants as a "principal" or an "indemnitor" for the provision of bail bond services and signed an agreement to defer payment of any balance owed on the bail premium and pay over time. This class is referred to as the "TILA Class."

89.    Plaintiffs Ms. Egana, Ms. Brown, and Mr. Egana seek to certify a class for damages pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The Class is defined as: All individuals who entered into an agreement with the Defendants as a "principal" or an "indemnitor" for the provision of bail bond services, where the principal was arrested and held against his or her will by Defendant Blair's for non-payment of the balanced owed on the bail premium. This class is referred to as the "Kidnapping and Extortion Class."

90.     Plaintiff Mr. Egana seeks to certify a subclass for damages pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The subclass is defined as: All individuals who entered into an agreement with the Defendants as a "principal" for the provision of bail bond services, where the principal was arrested and held against his or her will by Defendant Blair's for non-payment of the balance owed on the bail premium. This class is referred to as the "False Imprisonment Subclass," and is a subclass of the Kidnapping and Extortion Class.

91.     Plaintiff Mr. Egana seeks to certify a subclass for damages pursuant to Fed. R. Civ. P. 23(a) and (b)(3). The subclass is defined as: All individuals who entered into an agreement with the Defendants as a "principal" for the provision of bail bond services, where the principal was arrested and held against his or her will by Defendant Blair's for non-payment of the balance owed on the bail premium, and where the principal was required to wear an ankle monitor. This class is referred to as the "False Imprisonment With Ankle Monitor Subclass," and is a subclass of the False Imprisonment Subclass.

92.     Plaintiffs Ms. Egana, Ms. Brown, and Mr. Egana seek to certify a Class for damages and equitable relief pursuant to Fed. R. Civ. P. 23(a), (b)(2), and (b)(3). The Class is defined as: All individuals who enter or entered into an agreement with the Defendants as a "principal" or an "indemnitor" for the provision of bail bond services, where the principal was required to wear an ankle monitor and the principal and indemnitors are or were required to pay a fee for the ankle monitor. This class is referred to as the "Unlawful Debt Class."

93.     Plaintiffs Ms. Egana, Ms. Brown, and Mr. Egana seek to certify a Class for damages and equitable relief pursuant to Fed. R. Civ. P. 23(a), (b)(2) and (b)(3). The Class is defined as: All individuals who enter or entered into an agreement with the Defendants as a "principal" or an "indemnitor" for the provision of bail bond services and are or were charged a

bail fee in excess of that authorized by Louisiana law. This class is referred to as the "Contract Class."

94.     Rule 23(a)(1), Impracticability of Joinder: The precise sizes of the classes and subclasses are unknown by Plaintiffs but are substantial.

95.     Rule 23(a)(2), Commonality: Plaintiffs raise claims based on questions of law and fact that are common to, and typical of, the putative class members they seek to represent.

**Questions of law and fact common to the TILA Class include:**

a.     Whether the Bonding Defendants utilize standard form contracts when arranging for bail to be posted and deferring full payment of the bail fee;

b.     Whether the contracts used by the Bonding Defendants failed to make the disclosures required by TILA;

c.     Whether the Bonding Defendants extended credit more than 25 times in the preceding calendar year;

d.     Whether the ankle monitoring fees constitute a finance charge under TILA; and

e.     Whether the agreement between the TILA Class and the Bonding Defendants violated TILA.

**Questions of law and fact common to the Kidnapping and Extortion Class include:**

f.     Whether Blair's routinely detains principals who are not current on their premium payments;

g.     Whether Blair's routinely transports and holds principals at their office;

h.     Whether Blair's requires principals detained and held at their office to call family and friends to bring money, under further threat of jail;

i.      Whether Defendants collaborate and/or conspire in determining whether to demand money from a principal who is not current on payments or to surrender them to jail;

j.      Whether Defendants collaborate and/or conspire in determining whether to arrest and hold at Blair's office principals who are not current on payments;

k.      Whether the holding of principals is done with the intention of extorting payments;

l.      Whether Defendants' practices constitute the predicate act of extortion;

m.      Whether Defendants' practices constitute the predicate act of extortionate collection of extension of credit;

n.      Whether Defendants' practices constitute the predicate act of simple kidnapping or aggravated kidnapping;

o.      Whether Defendants have engaged in a pattern of racketeering activity; and

p.      Whether Defendants' practices violate RICO and state RICO.

