UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RONALD EGANA, SAMANTHA EGANA, and TIFFANY BROWN, on behalf of themselves and those similarly situated | CASE No. 17-cv-5899 |
| VERSUS | JUDGE MILAZZO<br>MAG. KNOWLES |
| BLAIR'S BAIL BONDS, INC. NEW ORLEANS BAIL BONDS, L.L.C., BANKERS INSURANCE COMPANY, INC., BANKERS SURETY SERVICES, INC., BANKERS UNDERWRITERS, INC., A2i L.L.C., ALTERNATIVE TO INCARCERATION, INC., and ALTERNATIVE TO INCARCERATION NOLA, INC. | |

**MEMORANDUM IN SUPPORT OF A2i DEFENDANTS' MOTION TO DISMISS PURSUANT TO FED. R. CIV. P. 12(B)(6)**

**NOW COME** defendants, A2i L.L.C., Alternative to Incarceration, Inc., and Alternative to Incarceration NOLA, Inc. (collectively, "A2i" or the "A2i defendants"), and file this Memorandum in Support of their Motion to Dismiss the plaintiffs' claims against them.

Disregarding, as the Court must, the plaintiffs' conclusory assertions of some alleged conspiracy between defendants, the plaintiffs' factual allegations against the A2i defendants amount only to this: A2i provides the GPS ankle-monitoring services used to monitor the location of some of Blair's clients and find them for arrest, and it sets its ankle monitoring fees. *Complaint*, ECF #1 at ¶110; *RICO Case Statement*, ECF #10 at p. 15.  Based on these sparse facts, the plaintiffs accuse A2i of participating in a criminal enterprise, violating racketeering statutes through acts such as kidnapping, extortion, and collection of an unlawful debt. Whatever the plaintiffs' personal or political feelings about the Louisiana bail bond industry may be, one would hope that they would refrain from leveling such serious charges without more

1

facts to back them up. The simple truth is that there is nothing illegal about charging a fee to provide ankle monitoring services to bail bond companies and their clients. That is all A2i did, or even is alleged to have done, and it is most certainly not a violation of RICO or any other provision of law. All of the plaintiffs' claims against A2i must be dismissed.

## BACKGROUND AND ALLEGATIONS

Plaintiff Ronald Egana was jailed in St. Bernard Parish in May 2016. ECF #1 at ¶ 42. The arrest stemmed from a criminal case dating back to 2014, for which Mr. Egana had absconded and failed to appear in court. A bench warrant had been issued for him in December 2015. It was on this warrant that he was arrested.

After Mr. Egana's arrest, plaintiff Tiffany Brown, a long-time friend of Mr. Egana, contacted Blair's to seek a bond for Mr. Egana. *Id*. Ms. Brown claims she paid $865 to Blair's on or about May 24, 2016, but was told they would have to wait until the court lowered the bond amount before Blair's could seek Mr. Egana's release. *Id*. After the bond was lowered to $26,000, plaintiffs Brown and Samantha Egana, the plaintiff's mother, went to Blair's to sign the necessary indemnitors paperwork for the bond. Blair's charged a nonrefundable bail fee of $3,275 for the bond, but the plaintiffs could pay only $750 on that date. *Id*. at ¶¶ 44-48. Blair's therefore agreed to defer payment of the balance of the fee, but advised that the plaintiffs "would either have to post real property as collateral or Mr. Egana would have to wear an ankle monitor." *Id*. at ¶ 49. Plaintiffs Brown and Mrs. Egana refused to post collateral, instead opting for the ankle monitor. *Id*. They claim the Blair's employees did not tell them there would be a charge for the monitor. *Id.* **There is no allegation that A2i was involved in these discussions or the decision to request Mr. Egana to wear an ankle monitor.**

Mr. Egana was released from jail on June 18, 2016. Two days later, he met with a Blair's employee at Blair's office, who told him he would be required to wear an ankle monitor with a $10 per day fee. A2i provided the monitor. Mr. Egana did not have any discussions with A2i representatives on this date, but he agreed to wear the monitor and pay the $10 per day fee. *Id*. at ¶¶ 50-51.