**Questions of law and fact common to the False Imprisonment Subclass include:**

q.      The common questions of law and fact listed in paragraph 95(f)-(j); and

r.      Whether the detention of individuals for several hours on condition of payment constitutes false imprisonment.

**Questions of law and fact common to the False Imprisonment With Ankle Monitor Subclass include:**

s.      The common questions of law and fact listed in paragraph 95(q)-(r);

t.      Whether Defendants regularly required ankle monitoring as a condition of posting bail or extending credit for the bail fee;

u.      Whether principals were charged a standard daily fee for the use of the ankle monitor;

v.      Whether that standard daily fee was charged by Blair's;

w.      Whether that standard daily fee was sent or shared with A2i; and

x.      Whether A2i conspires, assists, or otherwise encourages other Defendants to detain principals in order to obtain payment of the ankle monitoring fees.

**Questions of law and fact common to the Unlawful Debt Class include:**

y.      The common questions of law and fact listed in paragraph 95(t)-(x);

z.      Whether Defendants regularly charged and attempted to collect fees above the $25 administrative fee and statutory cap on bail bond premiums;

aa.      Whether Defendants conspired to charge and attempt to collect fees above the $25 administrative fee and statutory cap on bail bond premiums;

bb.      Whether the fees charged by Defendants were usurious;

cc.      Whether the fees charged by Defendants were more than double the enforceable rate;

dd.      Whether Defendants' practices constitute collection of unlawful debt;

ee.      Whether Defendants' practices violate RICO and state RICO; and

ff.      Whether the fees associated with the ankle monitoring requirement violate Louisiana state contract law on public policy grounds.

**Questions of law and fact common to the Contract Class include:**

gg.      The common questions of law and fact listed in paragraph 95(y)-(aa);

hh.      Whether collection of the fees above the premium and administrative fee allowed by law constituted conversion under Louisiana state law;

ii.      Whether contracting for payment of those fees violates Louisiana state contract law on public policy grounds; and

jj.      Whether the Bonding Defendants' standard contract requires that principals and indemnitors waive all rights to any refund owed until any outstanding balances of the principal are paid.

96.     Rule 23(a)(3), Typicality: The claims of the Plaintiffs are typical of those asserted on behalf of the proposed TILA Class, Kidnapping and Extortion Class, False Imprisonment Subclass, False Imprisonment and Ankle Monitor Subclass, Unlawful Debt Class, and Contract Class. The injuries of the Plaintiffs all arise out of the Defendants' standard policies, practices, and customs. Moreover, the claims of Plaintiffs are materially identical to those of the putative class members.

97.     Rule 23(a)(4), Adequacy: Plaintiffs will fairly and adequately protect the interests of the proposed Classes and Subclasses. Plaintiffs have no conflicts with the interests of the putative class members.

98.     Rule 23(b)(2): The Bonding Defendants employed identical or substantially similar documents when extending credit to those who could not afford to pay bail bond premiums up front, and they acted in a consistent manner. Thus, each of the Bonding Defendants have acted on grounds generally applicable to the Contract Class, making equitable relief with respect to the Class as a whole appropriate.

99.     Rule 23(b)(3): The common questions of fact and law predominate over the questions of law and fact affecting individual members of the proposed Classes, and Subclasses, and a class action is a superior method to adjudicate these claims, making it appropriate to decide the claim through the class mechanism. Particularly, the questions of law and fact surrounding

Defendants' standard policies and practices apply equally to all members of the respective Classes and Subclasses. Furthermore, proposed Class and Subclass members are all people who could not afford an up-front payment of a bail bond or a bail bond premium, and have little ability to pursue these claims individually. A class action is the superior method to adjudicating the claims because it will save the time, expense, and effort involved in preparing multiple claims against the same Defendants.