Mr. Egana failed to pay the amount agreed upon for the bond and monitoring. ECF #1 at ¶ 62. According to the Complaint, on September 27, 2016, a "bounty hunter employed by Blair's" arrested him and brought him to Blair's office. *Id*. at ¶ 63. There, Mr. Egana was allegedly told to call his mother and tell her he would go to jail unless she brought $800 to Blair's. When Mrs. Egana arrived with the money, a Blair's employee allegedly told her to obtain an additional $1500. She did so and Mr. Egana was released. *Id*. The Complaint alleges that $800 of the money collected on this date was for the ankle monitor fees. *Id*. at ¶ 64. **Again, however, there is no allegation A2i was involved in any part of this transaction.**

On December 26, 2016, "Blair's bounty hunters" came to Mr. Egana's house, placed him in handcuffs, and took him to Blair's office. *Id*. at ¶¶ 66-67. They ultimately discovered he had missed yet another court date in another criminal case pending in Orleans Parish. Accordingly, they removed his ankle monitor and turned him over to his bonding company for that case, which took him to the Orleans Parish jail. *Id*. at ¶ 68.

Mr. Egana was released shortly afterwards, and on March 31, 2017, he claims to have encountered the "bounty hunter" again, this time at Orleans Criminal Court. The bounty hunter took Mr. Egana to the Blair's office, where a Blair's employee allegedly contacted Mrs. Egana and told her she would have to pay $1500 or Mr. Egana would go to jail. *Id*. at ¶¶ 71-72. The Blair's employee also told Mr. Egana that "the insurance company . . . would require the ankle

3

monitor until an outstanding bench warrant from a court date Mr. Egana had missed in September in his underlying case was lifted." *Id*. at ¶ 73. Mr. Egana signed a contract entitled "Alternative to Incarceration," which provided for a $10 per day monitoring cost and a $75 additional hook up fee for participation in the "Alternative to Incarceration Electronic Monitoring Program." *Id*. at ¶ 74. Pursuant to this contract, the Blair's employee re-installed the ankle monitor on Mr. Egana and he was released. **There is no allegation A2i was involved in the decision to reinstall the ankle monitor.**

Later, Mr. Egana had the bench warrant lifted and asked to have the ankle monitor removed. A Blair's employee allegedly told him "the insurance company" had to be consulted first. Around this same time, Mr. Egana received a call advising he had an outstanding balance of $357 for use of the ankle monitor. He made some payments on this balance directly to A2i. *Id*. at ¶¶ 77-78.

On May 23, 2017, Blair's employees arrested Mr. Egana and surrendered him directly to St. Bernard Parish Jail. *Id*. at ¶ 82. **There is no allegation that A2i was involved in the decision to remand Mr. Egana to jail.**

## LAW AND ARGUMENT

Based on these very few facts, the plaintiffs allege a plethora of charges against A2i. They claim A2i is liable to them under six different legal theories, namely:

(1) RICO violation for collection of an unlawful debt
(2) RICO violation for extortionate extension of credit
(3) Violation of Louisiana Racketeering statute
(4) False Imprisonment
(5) Conversion
(6) Breach of Contract

4

All of these claims must fail. A2i was not involved in any conspiracy or RICO enterprise with the other defendants. Instead, it was merely a third-party vendor of a service to Blair's and Blair's clients, practically in the same position as a telephone company or car rental agency that sets a standard rate for goods or services provided. It is not *per se* illegal to contract to wear an ankle monitor, and A2i has never forced or threatened anyone to wear one. The plaintiffs allege Bankers decided whom to request to wear an ankle monitor, ECF #1 at ¶ 108, and of course anyone (including plaintiff Egana) can decline to do so. A2i is, furthermore, not a creditor: It does not loan money or extend credit to anyone, and it has no knowledge or control over whether Blair's or Bankers does so. Nor is A2i a producer of bail bonds subject to the limitations on fees set forth in Louisiana law. And there is no allegation anyone from A2i ever participated in or knew of any act of kidnapping, extortion, or false imprisonment, if such things occurred. If the plaintiffs' few allegations in this case are enough to subject A2i to the expenses of litigation—especially a potentially sprawling RICO class-action suit like this one—then the doors of court will be wide-open for plaintiffs to sue any other third-party necessary for Blair's (or other bail bond companies) to conduct business, such as their phone companies or internet providers. All such third-parties have about the same culpability in this matter as A2i does, which is to say, none. The plaintiffs' claims against A2i should be dismissed.