100.    Rule 23(g): Plaintiffs are represented by attorneys from the Southern Poverty Law Center who have experience in class-action litigation involving civil rights law, as well as experience litigating policies and practices that harm consumers. Counsel has the resources, expertise, and experience to prosecute this action.

## VI.    GENERAL RICO ALLEGATIONS

101.    Plaintiffs are "persons" with standing to sue within the meaning of 18 U.S.C. §§ 1961(3) and 1964(c) (RICO) and La. Stat. Ann. § 15:1356(E) (state RICO).

102.    Each of the Defendants is a RICO "person" within the meaning of 18 U.S.C. § 1961(3) because each is an entity capable of holding a legal or beneficial interest in property.

### The RICO Enterprise

103.    All Defendants have associated together as an association-in-fact, and therefore an enterprise within the meaning of 18 U.S.C. § 1961(4) and La. Stat. Ann. § 15:1352(B). Such RICO Enterprise has an ongoing relationship with the common purpose of providing bail bonds to persons in the greater New Orleans area and charging and collecting fees from those persons.

104.    The RICO Enterprise is engaged in interstate commerce in that its activities and transactions relating to the arrangement of bail bond agreements and collection of bail bond fees

frequently requires movement and communications across state lines and use of interstate facilities.

105.    The members of the RICO Enterprise function as a continuing unit.

106.    Blair's meets with potential clients to extend bail bonds and credit for bail fees. Blair's requires principals and indemnitors to sign the contract documents, working in part through its alter ego New Orleans Bail Bonds, and install ankle monitors. Blair's employs bounty hunters who seize and detain principals. Blair's communicates how much money is necessary to secure their release, tells them to call friends and family to bring the money, collects the money, and releases the person once it is paid. Blair's then distributes the money to the other enterprise members and others.

107.    Through these actions, Blair's conducts and participates in a pattern of racketeering (through predicate acts of kidnapping, extortion, and extortionate collection of extension of credit) and also commits the unlawful collection of debt, as well as conspiring with other Defendants to do the same. It poses a continuous threat of engaging in these racketeering acts.

108.    Bankers provides the insurance used to secure the bond with the court. It participates in setting the terms of the contracts signed by principals and indemnitors, identifying individuals who are behind in payments and need to pay, deciding how much money Blair's must collect from individuals to avoid jail, deciding when to install or remove ankle monitors, and determining when to surrender principals to jail.

109.    Through these actions, Bankers conducts and participates in a pattern of racketeering (through predicate acts of kidnapping, extortion, and extortionate collection of extension of credit) and also commits the unlawful collection of debt, as well as conspiring with

other Defendants to do the same. It poses a continuous threat of engaging in these racketeering acts.

110.    A2i provides the GPS ankle monitoring services used to monitor the location of defendants and find them for arrest. It also determines the ankle monitoring fees that will be collected by Blair's and A2i.

111.    Through these actions, A2i conducts and participates in a pattern of racketeering (through predicate acts of kidnapping, extortion, and extortionate collection of extension of credit) and also commits the unlawful collection of debt, as well as conspiring with other Defendants to do the same. It poses a continuous threat of engaging in these racketeering acts.

112.    These practices are a regular way of conducting the ongoing business of each Defendant and of conducting or participating in the ongoing enterprise.

## VII.    CLAIMS FOR RELIEF

### FIRST CLAIM FOR RELIEF
**Truth in Lending Act**
**15 U.S.C. § 1601 *et seq.***
***Named Plaintiffs and TILA Class versus Bonding Defendants***

113.    Named Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 88, 94 through 97, and 99 through 100 as if fully set forth herein.

114.    Named Plaintiffs bring this claim on behalf of themselves and the putative TILA Class, against the Bonding Defendants.

115.    The agreement to defer payment of the bail fee constitutes consumer credit extended for a personal or family purpose within the meaning of TILA, 15 U.S.C. § 1602(g) and (i), and Regulation Z, 12 C.F.R. § 1026.2 (a)(12).