## I.   STANDARD OF REVIEW

"Under Rule 12(b)(6), a claim may be dismissed when a plaintiff fails to allege any set of facts in support of his claim which would entitle him to relief." *Taylor v. Books A Million, Inc.*, 296 F. 3d 376, 378 (5th Cir. 2002) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F. 3d 558, 561 (5th Cir. 1998)). To survive a motion to dismiss, a plaintiff must furnish "more than labels and conclusions" or a "formulaic recitation of the elements of a cause of action." *Bell Atl.*

5

*Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Rather, a complaint must contain sufficient factual matter to "state a claim to relief that is plausible on its face." *Id*. at 570. While the court must accept all well-pleaded factual allegations as true, it need not accept as true legal conclusions couched as factual allegations. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-79 (2009). "[C]onclusory allegations or legal conclusions masquerading as factual conclusions will not suffice to prevent a motion to dismiss." *Taylor*, 296 F. 3d at 378. In reviewing the sufficiency of a complaint under Rule 12(b)(6), the Supreme Court directs that courts should first identify the allegations that are conclusory and thus not entitled to the assumption of truth. *Iqbal,* 556 U.S. at 678. Then, assuming the veracity of the remaining well-pleaded factual allegations, the court should determine whether those facts "plausibly give rise to an entitlement to relief." *Id*. at 679. If the facts presented by the plaintiff do not "permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not 'show[n]'—'that the pleader is entitled to relief,'" and dismissal should be granted. *Id*. (citing Fed. R. Civ. P. 8(a)(2)).

## II.   THE PLAINTIFFS' RICO CLAIMS

The plaintiffs assert three types of substantive racketeering claims against the A2i defendants: Unlawful Debt RICO, in violation of § 1962(c); Kidnapping/Extortion RICO, in violation of § 1962(c); and violation of the Louisiana Racketeering Act through predicate acts of extortion and kidnapping. In addition, they allege A2i conspired with the other defendants to commit RICO offenses, in violation of § 1962(d). Because A2i neither engaged in any illegal activity nor agreed to do so, these claims should be dismissed.

### A. Substantive RICO Claims Under § 1962(c)

A claim under RICO, 18 U.S.C. § 1962(c), requires (1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity or the collection of an unlawful debt. A "pattern of

racketeering activity" requires at least two acts of racketeering activity occurring within ten years of each other. 18 U.S.C. § 1961(5). "Unlawful debt" is defined as "a debt (A) incurred or contracted in gambling activity which was in violation of the law of the United States, a State or political subdivision thereof, or <u>which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury</u>, and (B) which was incurred in connection with the business of gambling in violation of the law of the United States, a State or political subdivision thereof, or <u>the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.</u>" 18 U.S.C. § 1961(6) (emphasis added).

### 1. The Plaintiffs Have Failed to Plead A2i Operated or Managed the Alleged Enterprise.

To establish a RICO violation, a plaintiff must plead that the defendant participated in the conduct of a RICO enterprise through a pattern of predicate acts or the collection of an unlawful debt. 18 U.S.C. § 1962(c); *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995). The alleged RICO defendant must have "conducted or participated in the conduct of the 'enterprise's affairs,' not just [its] own affairs." *Reves v. Ernst & Young*, 507 U.S. 170, 185 (1993). "In order to 'participate, directly or indirectly, in the conduct of such enterprise's affairs,' one must have some part in *directing* those affairs . . . some part in *directing* the enterprise's affairs is required." *Id.* at 179 (emphasis added). This is the "operation or management" test for RICO. *Id*.

Here, the plaintiffs claim an "association-in-fact" enterprise. ECF #1 at ¶ 103. However, they do not allege any facts showing that A2i operated or managed the affairs of this enterprise in a way that would subject it to RICO liability. Instead, the only assertion against A2i is that it supplied a service (GPS ankle monitoring) to Blair's and/or its clients. ECF #1 at 110. There are no allegations that A2i directed anyone to do anything. Instead, Bankers is alleged to have

decided who to request to wear the ankle monitor, and Blair's executed those instructions. ECF #1 at ¶¶ 106, 108.

Furthermore, there is nothing inherently illegal about the service A2i provided. Providing this service does not constitute a pattern of predicate acts. Nor, as discussed below, are the fees A2i charges for this service an unlawful debt. A2i does not extend credit to anyone, and it is not alleged to have knowledge regarding whether other defendants do so.