116.    At all times relevant hereto, the Bonding Defendants regularly extended or

offered to extend consumer credit for which a finance charge is or may be imposed or which, by written agreement, is payable in more than four installments, and are the persons to whom the transaction which is the subject of this action is initially payable, making the Bonding Defendants creditors within the meaning of TILA, 15 U.S.C. § 1602(g) and Regulation Z, 12 C.F.R. § 1026.2(a)(17).

117.    The Bonding Defendants violated the requirements of the Truth in Lending Act and Regulation Z in the following and other respects:

a.    By failing to provide the required disclosures specified in paragraph 58, *supra*, in violation of 15 U.S.C. § 1638 and Regulation Z, 12 C.F.R. § 1026.17.

b.    By failing to provide the required disclosures prior to consummation of the transaction, conspicuously segregated from all other terms, data, or information provided in connection with the transaction, in violation of 15 U.S.C. § 1638(b) and Regulation Z, 12 C.F.R. § 1026.17(b).

c.    By failing to make required disclosures, including the identity of the creditor, the amount financed, any charges which are not part of the principal amount of the credit arrangement and which are financed by Plaintiffs, any charges which are part of the finance charge but which will be paid by Plaintiffs before or at the time of the consummation of the transaction, any amount credited to Plaintiffs' prior balance with the Bonding Defendants and how payments are to be applied to the prior balance, and any other fees, such as ankle monitor fees or undisclosed fees, required over the term of the contract, in violation of 15 U.S.C. § 1638(a) and Regulation Z, 12 C.F.R. § 1026.18(a), (b), (c).

d.    By failing to include certain charges imposed by the Bonding Defendants payable by Plaintiffs incident to the extension of credit as defined and required in 15 U.S.C. §

1605 and Regulation Z, 12 C.F.R. § 1026.4, thus improperly disclosing the finance charge in violation of 15 U.S.C. § 1638(a)(3) and Regulation Z, 12 C.F.R. § 1026.18(d). Such amounts include, but are not limited to a $10/day GPS monitoring ankle bracelet fee and an ankle monitoring installation fee.

e.      By failing to provide the number, amounts, and timing of payments scheduled to repay the obligation, in violation of 15 U.S.C. § 1638(a)(6) and Regulation Z, 12 C.F.R. § 1026.18(g).

f.      By failing to provide a statement that Plaintiffs should refer to the appropriate contract document for any information such document provides about nonpayment, default, the right to accelerate the maturity of the debt, and prepayment rebates and penalties, in violation of 15 U.S.C. § 1638(a)(12) and Regulation Z, 12 C.F.R. § 1026.18(p).

**SECOND CLAIM FOR RELIEF**
**RICO Claim based on Collection of Unlawful Debt**
**18 U.S.C. § 1962(c) & (d)**
***Named Plaintiffs and Unlawful Debt Class versus All Defendants***

118.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 87, 92, 94 through 97, 99 through 100, and 101 through 112 as if fully set forth herein.

119.    Named Plaintiffs bring this claim on behalf of themselves and the putative Unlawful Debt Class against all Defendants.

120.    Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise through the collection of unlawful debt, in violation 18 U.S.C. § 1962(c) and (d).

121.    Specifically, Defendants engaged in the collection of unlawful debt by charging ankle monitoring fees as a condition of extending credit toward the premium charged on the

bond.

122.    The debt was incurred in the business of lending money or a thing of value; namely, the purchase price of the bail bond.

123.    Defendants charged ankle monitoring fees of $10 per *day*, which is an annualized cost of $3,650.

124.    Based on the $1600 balance owed by Named Plaintiffs at the time the credit was extended, this results in an annual interest rate of over 200%.

125.    This cost creates a usurious rate under Louisiana law for Named Plaintiffs and the Class, is more than double the enforceable rate, and therefore constitutes an unlawful debt as defined by 18 U.S.C. § 1961(6).

126.    As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this Claim, Plaintiffs and proposed Class members have suffered injuries to their property and/or business, including payment of unlawful debt to Defendants.

### THIRD CLAIM FOR RELIEF
**RICO Claim based on**
**Kidnapping, Extortion and Extortionate Collection of Extension of Credit**
**18 U.S.C. § 1962(c) & (d)**
***Named Plaintiffs and the Kidnapping and Extortion Class versus All Defendants***

127.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 87, 89, 94 through 97, 99 through 100, and 101 through 112 as if fully set forth herein.