Where a plaintiff's factual allegations describe nothing more than an ordinary commercial relationship between two purported RICO defendants, the plaintiff has failed to meet the *Iqbal*/ Rule 8 requirement that he or she "show" entitlement to relief. Simply having a business relationship or supplying services to an alleged enterprise is insufficient for RICO liability. *See, e.g., Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009) ("Allegations that a defendant had a business relationship with the putative RICO enterprise or that a defendant performed services for that enterprise do not suffice" to state a RICO claim); *Goren v. New Vision, Int.'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) (holding that "simply performing services for an enterprise, even with knowledge of the enterprise's illicit nature, does not meet the operation or management requirement under RICO); *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 603 (E.D. Mi. 2015) (dismissing RICO claims where plaintiff failed to plead outside vendors made any business decisions for alleged RICO enterprise or even carried out decisions of others). The plaintiffs' RICO claims should be dismissed as to A2i.

### 2. **Unlawful Debt RICO (Second Claim for Relief)**

In their Second Claim for Relief, the plaintiffs allege A2i violated § 1962(c) by collection of an unlawful debt. Their theory is that Blair's permitted plaintiffs to pay off the bond fee over time, thereby extending them credit, but required Mr. Egana to wear an ankle monitor supplied

by A2i as a condition of that extension of credit. According to the plaintiffs, A2i's fees for the ankle monitor constitute usurious interest on the credit Blair's extended them. In other words, the alleged "unlawful debt" at issue results from stacking A2i's standard daily rate on top of Blair's alleged extension of credit. Because this case does not involve gambling, the plaintiffs must contend that this arrangement creates a "debt . . . (A) which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and . . . (B) which was incurred in connection with the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

There is no support for the proposition that A2i could be liable under this novel RICO theory. A RICO defendant must have at least some guilty knowledge about an alleged RICO violation, and here A2i is not alleged to have had knowledge of *any* debt, much less an "unlawful debt" under RICO. A2i charges a flat day rate for the use of its ankle monitor services. It also charges standard installation fees. No credit is extended to anyone for these fees and A2i does not lend anyone money; all fees are payable when due. Furthermore, the plaintiffs have not and cannot allege A2i had any knowledge of any payment arrangements Blair's might have entered with its clients. Indeed, the plaintiffs allege Bankers decides which of Blair's clients should be asked to wear the ankle monitor. ECF #1 at ¶ 108. A2i is not alleged to have any role in those decisions. As far as A2i is aware, the Blair's clients who wear the ankle monitor might have paid their bond fee in full but have been asked to wear the monitor because they were a flight risk or for some other reason, for example, multiple prior failures to appear in court. In other words, A2i has no knowledge regarding the existence of any alleged debts between Blair's and

its clients, including the plaintiffs in this case, and certainly no knowledge of the amounts of such alleged debts or their terms.

A previously mentioned analogy helps to elucidate the problem with the plaintiffs' theory as it pertains to A2i: Suppose Blair's had demanded that Mr. Egana obtain a cell phone before extending him credit because it wanted to be able to contact him. Could the cell phone company be liable for a RICO violation if its fees over the course of a year exceeded the permissible interest rate on an extension of credit of which it was not even aware? How could anyone conform their conduct or business to law if that were the case? Thankfully, the law requires at least some guilty knowledge prior to imposing liability under RICO. *See Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 524 (5th Cir. 2016) (noting that criminal statute like RICO requires "corrupt activity" before someone can be liable); *United States v. Diecidue*, 603 F.2d 535, 556 (5th Cir. 1979) (holding that because defendant lacked knowledge of co-defendants activities he could not be guilty of RICO even though he sold dynamite to and bought cocaine from co-defendants); *United States v. Bright*, 550 F.2d 240, 242-43 (5th Cir. 1977) (dismissing prosecution where government failed to prove defendant had guilty knowledge of conspiracy).

Here, A2i is not alleged to have had knowledge of any purported debt between the plaintiffs and Blair's. Furthermore, A2i is not alleged to have knowledge regarding whether Blair's was in the "business of lending money or things of value," as is required for a debt to be unlawful under RICO. Instead, the plaintiffs' only factual allegations against A2i show that it merely supplies ankle monitors to Blair's and charges a set fee for doing so. ECF #1 at ¶ 110 ("A2i provides the GPS ankle monitoring services used to monitor the location of defendants and find them for arrest. It also determines the ankle monitoring fees that will be collected by Blair's

and A2i."). These allegations are insufficient to show A2i participated in a RICO enterprise by collecting an unlawful debt.