128.    Named Plaintiffs bring this claim on behalf of themselves and the putative Kidnapping and Extortion Class against all Defendants.

129.    Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity under 18 U.S.C. § 1961(1), in violation of 18 U.S.C. § 1962(c) and (d):

a.      Simple kidnapping in violation of La. Stat. Ann. § 14:45;

b.      Aggravated kidnapping in violation of La. Stat. Ann. § 14:44;

c.      Extortion in violation of the Hobbs Act, 18 U.S.C. § 1951;

d.      Extortion in violation of La. Stat. Ann. § 14:66;

e.      Extortion in violation of the Travel Act, 18 U.S.C. § 1952; and

f.      Extortionate Collection of Extension of Credit in violation of 18 U.S.C. § 894.

#### Simple Kidnapping and Aggravated Kidnapping, La. Stat. Ann. §§ 14:44, 14:45

130.    Through the RICO enterprise, Defendants committed the crime of kidnapping by intentionally and forcibly seizing Mr. Egana and similarly situated individuals without their consent and carrying them from the place of arrest to the Blair's office where they were kept against their will.

131.    Defendants did this with the intent to obtain money from Named Plaintiffs and members of the Kidnapping Subclass and their indemnitors.

#### Extortion generally, and under La. Stat. Ann. § 14:66

132.    Defendants, through the RICO enterprise, obtained payment of bail bond fees, including fees for ankle monitoring, from Plaintiffs and members of the putative Kidnapping and Extortion Class by detaining principals and then threatening them with jailing if they failed to make payments.

133.    Defendants arrested principals, told them to come up with certain amounts of money to avoid jail, and told them to call their family members.

#### Extortion, Hobbs Act, 18 U.S.C. § 1951

134.     Plaintiffs re-allege and incorporate by reference the allegations appearing in Paragraph 132-133.

135.     Defendants, through the RICO Enterprise, have obtained payments from Plaintiffs and the putative Kidnapping and Extortion Class by the wrongful use of actual and threatened force and fear, in violation of 18 U.S.C. § 1951 (Hobbs Act).

136.     The proceeds of the Defendants' extortionate activities were used in commerce and prevented Plaintiffs from purchasing other goods in interstate commerce, and therefore affected commerce or the movement of any article or commodity in commerce, as these terms are understood by 18 U.S.C. § 1951(a).

<u>Travel Act, 18 U.S.C. § 1952</u>

137.     Plaintiffs re-allege and incorporate by reference the allegations appearing in Paragraph 132-133.

138.     Defendants, through the RICO Enterprise, have obtained by threat payments from Plaintiffs and the putative Kidnapping and Extortion Class members, with the intent to deprive them of this money, in violation of 18 U.S.C. § 1952 (Travel Act).

139.     Defendants, through the RICO Enterprise, have traveled in interstate commerce, and have used the mail, GPS, and other facilities in interstate commerce to promote, manage, establish, carry on, or facilitate the promotion, management, establishment, or carrying on, of an extortionate scheme, in violation of 18 U.S.C. § 1952(a)(3).

<u>Extortionate Collection of Extension of Credit, 18 U.S.C. § 894</u>

140.     Plaintiffs re-allege and incorporate by reference the allegations appearing in Paragraph 132-133.

141.   Defendants, through the RICO enterprise, engaged in the extortionate collection of extension of credit by using actual and threatened wrongful arrest, detention, and kidnapping.

142.   As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this Claim, Plaintiffs and proposed Class members have suffered injuries to their property and/or business, including money obtained unlawfully by Defendants by kidnapping and extortion.

### FOURTH CLAIM FOR RELIEF
**Louisiana Racketeering Act**
**La. Stat. Ann. §§ 15:1351 *et seq.***
***Named Plaintiffs and the Kidnapping and Extortion Class versus All Defendants***

143.   Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 87, 89, 94 through 97, 99 through 100, and 101 through 112 as if fully set forth herein.