### 3. Kidnapping/Extortion RICO (Third Claim for Relief)

The plaintiffs also allege A2i violated § 1962(c) through a pattern of predicate acts including kidnapping, extortion, Hobbs Act violations, Travel Act violations, and Extortionate Extension of Credit. Again, the facts alleged in the Complaint do not support these claims against A2i. Instead, they show that A2i did nothing more than lease ankle monitoring equipment and set a price for doing so. No one from A2i is alleged to have kidnapped, extorted, or extended credit to anyone. There are no allegations in the Complaint that anyone from A2i had any knowledge any of these activities were occurring, if they did in fact occur. Furthermore, to the extent the plaintiffs' theory is that the ankle monitor assisted other defendants to commit these activities, it is again the case that the same could be said about the plaintiffs' telephone service provider, as the plaintiffs allege they were contacted via telephone and instructed to bring money to Blair's office. ECF #1 at ¶¶ 63, 72. Simply because other defendants may have used an A2i service to assist in committing alleged predicate acts does not mean A2i is part of some RICO enterprise. Again, guilty knowledge is required for a RICO violation. *Snow Ingredients*, 833 F.3d at 524; *Diecidue*, 603 F.2d at 556; *Bright*, 550 F.2d at 242-43.

### B. RICO Conspiracy (Second, Third, and Fourth Claims for Relief)

At various points in their Complaint and RICO Case Statement, plaintiffs allege that A2i conspired with other defendants to violate RICO. Specifically, the plaintiffs assert that A2i is liable under a conspiracy theory for Unlawful Debt RICO (Second Claim), Kidnapping/Extortion RICO (Third Claim), and Louisiana Racketeering Act (Fourth Claim). But for each of these claims, plaintiffs' conspiracy allegations are wholly conclusory, with no substantial facts offered

in support. They do not even allege an agreement between the defendants, as is required to plead a RICO conspiracy. *Chaney v. Dreyfus* Serv. Corp., 595 F3d 219, 239 (5th Cir. 2010) (holding that "(1) that two or more people agreed to commit a substantive RICO offense and (2) that [defendant] knew of and agreed to the overall objective of the RICO offense.").

The sum of the plaintiffs' allegations against A2i are:

> 110.   A2i provides the GPS ankle monitoring services used to monitor the location of defendants and find them for arrest. It also determines the ankle monitoring fees that will be collected by Blair's and A2i.
>
> 111.   Through these actions, A2i conducts and participates in a pattern of racketeering (through predicate acts of kidnapping, extortion, and extortionate collection of extension of credit) and also commits the unlawful collection of debt, as well as conspiring with other Defendants to do the same. . . .
>
> 120.   Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise through the collection of unlawful debt . . .
>
> 129.   Defendants conducted or participated in and conspired to conduct the affairs of the RICO Enterprise by engaging in the following predicate acts of racketeering activity . . .
>
> 162.   In addition, Defendant A2i conspires with, assists, or otherwise encourages the Bonding Defendants to charge Named Plaintiffs and the proposed Unlawful Debt Class an additional daily fee for ankle monitor use, and to condition bail bond services and credit for the bail fee on use of the ankle monitor.

The Supreme Court has been clear that such unsupported allegations are insufficient to permit a claim of conspiracy to survive. *Twombly*, 550 U.S. at 556-57 (holding that "a bare assertion of conspiracy will not suffice" under Rule 8 and "[c]onclusory allegation of agreement at some unidentified point does not supply facts to show illegality"). The Fifth Circuit has been equally clear in the RICO context that conclusory allegations that defendants "conspired" are insufficient:

> Because the core of a RICO civil conspiracy is an agreement to commit predicate acts, a RICO civil conspiracy complaint, at the very least, must allege specifically such an agreement. While [the plaintiff] has pled the conclusory allegation that

>the defendants herein "conspired," nowhere does he allege facts implying any agreement to commit predicate acts of racketeering. Therefore, [the plaintiff's] claim under 18 U.S.C. § 1962(d) must . . . fail.

*Crowe*, 43 F.3d at 206.