144.   Named Plaintiffs bring this claim on behalf of themselves and the putative Kidnapping and Extortion Class against all Defendants.

145.   Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity:

      a.   Extortion in violation of La. Stat. Ann. § 14:66;

      b.   Simple Kidnapping in violation of La. Stat. Ann. § 14:45; and

      c.   Aggravated Kidnapping in violation of La. Stat. Ann. § 14:44.

Extortion, La. Stat. Ann. § 14:66

146.   Plaintiffs re-allege and incorporate by reference the allegations appearing in Paragraph 132-133.

Simple Kidnapping and Aggravated Kidnapping, La. Stat. Ann. §§ 14:44, 14:45

147.    Plaintiffs re-allege and incorporate by reference the allegations appearing in Paragraph 130-131.

148.    As a direct and proximate result of Defendants' willful, knowing, and intentional acts discussed in this Claim, Plaintiffs and proposed Class members have suffered injuries to their property and/or business, including money obtained unlawfully by Defendants by kidnapping and extortion.

## FIFTH CLAIM FOR RELIEF
### False Imprisonment
***Mr. Egana and False Imprisonment Subclass versus Bonding Defendants and
Mr. Egana and False Imprisonment With Ankle Monitor Subclass versus A2i***

149.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 87, 90 through 91, 94 through 97, and 99 through 100 as if fully set forth herein.

150.    Named Plaintiffs bring this claim on behalf of themselves and the putative False Imprisonment Subclass against Bonding Defendants.

151.    Named Plaintiffs also bring this claim on behalf of themselves and the putative False Imprisonment With Ankle Monitor Subclass against Defendant A2i.

152.    The Bonding Defendants detained Mr. Egana and members of the putative False Imprisonment Subclass against their will. Agents employed by the Bonding Defendants appeared at proposed subclass members' homes, workplaces, and court hearings, frequently visibly bearing firearms, and forcibly brought them to Blair's office where they were restrained and not allowed to leave until the Bonding Defendants were satisfied with the amount of money class members or their indemnitors had produced.

153.    The Bonding Defendants did this while insisting that the Contract Documents signed by proposed subclass members conferred upon the Bonding Defendants complete "jurisdiction and control" over the proposed subclass members.

154.    Defendant A2i participated in the conduct described in the previous two paragraphs by conspiring with, assisting, or otherwise encouraging the Bonding Defendants in detaining Plaintiff Mr. Egana and the Ankle Monitor Subclass.

155.    The Bonding Defendants and Defendant A2i lacked legal authority for the detentions described in the previous three paragraphs.

156.    The actions taken by Bonding Defendants and Defendant A2i constitute false imprisonment under Louisiana law.

**SEVENTH CLAIM FOR RELIEF**
**Conversion**
***Named Plaintiffs and Contract Class versus Bonding Defendants, and***
***Named Plaintiffs and Unlawful Debt Class versus Defendant A2i***

157.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 87, 92, 93, 94 through 97, and 99 through 100 as if fully set forth herein.

158.    Named Plaintiffs bring this claim on behalf of themselves and the putative Contract Class against the Bonding Defendants.

159.    Named Plaintiffs bring this claim on behalf of themselves and the putative Unlawful Debt Class against Defendant A2i.

160.    Louisiana law limits the amount a bail bonding insurer or producer may charge; they may charge a $25 administrative fee, La. Stat. Ann. § 22:855(B)(2)(b), and a bail bond premium of 12% of the total value of the bond, *id.* § 22:1443, except in Jefferson Parish where they may charge 12.5%, *id.* § 13:718(I)(2)(a).

161.    The Bonding Defendants charged Plaintiffs, and members of the putative Contract Class, fees above the $25 fee and premium authorized by law, including ankle monitor fees, other fees, and by requiring that principals and indemnitors pay earlier outstanding balances before satisfying the bail premium on the current bond.

162.    In addition, Defendant A2i conspires with, assists, or otherwise encourages the Bonding Defendants to charge Named Plaintiffs and the proposed Unlawful Debt Class an additional daily fee for ankle monitor use, and to condition bail bond services and credit for the bail fee on use of the ankle monitor.