Furthermore, "civil RICO conspiracy cannot be premised on negligence. It requires an actual agreement between conspirators—they must specifically intend the illegal conduct." *Snow Ingredients, Inc*., 833 F.3d at 526 (citations and quotations omitted). "A person cannot be liable for a RICO conspiracy merely by evidence that he associated with other . . . conspirators or by evidence that places the defendant in a climate of activity that reeks of something foul. A conspirator must at least know of the conspiracy and adopt the goal of furthering or facilitating the criminal endeavor." *Chaney,* 595 F.3d at 239. *See also Salinas v. United States*, 522 U.S. 52, 65 (1997).

The plaintiffs' allegations that A2i supplied ankle monitors to Blair's and set a fee for their use does not show that it participated in a criminal conspiracy. The plaintiffs have not alleged any agreement by A2i to do anything more than provide the ankle monitors. Their conspiracy claim should be dismissed.

### III.     Louisiana Racketeering Act (Fourth Claim For Relief)

The plaintiffs also allege A2i violated the Louisiana Racketeering Act through the predicate acts of Extortion, Simple Kidnapping, and Aggravated Kidnapping, and conspired to do so. Louisiana's Racketeering Act is interpreted consistently with the federal RICO statute. *State v. Touchet*, 759 So.2d 194, 197 (La. App. 3d Cir. 2000). Therefore, for the reasons outlined in part II.A. above, this claim against A2i should be dismissed.

### IV.     False Imprisonment Claim (Fifth Claim for Relief)

The plaintiffs contend A2i is liable for False Imprisonment of Mr. Egana because it allegedly "conspire[ed] with, assisted[ed] and encourage[ed]" the Bonding Defendants to detain him at various points in time.  ECF # 1 at ¶154.  The plaintiffs have not offered any well-pleaded facts to support these contentions regarding conspiracy or encouragement.  Furthermore, as shown in the Memorandums in Support of the Motions to Filed by Blair's and Bankers, it is legal for bonding agents to detain clients who are in violation of their bonds.  *See* La. C. Cr. P. Arts. 311 and 345.  Even if A2i were aware Mr. Egana had been detained by Blair's or some other entities, the plaintiffs have not pleaded any facts to show that A2i would have been aware that these detentions were illegal in any respect.  This claim must be dismissed.

### V.     Conversion (Seventh Claim for Relief)

The plaintiffs contend A2i is liable for conversion because it allegedly engaged in the wrongful taking of property from the plaintiffs.  Specifically, the plaintiffs allege that Louisiana law limits fees for bail bond producers to 12% of the bond amount.  They then claim that the fees A2i charges exceed this amount.  However, A2i is not a bail bond producer under Louisiana law. *See* La. R.S. § 22:1542(6) (defining "producer" as "a person required to be licensed under the laws of this state to sell, solicit, or negotiate insurance").  It is therefore not subject to the 12% limit set by law.  Furthermore, A2i simply offers a service for a flat fee; it is not alleged to write bonds.  The plaintiffs in this case could have chosen to decline the service and post property as collateral.  ECF #1 at ¶ 49.  No one forced Mr. Egana to agree to the ankle monitor.  This claim should be dismissed.

### VI.     Louisiana State Contract Law (Eighth Claim for Relief)

Plaintiffs allege that they were required, as a condition of receiving bonding services and receiving credit for the bond fee, to execute a contract with A2i, which charges a daily fee for ankle monitoring services. They then allege "these fees charged are not authorized by law." ECF #1 at ¶176. As noted, however, there is nothing *per se* illegal about charging a fee for ankle monitoring services. Furthermore, A2i does not write bonds, collect bond fees, or extend credit to anyone. In fact, it does not even determine whom to request to wear the ankle monitors. *Id*. at ¶ 108. Unless plaintiffs can show there is something inherently illegal about ankle-monitor contracts, this claim must be dismissed.

Respectfully submitted,

/s/ Gary W. Bizal
**GARY W. BIZAL** (#1255)
639 Loyola Ave., #1820
New Orleans, LA 70113
P: 504.525-1328
F: 504.525-1353


/s/ Stephen J. Haedicke
_____
**STEPHEN J. HAEDICKE** (LA No. 30537)
Law Offices of Stephen J. Haedicke, LLC
639 Loyola Ave. #1820
New Orleans, LA  70113
(504)525-1328 Telephone
(504)910-2659 Fax
Stephen@haedickelaw.com

## **CERTIFICATE OF SERVICE**

  I hereby certify that on September 1, 2017 I electronically filed the foregoing with the Clerk of Court by using the CM/ECF system which will send a notice of electronic filing to all parties.

              /s/ Stephen Haedicke