163.    Because paying a fee for ankle monitoring is a condition of receiving bail services and of receiving credit for the purchase price of the bond, this fee is illegally in excess of what bail bonding insurers and producers may charge.

164.    In so doing, the Bonding Defendants engaged in a wrongful taking of property from the Plaintiffs and the putative Contract Class members.

165.    In so doing, Defendant A2i engaged in a wrongful taking of property from the Plaintiffs and the putative Unlawful Debt Class members.

**EIGHTH CLAIM FOR RELIEF**
**Louisiana State Contract Law**
**La. Civ. Code Ann. Art 7; La. Civ. Code Ann. Art. 1968; La. Stat. Ann. § 22:1452**
*Named Plaintiffs and Contract Class versus Bonding Defendants and*
*Named Plaintiffs and Unlawful Debt Class versus Defendant A2i*

166.    Plaintiffs re-allege and incorporate by reference each and every allegation contained in paragraphs 1 through 87, 92, 93, 94 through 98, and 100 as if fully set forth herein.

167.    Named Plaintiffs bring this claim on behalf of themselves and the putative Contract Class against the Bonding Defendants.

168.    Named Plaintiffs bring this claim on behalf of themselves and the putative Unlawful Debt Class against Defendant A2i.

169.    Louisiana law limits the amount a bail bonding insurer or producer may charge; they may charge a $25 administrative fee, La. Stat. Ann. § 22:855(B)(2)(b), and a bail bond premium of 12% of the total value of the bond, *id.* § 22:1443, or 12.5% in Jefferson Parish, *id.* § 13:718(I)(2)(a).

170.    The contracts used by the Bonding Defendants when entering into a Credit Agreement with the Plaintiffs and members of the Proposed Debtor Class include provisions that violate Louisiana law.

171.    The contracts require principals and indemnitors to pay at least a $25 fee and a premium.

172.    The contracts also charge other fees on top of the $25 fee and premium authorized by law, including the requirement that principals and indemnitors pay earlier outstanding balances (and waive their rights to a refund under state law until they do so).

173.    The Plaintiffs and putative Contract Class members executed contracts with Bonding Defendants that suffer from these deficiencies.

174.    These provisions of the contracts with Bonding Defendants are void as a matter of law, and they should be enjoined from enforcing them.

175.    In addition, Named Plaintiffs and members of the putative Unlawful Debt Class were also required, as a condition of receiving bonding services and receiving credit for the bond fee, to execute a contract with Defendant A2i. This contract charges an additional daily fee for ankle monitor use.

176.    These fees charged are not authorized by law.

177.    These provisions of the contracts with Defendant A2i are void as a matter of law, and they should be enjoined from enforcing them.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that the Court provide the following relief:

a.    Assume jurisdiction over this action;

b.    Certify classes and subclasses, represented by Plaintiffs Ronald Egana, Samantha Egana, and Tiffany Brown, as described in paragraphs 88 to 93;

c.    Award statutory damages in the amount of $1,000,000 or 1% of the Bonding Defendants' net worth, whichever is less, in accordance with TILA, 15 U.S.C. § 1640;

d.    Award treble damages as authorized by RICO, 18 U.S.C. § 1964(c);

e.    Award compensatory damages;

f.    Award declaratory and injunctive relief;

g.    Award Plaintiffs costs and reasonable attorney fees; and

h.    Order such other relief as the Court deems just and appropriate.


DATED this 16th day of June, 2017.                    Respectfully submitted,

 /s/ Ivy Wang_____
Ivy Wang
*On Behalf of Plaintiffs' Counsel*

Ivy Wang
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue, Suite 505
New Orleans, Louisiana 70130
P: 504-486-8982
F: 504-486-8947
E: ivy.wang@splcenter.org

Caren E. Short*
Sara Zampierin*

Samuel Brooke*
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, Alabama 36104
P: 334-956-8200
F: 334-956-8481
E: caren.short@splcenter.org
E: sara.zampierin@splcenter.org
E: samuel.brooke@splcenter.org

*application for pro hac vice pending

**Attorneys for Plaintiffs**