UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | | |
|---|---|---|
| RONALD EGANA, SAMANTHA EGANA, and TIFFANY BROWN, on behalf of themselves and those similarly situated, | ) ) ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| vs. | ) | CIVIL ACTION NO. 2:17-cv-5899 |
| | ) | |
| BLAIR'S BAIL BONDS, INC., NEW ORLEANS BAIL BONDS, L.L.C., BANKERS INSURANCE COMPANY, INC., BANKERS SURETY SERVICES, INC., BANKERS UNDERWRITERS, INC., A2i, L.L.C., ALTERNATIVE TO INCARCERATION, INC., and ALTERNATIVE TO INCARCERATION NOLA, INC., | ) ) ) ) ) ) ) ) ) | HON. JANE TRICHE MILAZZO SECTION "I" HON. DANIEL E. KNOWLES (M-3) |
| | ) | |
| Defendants. | ) | |

**BANKERS INSURANCE COMPANY, INC., BANKERS SURETY SERVICES, INC., AND BANKERS UNDERWRITERS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF ITS MOTION TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

## I.   INTRODUCTION

A Louisiana career criminal, Mr. Ronald Egana, along with his mother, Samantha Egana and close friend, Tiffany Brown (collectively, the "**Plaintiffs**"), have sued Bankers Insurance Company, Inc. ("**Bankers Insurance**"), Bankers Surety Services, Inc. (**"Bankers Surety"**), and Bankers Underwriters, Inc. ("**Bankers Underwriters**")[1] (collectively, the "**Bankers Entities**").[2] The Bankers Entities are separate corporations, each with their principal place of business in Florida. The Bankers Entities—as their corporate names suggest—are involved in the "business of insurance" regulated by the State of Louisiana. They are not creditors, and the Plaintiffs do not

---

[1] Bankers Underwriters is "duly licensed under the laws of Louisiana" and has a "principal business establishment in Louisiana at 501 Louisiana Ave., Baton Rouge, LA 70802." (ECF No. 26, at ¶ 14).

[2] Plaintiffs have also sued Blair's Bail Bonds, Inc. ("**Blair's**"), New Orleans Bail Bonds, L.L.C. ("**NOBB**"), and A2i, L.L.C., Alternative to Incarceration, Inc., and Alternative to Incarceration NOLA, Inc. (collectively defined in the Amended Complaint as, "**A2i**").

contend otherwise in the Plaintiffs' *third* iteration of its claims. (the "**Amended Complaint**").[3] To the contrary, Plaintiffs agree in the Amended Complaint that the Bankers Entities are involved in the business of insurance (*See e.g.* ECF No. 26, ¶ 120)("Bankers provides the insurance used to secure the bond with the court.").

> *The allegations against the Bankers Entities in this lawsuit are scant—the Amended Complaint mentions the Bankers Entities specifically in only* <u>*seven*</u> *substantive paragraphs over the course of the sprawling thirty-six (36) page pleading.* (*See* ECF No. 26, ¶ 32, 33, 50, 51, 120, 121). Nevertheless, Plaintiffs seek relief against each of the Bankers Entities for violations of the Truth in Lending Act ("**TILA**"), RICO, kidnapping, extortion, breach of contract, and violation of Louisiana's usury law. As to each count, dismissal is appropriate for the following reasons:

- **TILA Claim (Count I):** The McCarran-Ferguson Act, 15 U.S.C. § 1101, *et seq.*, precludes the application of TILA to the surety/bail bond transaction activities in which Plaintiffs allege the Bankers Entities are engaged. *Buckman v. Am. Bankers Ins. Co. of Fla.*, 924 F. Supp. 1156, 1157–58 (S.D. Fla. 1996), *affirmed on other grounds*, 115 F.3d 892 (11th Cir. 1997). Moreover, there is no allegation that the Bankers Entities are creditors—an absolute requirement for any liability under TILA.

- **Federal and State RICO Claims (Counts II, III, IV):** Plaintiffs do not allege nor establish that the Bankers Entities are part of a RICO enterprise or conspiracy, let alone that the Bankers Entities specifically participated in the underlying alleged predicate acts.

- **False Imprisonment and Conversion (Counts V, VI):** There are no allegations showing that the Bankers Entities participated in or engaged in any conversion or false imprisonment. Such acts are only alleged to have been undertaken by "bounty hunters" working for other defendants.

- **Breach of Contract (Count VII):** Plaintiffs allege that the Payment Arrangement Contract, as identified in the Amended Complaint, contains provisions that violate Louisiana state law. The Bankers Entities are not parties or signatories to that contract and have no involvement in the provisions challenged by the Plaintiffs.

- **Louisiana Consumer Credit Law – Usury (Count VIII):** Plaintiffs do not allege that the Bankers Entities had any involvement in the extension of any alleged credit to any Plaintiff. Further, the items that the Plaintiffs attempt to include as interest in the usury analysis are not interest at all, but rather, separate fees and charges.

---

[3] The Plaintiffs filed two similar cases on June 16, 2017, Case No. 17-5861 and the instant Case No. 17-5899. Case No. 17-5861 was dismissed by the Plaintiffs on June 19, 2017. (*See, e.g.* ECF No. 11)

In addition, the allegations also fail under basic federal pleading standards. *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Plaintiffs' simply fail "state a claim for relief" as against any Bankers Entity "that is ***plausible*** on its face" as required by *Twombly*. Indeed, the vast majority of Plaintiffs' allegations are lodged against "Defendants" generally, or against the "Bonding Defendants"–terms that Plaintiffs use to collectively describe groups of defendants without specifying the alleged conduct of any one Defendant. The few allegations against "Bankers" are wholly conclusory or unwarranted deductions of fact that do nothing to "nudge the claims . . . across the line from conceivable to plausible" as required by *Iqbal*. For the reasons more particularly set out below, the Court should dismiss each count of Plaintiffs' Amended Complaint as to the Bankers Entities.

## II.   FACTUAL BACKGROUND

### A.   *Egana obtained a bail bond and executed agreements in which the Bankers Entities are not involved.*

Egana is a career felon in New Orleans who has been incarcerated and released on bail multiple times. (ECF No. 26, at ¶¶ 66, 81). To meet the monetary conditions of his bail, Mr. Egana has, over the course of his life, obtained "bail bonds" from Blair's and/or NOBB. *Id.* at ¶¶ 66, 81, 88. After one of his many arrests, Egana's mother, Samantha Egana, and a close friend, Tiffany Brown, visited Blair's office to obtain a $26,000 bail bond to secure Egana's release from jail. *Id.* at ¶¶ 47-49, 54-56. Plaintiffs claim that to obtain the bail bond, Ms. Egana and Ms. Brown spoke and dealt with Marcel Compass (an alleged "Blair's employee"). *Id.* at ¶ 47. Mr. Egana, Ms. Egana and Ms. Brown each signed as "'indemnitors' on a number of form contract documents that Blair's employees gave to them." *Id.* at ¶¶ 49, 54. The fee for the $26,000.00 bond was $3,275.00, of which Plaintiffs were able to pay upfront $1,615.00. *Id.* at ¶¶ 47, 52.

Plaintiffs allege that the "Bonding Defendants" agreed to "extend credit to the Plaintiffs for the remaining bail fee and told Plaintiffs that they would either have to post real property as

3

collateral or Mr. Egana would have to wear an ankle monitor." *Id.* at ¶ 54.[4] Plaintiffs signed a "Payment Arrangements" agreement, which (i) states at the top: "Blair's Bail Bonds, LLC"; (ii) lists Mr. Egana under "Defendant's name"; and (iii) states a "balance due" of $1,660.00. *Id.* at ¶ 65. The "Payment Arrangements" agreement is signed by Mr. Egana as "Defendant" and Ms. Egana and Ms. Brown as "Indemnitors." *Id.* By it, Mr. Egana, Ms. Egana, and Ms. Brown agreed to make payments of $300.00 bi-weekly. *Id.* ***None of the Bankers Entities are mentioned anywhere on the "Payment Arrangements Agreement" and there are no allegations that Bankers extended any credit to the Plaintiffs.*** *Id.* ¶

As a condition of the payment arrangements, Plaintiffs contend, "Mr. Compass told Mr. Egana that he was required to wear an ankle monitor" and that he would "be charged $10 per day for its use." *Id.* at ¶ 56. According to Plaintiffs, "[t]he ankle monitor was provided by Defendant A2i." *Id.* At some point, "Mr. Compass required Mr. Egana to sign a contract bearing the heading 'Alternative to Incarceration,'" which provided for fees to be paid for the ankle-monitoring device. *Id.* at ¶ 82. Plaintiffs claim that they made some payments required for the ankle monitor "directly to A2i." *Id.* at ¶ 85. ***Plaintiffs do not allege that any Bankers Entity is even mentioned in the contract titled "Alternative to Incarceration" (Exhibit A) and do not allege that any Bankers Entity received fees for the alleged use of the ankle monitor.***[5]

---

[4] Although Plaintiffs in the Amended Complaint assert this allegation against the "Bonding Defendants" generally, Plaintiffs' Amended RICO Statement (the **Am. RICO Statement,** ECF No. 27) makes clear that Plaintiffs contend the alleged conduct was that of Blair's and/or NOBB, alleging: "Blair's meets with potential clients to extend bail bonds and credit to pay for the bail premium and fees it charges" and that "Blair's . . . working in part through its alter ego [NOBB], [] requires ankle monitors for some principals." (ECF No. 27 at p. 2; *see also id.* at p. 3-4 ("When Blair's extends bail bonds, it charges principals a bail premium and other fees (collectively, 'bail bonding fees'). Blair's also requires some principals who enter deferred payment agreements to wear an ankle monitor provided by A2i . . ."); *id.* at p. 15 ("Blair's arranges to provide bail bond services and credit for bail bonding fees . . . Blair's requires principals and indemnitors to sign contract documents and wear ankle monitors.").

[5] While the Plaintiffs reference the "Alternative to Incarceration Agreement" in their Amended Complaint, they do not attach it. Documents referenced and relied on in a Complaint may be considered by the Court for purposes of a Motion to Dismiss. *In re Katrina Canal Breaches*, 495 F.3d 191, 205 (5th Cir. 2007); *Collins v. Morgan Stanley*

4

As part of obtaining the bail bond, Plaintiffs also signed a "Bail Bond Agreement." *Id.* at ¶ 57. The Bail Bond Agreement states that it is "entered into . . . by and between New Orleans Bail Bonds, LLC (hereinafter referred to as 'The Company')" and the "Indemnitors." (**Exhibit B**).[6] By that Bail Bond Agreement, Plaintiffs each acknowledged that, as provided under Louisiana law, "the Company [defined as NOBB], as surety, shall have control and jurisdiction over the Defendant [Mr. Egana] during the term for which the bond is executed, and that the Company [NOBB] has the right to surrender the Defendant [Mr. Egana] on this bond at any time the company [NOBB] so desires, in accordance with the law." *Id.* at ¶ 60; Ex. B. ***None of the Bankers Entities are mentioned on the "Bail Bond Agreement" as a creditor or lender.*** Ex. B.

Mr. Egana was unable to make payments due for the bail bonds fees. (ECF No. 26 at ¶ 69). As a result, Mr. Egana alleges, he was picked up on multiple occasions by "bounty hunters." To keep Mr. Egana from being surrendered to law enforcement, Plaintiffs were required to pay amounts due on bonds issued by Blair's and/or NOBB. *Id.* at ¶¶ 70–85. The bounty hunters who picked Mr. Egana up were "employed by Blair's." *Id.* at ¶¶ 70, 74, 90. When the "Blair's bounty hunters" picked up Mr. Egana, instead of surrendering him to jail or court, "Blair's bounty hunters" took Mr. Egana "to the Blair's office" and demanded Plaintiffs make payments due. *Id.* at ¶¶ 70, 75, 79, 81.[7]

### B.   Plaintiffs assert scant allegations against the Bankers Entities.

Plaintiffs assert that one tactic used by the "Blair's bounty hunters" and by Mr. Compass to collect money due from Plaintiffs was to claim their actions were a result of the requirements

---

*Dean Witter*, 224 F.3d 496, 498 (5th Cir. 2000).  Accordingly, here attached as **Exhibit A** is the "Alternative to Incarceration Agreement," signed by Mr. Egana.

[6] While Plaintiffs reference the "Bail Bond Agreement" in their Amended Complaint, just as with the Alternative to Incarceration Agreement, they did not attach it. Accordingly, here attached as **Exhibit B** is the "Bail Bond Agreement, Indemnity Agreement, and Contract of Guarantee" signed by Plaintiffs.

[7] Plaintiffs' Amended RICO Statement also alleges that the "bounty hunters" were employed by and their actions were on behalf of "Blair's." (*See* ECF No. 27 at pp. 5, 15).

of the "insurance company." (ECF No. 26 at ¶¶ 81, 87, 91, 83). Mr. Compass allegedly told Mr. Egana that "the insurance company had changed its mind and would require an ankle monitor until an outstanding bench warrant" was lifted. *Id.* at ¶ 81. When Mr. Egana asked Blair's to remove the ankle monitor, Plaintiffs allege "Mr. Compass said he had to consult with the insurance company" and later "told [Mr. Egana] the insurance company would not allow the ankle monitor to be removed." *Id.* at ¶¶ 86, 87. Plaintiffs do not offer even speculation as to the identity of the "insurance company," do not allege any direct statements by it and, do not allege (or even speculate) that the "insurance company" actually made the statements or provided the direction that Mr. Compass allegedly attributed to it. Rather, Plaintiffs make unsubstantiated hearsay statements that are not plausibly tethered to the Bankers Entities.[8]

Ultimately, Plaintiffs were unable to make all payments due for Mr. Egana's bond fees. *Id.* at ¶¶ 69-89. Accordingly, on May 23, 2017, "Mr. Allen," one of the bounty hunters allegedly employed by Blair's, "and another Blair's employee . . . arrested Mr. Egana and took him straight to the St. Bernard Parish jail." *Id.* at ¶ 90. Mr. Egana claims that when he asked why he was taken to jail, "a Blair's employee said it was 'because the ***insurance company*** decided they don't want to have anything to do with [Mr. Egana] anymore.'" *Id.* at ¶ 91. When Ms. Egana called Blair's to find out why her son had been taken to jail, Plaintiffs allege, "another Blair's employee told her Mr. Egana had been surrendered 'because of the payments.'" *Id.*

By these actions, Plaintiffs allege, without alleging any factual predicate, that: (i) Blair's and/or NOBB serves as the "agent" of "Bankers," *id.* at ¶¶ 32, 51; (ii) documents Plaintiffs signed in connection with obtaining the bail bonds from Blair's "include references to and obligations that concern . . . Bankers," among others, *id.* at ¶ 50; (iii) "Bankers provides the insurance used to

---

[8] Such allegations could not be made consistent with Rule 11.

secure the bond with the court" *id.* at ¶ 120; and, (iv) "Bankers conducts, facilitates, furthers, and participates in a pattern of racketeering . . . commits the unlawful collection of debt" and conspires and participates "with other Defendants to do to the same," *id.* at ¶121. On these scant, conclusory allegations, Plaintiffs have sued the Bankers Entities for, among other things, civil RICO.

Plaintiffs' Amended RICO Statement contains little more to tie any of the three separate Bankers Entities to the claims Plaintiffs attempt to assert against each of them.[9] (*See generally,* ECF No. 27). As to the specific Bankers' Entities, Plaintiffs allege in the Amended RICO Statement only that:

> Bankers Insurance Company, Inc. is listed as the surety on the bond paperwork. Bankers Surety Services, Inc. works with bail agents to provide bail services. Bankers Underwriters, Inc. appears to underwrite insurance services in Louisiana, as it is licensed with the Secretary of State of Louisiana.

(*Id.* at p. 2-3). Plaintiffs proceed in their Amended RICO Statement to make only one, wholly conclusory allegation as to "Bankers," just as in their Amended Complaint:

> Bankers . . . participates in setting the terms of the contracts signed by principals and indemnitors, identifying individuals who are behind in payments and need to pay, deciding how much money Blair's must collect from individuals to avoid jail, deciding when to install or remove ankle monitors, and determining when to surrender principals to jail.

*Id.* at p. 2-3; *see also id.* at p. 15. This conclusory allegation, however, is wholly implausible in light of the following non-exhaustive list of contradictory specific allegations in the Amended Complaint and the contracting documents referenced by Plaintiffs:

    i.    Plaintiffs admit that the bounty hunters were employed by and were acting for Blair's;

    ii.    Plaintiffs admit that it was Blair's (and not the Bankers Entities) that provided the purported financing of the bond premiums;

---

[9] The Court may consider the Amended RICO Statement alongside the Amended Complaint. *Conwill v. Greenberg Traurig, L.L.P.*, No. 09-4365, 2009 WL 5178310, at *2 n.16 (E.D. La. Dec. 22, 2009).

iii.    None of the Bankers Entities are parties to the purported financing contract for the bond amount;

iv.    Plaintiffs admit that it was Blair's that required the installation of and monitored the ankle bracelets; and

v.    None of the Bankers Entities are parties to the purported "ankle" monitoring financing contract.

Since, per the Plaintiffs' ***specific*** allegations, the Bankers Entities had no involvement in the contracts referenced in the Amended Complaint or with the extension of credit, it is wholly implausible to say in a summary fashion (as the Plaintiffs do), that in some mysterious way the Bankers Entities were nevertheless involved in the apprehension of Mr. Egana or any of the other alleged bad acts directed at the Plaintiffs, by conducting, facilitating, further, or otherwise participating in these bad acts. The lack of facts alleged as to the Bankers Entities leads to only one logical conclusion: Plaintiffs are trying to inject three Florida-based insurance corporations into a dispute regarding transactions and events in which they did not participate. Accordingly, this Court should dismiss the Amended Complaint as to the Bankers Entities.

## III.    STANDARD OF REVIEW

"A pleading that offers 'labels and conclusions' or a 'formulaic recitation of the elements of a cause of action will not do'" to satisfy the pleading requirements of Federal Rule of Civil Procedure 8(a)(2). *Iqbal*, 556 U.S. at 678. While "[r]ule 8 marks a notable and generous departure from the hypertechnical, code-pleading regime of a prior era, [] it does not unlock the doors of discovery for a plaintiff armed with nothing more than conclusions." *Iqbal*, 556 U.S. at 678–79. Evaluating the plausibility of a complaint on a motion to dismiss is "a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Barlow v. Safety Nat'l Cas. Corp.*, No. 11:236, 2012 WL 1965417, at *4 (M.D. La. May 31, 2012). When a complaint makes "unwarranted deductions of fact," the court is not required to accept these as true. *United Food & Comm. Workers Unions and Employers Midwest Health Benefit Fund v. Walgreen,*

*Co.*, 719 F.3d 849, 854 (7th Cir. 2013) (dismissing RICO claim). Here, at the very least as to the Bankers Entities, Plaintiffs' Amended Complaint (even when considered alongside Plaintiffs' Amended RICO Statement) is a collection of conclusory allegations and unwarranted deductions not supported by any facts specifically attributed to any Bankers Entity, and not supported by logic or common sense. Dismissal is wholly appropriate.

## IV.   LEGAL ARGUMENT

### A.   Plaintiffs' allegations are not sufficient to maintain the causes of action they attempt to bring against the three independent Bankers Entities.

Plaintiffs' allegations are inappropriately directed against groups of defendants.  Moreover, Plaintiffs' wholly conclusory "agency" allegations are not sufficient to charge any Bankers Entity with conduct alleged as to any other defendant.

#### 1.   *Plaintiffs inappropriately lump all Defendants together.*

Neither the Amended Complaint nor the Amended RICO Statement satisfy the requirements of Fed. R Civ. P. 8 to provide appropriate notice to ***each*** of the three separate Bankers Entities. When a complaint contains multiple claims and multiple defendants, the Court must determine whether the complaint gives adequate notice to ***each defendant***. *Body by Cook, Inc. v. State Farm Mutual Auto. Ins.*, No. 15-2177, 2016 WL 4479507, at *2–3 (E.D. La. Aug. 25, 2016), *aff'd in part, rev'd in part*, 869 F.3d 381 (5th Cir. Aug. 24, 2017). Pleading claims against multiple defendants by referring to them collectively "runs afoul of the practical pleading standard where it denies a defendant notice of the specific claims against it or attempts to hold one defendant liable for the acts of another defendant." *Pro Image Installers, Inc. v. Dillion*, No. 3:08-cv-273, 2009 WL 112953, at *2 (N.D. Fla. Jan. 15, 2009); *see also Del Castillo v. PMI Holdings N.A., Inc.*, No. 4:14-cv-03435, 2016 WL 3745953, at *17 (S.D. Tex. July 13, 2016) ("lumping together multiple defendants without identifying who is responsible for what acts does not satisfy the requirements of Rule 8(a)(2) and 12(b)(6)"); *Medina v. Bauer*, No. 02 Civ. 8837(DC), 2004 WL 136636, at *6

(S.D.N.Y. Jan. 27, 2004) ("by lumping all the defendants together and failing to distinguish their conduct, plaintiff's amended complaint fails to satisfy the requirements of Rule 8").

Here, Plaintiffs make absolutely no distinction between the three Bankers Entities, referring to them in their Amended Complaint and Amended RICO Statement collectively as "Bankers." Plaintiffs then further blur the distinction by lumping the three separate Bankers Entities together with both Blair's and NOBB to create a group of five defendants that Plaintiffs refer to collectively as the "Bonding Defendants." In doing so, Plaintiffs are attempting to bootstrap a conspiracy claim, but have failed to distinguish the actionable conduct of each Bankers Entity, Blair's and NOBB, and, therefore, have failed to put each defendant (and particularly each Bankers Entity), on notice of what it allegedly did wrong–either individually or as a group. This is particularly true where all actions of "Bankers" are attributed to all three Bankers Entities. Plaintiffs must be compelled to separate out the acts, facts, events, and occurrences as to each of the Bankers Entities.

> **2.** ***Plaintiffs' conclusory "agency" allegations are not sufficient to charge any Bankers Entity with conduct alleged as to Blair's and/or NOBB.***

Twice in the Amended Complaint Plaintiffs summarily allege that Blair's and/or NOBB serve as an "agent of Bankers." (ECF No. 26, ¶ 32, ¶ 51). Plaintiffs must, however, do more than assert a blanket statement that an agency relationship exists. *See Ehlinger & Assoc. v. La. Architects Ass'n*, No. 96-2413, 1996 WL 603928, at *3 (E.D. La. Oct. 22, 1996) (dismissing a claim based upon apparent authority where plaintiffs failed to allege facts indicating elements of apparent authority, including reasonable reliance on apparent authority to their detriment); *see also Ceithaml v. Celebrity Cruises, Inc.*, 207 F. Supp. 3d 1345, 1356 (S.D. Fla. 2016) (dismissing a claim based upon actual agency where plaintiff made only conclusory allegations on the existence of an "agency relationship" but did not point to facts that went to the elements of agency). As

pleaded, there is no basis to extend the alleged bad acts of other defendants to any Bankers Entity. Dismissal is also appropriate on this point.

### B. The Court should dismiss Count I with prejudice because the Truth in Lending Act does not apply to the business of insurance or bail transactions.

Plaintiffs' claims for violation of the Truth In Lending Act cannot stand against any Bankers Entities because the Act does not apply to the business in which Plaintiffs allege the Bankers Entities are engaged—insurance—and because Plaintiffs do not allege that any Bankers Entity is a "creditor" as defined in the act.

#### 1. TILA does not apply to the alleged activities of the Bankers Entities.

The McCarran-Ferguson Act, 15 U.S.C. § 1101, *et seq*., precludes the application of federal statutes to "the business of insurance" if those federal statutes themselves do not specifically relate to the business of insurance. *Buckman*, 924 F. Supp. at 1157–58, *aff'd on other grounds*, 115 F.3d 892 (11th Cir. 1997). The Fifth Circuit has recognized that in enacting the legislation, "Congress was clearly concerned with the overall regulatory picture, including 'collection of premiums, general regulations, issuing of licenses, and many other aspects of the business.'" *Cochran v. Paco, Inc.*, 606 F. 2d 460, 464 (5th Cir. 1979) (quoting 91 Cong. Rec. 481–82 (1945)). This Circuit has also held that TILA "does not 'specifically relate[] to the business of insurance.'" *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 433 (5th Cir. 1998) (quoting *Cochran*, 606 F.2d at 464). Moreover, for surety services involving bail bonds transactions, the federal courts have conclusively spoken–the McCarran-Ferguson Act prohibits the application of TILA. *Buckman*, 924 F. Supp. at 1157–58. The reason is simple as stated by the Eleventh Circuit–the bond indemnitor (i.e., the inmate) is not shopping for credit. *See Buckman*, 115. F.3d at 892.

In *Buckman*, the "indemnitors" on a bail bond executed a contingent Promissory Note and Mortgage as collateral for the bond, which the indemnitors alleged constituted the "extension of credit" under TILA. The Eleventh Circuit disagreed. *Id.* In so doing, the court observed that the

11

note and mortgage should not "be considered in a vacuum instead of as integral parts of a bail bond transaction." *Id*. at 893. The court ultimately held that "we do not believe that executing an agreement to indemnify a bail bond surety and providing a note and mortgage to facilitate any indemnification that may become necessary is the 'extension of credit' as that phrase is commonly understood or as used in the pertinent statute and regulations." *Id*. at 894.[10]

The activities in which Plaintiffs allege the Bankers Entities are engaged, with regard to the bail bonds transactions at issue, are "the business of insurance." Indeed, Plaintiffs allege that: "Bankers provides the insurance used to secure the bond with the court" (ECF No. 26 at ¶ 120); "Bankers Insurance Company, Inc. is listed as the surety on the bond paperwork," (ECF No. 27, p. 3); and, "Bankers Underwriters, Inc. appears to underwrite insurance services in Louisiana, as it is licensed with the Secretary of State of Louisiana." *Id.* Moreover, commercial surety underwriters providing bail bonds (as "Bankers" is alleged to be doing) are governed by Louisiana insurance law as follows:

> (1) Louisiana's Insurance Code, found at Title 22, Louisiana Statutes, includes "surety" as a "kind of insurance," defined as a "contract whereby one becomes a surety or guarantor for the performance of any lawful obligation, undertaking, agreement or contract of any kind . . ." and sets licensing guidelines and other requirements for bail bond producers and insurers. *See* La. Rev. Stat. Ann. § 22:47(18) (defining surety as a type of insurance); La. Rev. Stat. Ann. § 22:1547(A)(13) (authorizing issuance of a license for bail bonds producers); La. Rev. Stat. Ann. § 22:1671(A)(2) (setting guidelines for registered insurance and bail bond producer prelicensing programs).

> (2) Under the Louisiana Code of Criminal Procedure, a commercial surety company authorized to do business in Louisiana "may become surety for the release of a person on a bail undertaking." La. Code Crim. Proc. Ann., art. 322 (2017). The sufficiency of security posted by a surety company "*shall be determined solely by the commissioner of insurance.* A contract to indemnify a surety company against loss on a bail undertaking is valid and enforceable." *Id*. (emphasis added).

---

[10] Blair's alleged agreement to provide the bond and allow for periodic payments of the bond premium, cannot be "considered in a vacuum." *See id.* at 893. Rather, the alleged "Payments Arrangements" agreement—to which no Bankers Entity was a party in any event—was an "integral part of the bail bonds transaction," just like the contingent note and mortgage in *Buckman*. *See* 115 F. 3d 893. Accordingly, TILA does not apply. *Id.*

(3) The Louisiana Commissioner of Insurance has developed rules and regulations enforceable against commercial sureties, bail bonds producers, and bail enforcement agents as the governing body of the bail bonds industry. *See, e.g.* La. Admin Code Title 37, § 4091 (defining the purpose of the regulations with respect to bail bond transactions); § 4913 (outlining "prohibited acts" by commercial sureties, bail agents, or solicitors); § 4915 (confirming that "[t]he commissioner of insurance is vested with the authority to enforce this regulation," including through the imposition of penalties, sanctions, or fines).

Thus, irrespective of Plaintiffs' allegations against other defendants, or even against groups of defendants that generally include the Banker Entities, Plaintiffs' specific allegations, and Louisiana law, demonstrate that the activities of the Bankers Entities here constitute the "business of insurance" and cannot be regulated pursuant to TILA. *See* 15 U.S.C. § 1101. Accordingly, the Court should dismiss, with prejudice, Plaintiffs' TILA claim against the Bankers Entities.

### 2. *Plaintiffs do not assert any allegations to show that any Bankers Entity is a "creditor" under TILA.*

In addition to the inapplicability of TILA to bail bonds transactions generally, the Bankers Entities, individually or as a group, are not "creditors" as defined in TILA. TILA defines a "creditor" as follows:

The term "creditor" refers **only** to a person who **both** (1) **regularly** extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, **and** (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(g) (emphasis added).

Plaintiffs do not allege in their Amended Complaint any facts whatsoever to show that any Bankers Entity "regularly extends . . . consumer credit," or that any Bankers Entity "is the person to whom debt arising from the consumer credit transaction" in this case "is initially payable on the face of the evidence of indebtedness or . . . by agreement." 15 U.S.C. § 1602(g). The "Payments Arrangements" agreement does not state "on its face" that payments are due to any Bankers Entity, and states only "Blair's Bail Bonds, LLC" at the top. (ECF No. 26 at ¶ 65). Accordingly, Plaintiffs

do not allege the basic predicate facts necessary to establish that any Bankers Entity is a "creditor" so as to be subject to TILA. For this additional reason, the Court should dismiss Plaintiffs' TILA claims against each Bankers Entity.

### C. The Court should dismiss Counts II, III, and IV (the RICO claims) against the Bankers Entities.

To establish a claim under any of the four RICO subsections, a plaintiff must allege: (1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition, establishment, conduct or control of an enterprise." *In re Mastercard Intern., Inc. Internet Gambling Litig.*, 132 F. Supp. 2d 468, 476 (E.D. La. 2001) (citing *Crowe v. Henry*, 43 F.3d 198, 204 (5th Cir. 1995)); *Elliot v. Foufas*, 867 F.2d 877, 880 (E.D. La. 1989). For multiple reasons, Plaintiffs miss the mark on properly pleading necessary and essential facts to survive a motion to dismiss the RICO claims.[11]

#### 1. Plaintiffs fail to meet the Iqbal and Twombly pleading standards.

Plaintiffs' allegations of each of the Bankers Entities' actions and participation in the alleged RICO offenses are few; those that are asserted are conclusory and, therefore, not entitled to the presumption of truth. *See Iqbal*, 556 U.S. at 678. Plaintiffs' only non-background RICO allegations as to the Bankers Entities are directed collectively to the group of "Bankers" defendants and found in paragraphs 120 and 121 (included in the "General RICO Allegations" section of the Amended Complaint):

> 120.   Bankers provides the insurance used to secure the bond with the court. It participates in setting the terms of the contracts signed by principals and indemnitors, identifying individuals who are behind in payments and need to pay, deciding how much money must be collected from individuals to

---

[11] Plaintiffs attempt to bring their Fourth Claim for Relief (Louisiana RICO) based on, and incorporated into their Fourth claim, many of the same predicate acts alleged in the federal RICO claim asserted in their Third Claim for Relief. (ECF No. 26 at ¶¶ 158–63). Accordingly, the Court should dismiss Plaintiffs' Fourth Claim for Relief for the same reasons it should dismiss Plaintiffs' Third Claim for relief. *See, e.g. Meadaa v. K.A.P. Enter.*, No. 09-1211, 2014 WL 6801636, at *6 (W.D. La. Dec. 1, 2014) (noting that the Louisiana Racketeering Act is modeled upon federal RICO legislation and federal decisions are persuasive in its analysis); *State v. Touchet*, 759 So. 2d 194 (La. App. 3d 2000) (same).

avoid jail, deciding when to install or remove ankle monitors, and determining when to surrender principals to jail.[12]

121.   Through these actions, Bankers conducts, facilitates, furthers and participates in a pattern of racketeering (through predicate acts of kidnapping, extortion, and extortionate collection of extension of credit) and also commits the unlawful collection of debt, as well as conspiring with the other Defendants to do the same. It knows and intends that these acts of racketeering will be committed through its participation in the enterprise. It poses a continuous threat of engaging in these racketeering acts.[13]

(ECF No. 26). Plaintiffs' Amended RICO Statement does not provide any additional facts to support these bare and implausible allegations. (*See* ECF No. 27 at pp. 3, 15).[14] Paragraph 120 is a conclusory allegation entitled to no presumption of truth, and Paragraph 121 is merely an "unwarranted deduction of fact" that has no factual basis in any of the allegations of the Amended Complaint or Amended RICO Statement. *See Amer. Dental Ass'n v. Cigna Corp.*, 605 F.2d 1283, 1294 (11th Cir. 2010) (dismissing RICO claim where other explanations of conduct were more likely); *see also Iqbal*, 556 U.S. at 681 (finding that allegations of plaintiff with respect to actions of Aschroft and Mueller, high ranking officials, might have been consistent with the plaintiff's theme, but did not plausibly establish a claim given more likely explanations). The more plausible explanation regarding the "bounty hunter's" purported references to the "insurance company" during the encounters with Egana was that these purported statements were used as a bounty hunter tool to induce payment from the Plaintiffs, rather than that the Bankers Entities–which according

---

[12] Interestingly, the initial Complaint alleged that Bankers participated in "deciding how much money Blair's must collect from individuals to avoid jail" rather than "deciding how much money must be collected from individuals to avoid jail." (Compare ECF No. 1, at ¶ 108, ECF No. 26, at ¶ 120). Given that the other allegations of the Amended Complaint make clear that it was Blair's and/or NOBB and A2i that participated in the collection of money, this distinction cannot help the Plaintiffs state a plausible claim.

[13] The only differences between paragraph 121 of the Amended Complaint and its predecessor paragraph 109 of the previous iteration of the complaint are the inclusion of blanket, conclusory recitations of legal terms of art, including "conducts, facilitates, furthers and participates in," and "[i]t knows and intends that these acts of racketeering will be committed through its participation in the enterprise. (*Cf.* ECF No. 1, at ¶ 109 with ECF No. 26, at ¶ 121).

[14] Plaintiffs' remaining RICO allegations are directed generally to the "Bonding Defendants" collectively, or even more generally, to "Defendants" collectively. (*See* ECF No. 26 at ¶¶ 115, 133-141, 144-157, 160-163).

to other specific allegations in the Amended Complaint and the contract documents are not involved in financing, collection efforts, or apprehension–actually made any such statements or provided direction to the bounty hunters.[15]

### 2.    *Plaintiffs fail to distinguish between the Bankers Entities.*

Where, as here, plaintiffs accuse a defendant of "carrying out a pattern of racketeering activity through various combinations of its parent and subsidiary corporations, as well as third-party agents . . . [they] must plead facts that show [the defendants'] decision to operate through subsidiaries and agents allowed it to carry out its pattern of racketeering in a way that it could not have if it was wholly integrated." *St. Gregory Cathedral Sch. v. LG Electronics, Inc.*, No. 6:13-cv-739, 2015 WL 11121531, at * 3 (E.D. Tex. Mar. 31, 2015); *accord ISystems v. Spark Network Ltd.*, No. 10-10905, 2012 WL 3101672, at *4–5 (5th Cir. Mar. 21, 2012) (noting further that the plaintiff's complaint alleging RICO violations "fails to distinguish the entities at all, as it refers to them collectively as 'Sparks Networks,' 'Sparks,' or "defendants.'"). There are no such allegations here, nor can there be.

The Bankers Entities, while related, are alleged to serve different purposes. (*See* ECF No. 27 at p. 3 (alleging separate purposes of each of the three Bankers Entities)). Neither the Amended Complaint nor Amended RICO Statement, however, contain any allegations whatsoever to show (or even state in conclusory fashion) that their decision to operate as three distinct entities allowed them to "carry out [their] pattern of racketeering in a way that [they] could not have if [they were] wholly integrated." *See St. Gregory Cathedral Sch.*, 2015 WL 11121531 at * 3. "The existence of multiple defendants in one action does not justify imposing RICO liability to a common business

---

[15] The alleged passing references to the "insurance company" by the bounty hunters is hearsay which is unsupported by any other plausible facts. Moreover, the Amended Complaint does not contain any allegation that the "insurance company" actually said or participated in these specific exchanges.

decision to operate through parent subsidiary relationships." *St. Gregory Sch.*, 2015 WL 11121531 at *4. To state a claim against any of the Bankers Entities, the Plaintiffs need to specifically allege wrongs committed by each of the entities, or specifically plead how their alleged operation as one unit was for the purpose of carrying out the RICO scheme. *See id.* The Plaintiffs here fail to do either.

Instead, Plaintiffs attempt to assert RICO claims against each of the Bankers Entities by asserting allegations against the "Bonding Defendants" generally—a group that contains not only all three Bankers Entities, but also Blair's and NOBB—and by alleging in conclusory fashion that Blair's "serves as an agent of Bankers." (ECF No. 26 at ¶¶ 32, 51; ECF No. 27 at p. 4). These allegations do not satisfy the RICO pleading requirements and, therefore, the Court should dismiss Plaintiffs' RICO claims against the Bankers Entities.

### 3.    *Plaintiffs fail to adequately allege a "RICO enterprise."*

The Plaintiffs have failed to plausibly plead that any of the Bankers Entities "participate[d], directly or indirectly, in the conduct of such enterprise's affairs." 18 U.S.C. § 1962. Plaintiffs' allegations of the "association in fact" enterprise, and "Bankers'" participation in it, are unwarranted deductions of fact that should not be afforded the presumption of truth. *See Cigna Corp.*, 605 F.2d at 1294 (stating that the court is not required to accept as true the "unwarranted deductions of fact[s]" made by plaintiffs on a motion to dismiss); *see also United Food*, 719 F.3d at 854 (dismissing RICO claims and rejecting leaps in logic by plaintiffs designed to invoke liability). Plaintiffs' bare allegations of an "ongoing relationship" and a "continuing unit" simply are not sufficient to "show evidence of an ongoing organization, formal or informal, that functions as a continuing unit over time through a hierarchical or consensual decision-making structure." *See Elliot*, 867 F.2d at 881. The allegations of the Amended Complaint are not sufficient to show that any Bankers Entity was conducting the affairs of the enterprise "as opposed to their own

affairs." *United Food*, 719 F.3d at 854. Rather, the Amended Complaint shows, at most, that the defendants had a commercial relationship, "not that they had joined together to create a distinct entity for the purposes of improperly" extorting additional funds from the Plaintiffs. *Id*. at 855.

Plaintiffs' allegations, while dramatic and scandalous, are not supported by any ultimate facts, or even any theory of *why* the Bankers Entities would be so intimately involved in the hundreds, or even thousands, of bail bonds transactions of Blair's and NOBB. The simple addition of the terms "facilitates," "furthers," or "participates" with respect to the Bankers Entities' involvement in the alleged bad acts does nothing to nudge the Plaintiffs' claims over the line to sufficiency. In short, Plaintiffs do not assert any allegations to "elevate [Plaintiffs'] inference from a 'sheer possibility' to something that is 'plausible on its face.'" *United Food*, 719 F.3d at 855 (citing *Iqbal*, 556 U.S. at 678). The Court is simply not required to put away its common sense in reviewing the Plaintiffs' allegations. *See Iqbal*, 556 U.S. at 681.

### 4.    Plaintiffs fail to allege any Bankers Entity engaged in predicate acts that serve as the foundation of their Third Claim for Relief for RICO.

To state a RICO claim other than for the collection of an unlawful debt, a plaintiff must allege at least two predicate criminal acts in which *each* defendant engaged. *Elliott*, 571 F.2d at 903. By their Third Claim for Relief, Plaintiffs attempt to assert a claim based on six alleged predicate acts: simple kidnapping, aggravated kidnapping, extortion in violation of the Hobbs Act, extortion in violation of Louisiana law, extortion in violation of the Travel Act, and extortionate collection of extension of credit. (ECF No. 26 ¶ 144 (a)–(f)). Plaintiffs, however, failed to allege *any* Bankers Entity's involvement in *any* of these predicate acts. Instead, Plaintiffs allege that each and every one of the predicate acts is was committed by "Defendants" generally, "through the RICO enterprise." (ECF No. 26 ¶¶ 144, 145, 147, 138, 153). Pleading these predicate acts in conclusory fashion against the "Defendants" generally is not sufficient to state a RICO claim

18

against any Bankers Entity. *See ISystems,* 2012 WL 3101672, at \*4–5 (cited *supra* at p. 17). Accordingly, the Court should dismiss Plaintiffs' Third Claim for Relief as to the Bankers Entities.

### 5.    *Plaintiffs fail to allege that any Bankers Entity agreed to participate in a conspiracy.*

Both of the RICO claims Plaintiffs attempt to assert are based, at least in part, on allegations of a conspiracy under 18 U.S.C. § 1962(d). (ECF No. 26 at ¶¶ 133, 144 (each alleging "Defendants . . . conspired to conduct the affairs of the RICO Enterprise . . .")); (ECF No. 27 at p. 5) (alleging that all Defendants "violated 18 U.S.C. § 1962(d) by conspiring with one another to conduct the affairs of the enterprise . . .")). Although Plaintiffs allege the act of conspiring, Plaintiffs fail to assert any allegations of an ***agreement*** by any Bankers Entity to commit at least two specific predicate offenses, which is required to state a claim for civil conspiracy under 18 U.S.C. § 1962. *Herman v. Jefferson Bancshares, Inc.*, Civ.A. 86-4560, 1987 WL 1042, at \*2 (E.D. La. Oct. 26, 1987) (citing *Elliott*, 571 F.2d at 903). To properly state such a claim for civil conspiracy, "[i]t is critical" that Plaintiff allege

> that ***each defendant*** knowingly and willfully agreed to join in a conspiracy with specific intent either to personally participate in the commission of two particular predicate offenses or to otherwise participate in the affairs of the enterprise with the knowledge and intent that other members of the conspiracy would commit two or more predicate offenses as part of the pattern of racketeering activity.

*Id*. (emphasis added). A plaintiff alleging RICO conspiracy must ***plausibly*** allege a "meeting of the minds." *Cigna Corp.*, 605 F.3d at 1296. A conclusory allegation, such as those asserted by Plaintiffs here, that the defendants "conspired," is simply insufficient to support a claim under 18 U.S.C. § 1962(d). *Id*. Accordingly, each of the Plaintiffs' claims under § 1962(d) fail.

### 6.    *Plaintiffs fail to state a RICO claim based on collection of an unlawful debt.*

Plaintiffs' Second Claim for Relief under RICO alleges that the Defendants engaged in the collection of an unlawful debt by charging ankle monitoring fees "as a condition of extending

credit." (ECF No. 26, ¶ 134, 135). Plaintiffs' allege that the ankle monitoring fee debt is "unlawful" because it constitutes interest on the principal amount of Mr. Egana's bail bond fee and makes such debt usurious under Louisiana law, without reference to any specific statutory section. *Id.* As alleged, however, the "ankle monitoring fees" cannot constitute unlawful interest under Louisiana law on any credit extended for the bail bond premium.

La. Rev. Stat. Ann. § 9:3500(C)(1), found in Title XII of the Louisiana Code entitled "of Loan," provides that "conventional interest" may not exceed twelve percent per annum, fixed in writing. La. Rev. Stat. Ann. § 9:3505(5), however, specifically delineates a non-exclusive list of items that are *not considered interest*, including:

> Fees, taxes, charges or other expenses incurred in making the loan which are collected from or paid by the borrower or on his behalf, if such fees, taxes, charges, and other expenses are actually paid to or payable to persons other than the lender or the person making the loan or any employee of such lender or person making the loan.

Here, according to the allegations of the Amended Complaint, the "ankle monitoring fees" are charged pursuant to a contract with A2i, and paid to A2i, not as part of the "Payment Arrangements" agreement under which the bail bond premium is allegedly financed by Blair's. (ECF No. 26, ¶ 82). Accordingly, under La. Rev. Stat. Ann. § 9:3505(5) (2005), the "ankle monitoring fees" are not considered interest. Thus, the Court should dismiss Plaintiffs' Second Claim for Relief asserted under § 1962(c) for collection of an unlawful debt, along with Plaintiffs' § 1962(d) claim for conspiracy to commit the collection of an unlawful debt. *See Nolen v. Nucentrix Broadband Networks, Inc.*, 293 F 3d 926, 930 (5th Cir. 2002) (dismissing RICO claim for unlawful collection of debt where fees charged were not considered interest and noting "[t]he failure to plead the requisite elements of either §1962(a) or a § 1962(c) violation implicitly means that [Nolen] cannot plead a conspiracy to violate either section").

**D.     The Court should dismiss Counts V and VI because Plaintiffs fail to state a claim under Louisiana law for False Imprisonment and Conversion.**

Plaintiffs' Fifth and Sixth Claims for Relief attempt to assert claims for, respectively, false imprisonment and conversion under Louisiana law. The factual allegations of these claims name only the "Bonding Defendants" generally, and Defendant "A2i," but do not specifically identify any Bankers Entity. As such, Plaintiffs fail to allege that any Bankers Entity directly participated in the alleged acts, and, therefore, Plaintiffs have failed to state these claims against any Bankers Entity. *See Body by Cook, Inc.*, 2016 WL 4479507 at *2–3 (stating that on a Motion to Dismiss, the Court must determine whether the complaint gives adequate notice to ***each defendant***). The Court should, therefore, dismiss Plaintiffs' Fifth and Seventh causes of action as to each of the Bankers Entities.

**E.     The Court should dismiss Count VII because Plaintiffs fail to state a claim against any Bankers Entity for violation of Louisiana contract law.**

By their Seventh Claim for Relief, Plaintiffs ask the Court to enjoin the "Bonding Defendants" from enforcing the "contracts used by the Bonding Defendants when entering into a Credit Agreement with Plaintiffs" because those contracts allegedly include provisions that violate Louisiana law that limits the "agency fees" that may be charged for criminal bail bonds. (ECF No. 26 ¶¶ 179-186). Plaintiffs, however, do not allege any facts to show that any of the Bankers Entities violated, or based on their alleged relationship to the bail bond transactions, could have violated, any of the provisions of the Louisiana law Plaintiffs cite.

First, Plaintiffs claim that the contracts used by the "Bonding Defendants violates La. Rev. Stat. Ann. § 22:855(B)(2)(b)," which provides that "[a]gency fees for criminal bail bonds . . . shall not exceed twenty-five dollars." According to Plaintiffs' allegations, however, no Bankers Entity is even subject to this section of Louisiana law because "agency fees" are those fees charged by "producers" and Plaintiffs do not allege that any Bankers Entity is a producer.

Only a "producer" can violate § 22:855(B)(2)(b), as only a "producer" can charge an "agency fee." Indeed, § 22.855(B)(2)(a) explains that "*the producer may* charge a reasonable agency fee related to the services *provided by the producer*." (emphasis added). Plaintiffs allege that that the Bankers Entities act as surety for the producers, Blair's and NOBB.[16] Accordingly, Plaintiffs cannot state a cause of action against the Bankers Entities for the alleged improper charging of producer fees.

Even if any Bankers Entity were a "producer"–which none are–and were directly charging Plaintiffs any fees at all–which they did not–Plaintiffs' own allegations show that the two "fees" about which they complain ("prior outstanding balances" and "ankle monitoring fees") do not, and cannot in the circumstances alleged, violate Louisiana law. First, Plaintiffs allege that "the requirement that principals and indemnitors pay earlier outstanding balances (and waive their rights to a refund under state law until they do so)" results in illegal "agency fees" in excess of $25 (ECF No. 26, ¶ 184). Plaintiffs do not explain how fees due for prior bail bonds transactions amount to "other fees" for a current bail bond. Nor do Plaintiffs cite to any provision of Louisiana law that specifically precludes a producer from applying payments made to the oldest "outstanding balances" first. Accordingly, Plaintiffs have failed to state a cause of action for enjoining this contractual provision.[17]

Second, Plaintiffs allege that the charging of additional daily fees for ankle monitoring constitutes an improper fee. As alleged, however, the "ankle monitoring" fees are separate and independent from the fees for the bail bond and, in any event, are not alleged to have been charged

---

[16] A "producer" is defined in La. Rev. Stat. Ann. § 22:1542(6) as "a person required to be licensed under the laws of this state to sell, solicit, or negotiate insurance." "Insurer" is defined as "every person engaged in the business of making contracts of insurance, other than a fraternal benefit society." La. Rev. Stat. Ann. § 22:46(10).

[17] Furthermore, under La. Rev. Stat. Ann. § 22:855(2)(C)(2)(e), the remedy for an excess premium charged is a refund of the excess amount paid, through written order from the Insurance Commissioner.

by or paid to any Bankers Entity. Indeed, Plaintiffs allege Mr. Egana made payments directly to Defendant A2i for the ankle monitoring fees. (ECF No. 26 at ¶ 85). Moreover, Plaintiffs allege that ankle monitoring devices are required "*__as a condition of the extension of credit__*," rather than as a condition of provision of bond services. (*Id.* at ¶¶ 40, 45) (emphasis added). Fees associated with the financing of bond premiums, as opposed to fees related to the procurement of the bond itself, are not subject to La. Rev. Stat. Ann. § 22.855's disclosure and other requirements. *See, e.g. Blanchard v. Allstate Ins. Co.*, 774 So. 2d 1002, 1006 (La. Ct. App. 1st 2000) (considering challenge under La. Rev. Stat. Ann. § 22:855 (formerly 22:627), noting "[t]he installment fees are paid not to procure an indemnification contract, but for the privilege of paying the premium over time").

For these reasons, this Court should dismiss Plaintiffs' Seventh Claim for Relief as to each of the Bankers Entities.

**F.     The Court should dismiss Count VIII because the Plaintiffs cannot state a cause of action for Usury.**

In their Amended Complaint, Plaintiffs double-down on the wholly unsupported usury allegations of the initial Complaint by adding a separate cause of action for alleged violations of Louisiana's consumer credit transaction statute.  Plaintiffs fail, however, to allege any relationship between the Bankers Entities and the conduct they allege violates the Louisiana usury statute. Even if they had alleged such a relationship, a bail bond transaction is not covered by the Louisiana statute Plaintiffs allege the "Bonding Defendants" violated.

Like their Count VII claim for violations of Louisiana contract law, Plaintiffs' new separate Usury claim (Count VIII) is based entirely on "Defendants" alleged charging of "ankle monitoring fees" and requirement of the "repayment of any outstanding balances."  (ECF No. 26 at ¶ 190). As discussed above, Plaintiffs do not assert any allegations in the Amended Complaint that tie the

Bankers Entities to these alleged charges.[18] Implying such a relationship between any Bankers Entities and these charges is nonsensical and implausible and, therefore, does not state claims against any Bankers Entity for violation of the Louisiana Consumer Credit law.

Moreover, La. Rev. Stat. Ann. § 9:3520 does not apply to deferred payments for a bail bond premiums. Rather, it applies *only* to "consumer credit sales," which are defined to be:

> [T]he sale of a thing . . . or immovable property, in which a credit service charge is charged and the purchaser is permitted to deter all or part of the purchase price or other consideration in two or more installments excluding the down payment when the thing is purchased primarily for personal, family, or household purposes, and the purchase is a person other than an organization.

La. Rev. Stat. Ann. §9:3516(12). Deferred payments for a bail bond premium are not "the sale of a thing . . . or immovable property." Accordingly, the statute does not apply to the alleged transactions. For this additional reason, the Court should dismiss, with prejudice Plaintiffs' Eighth Claim for Relief as to the Bankers Entities,

## V.   CONCLUSION

For all the foregoing reasons, the Bankers Entities ask that the Court dismiss the Plaintiffs' claims against the Bankers Entities, and provide such other and further relief as appropriate.

Respectfully Submitted,
CHEHARDY,      SHERMAN,      WILLIAMS,
MURRAY, RECILE, STAKELUM & HAYES,
L.L.P.

/s/ Stephen D. Marx
STEPHEN D. MARX (#17041)
PRESTON L. HAYES (#29898)
One Galleria Boulevard,      Suite 1100
Metairie, Louisiana 70001
Telephone: (504) 833-5600
Facsimile: (504) 833-8080

---

[18] To the contrary, Plaintiffs specifically allege in Count VIII that the "outstanding balances" are "with Blair's," not any Bankers Entity. (ECF No. 26 at ¶ 190). Likewise, Plaintiffs allege that the "ankle monitoring fees" are charged by and paid to Defendant A2i. *Id.*at ¶ 26

*and*

SMOLKER   BARTLETT   LOEB   HINDS   &
SHEPPARD, P.A.

/s/ Ethan Loeb
ETHAN J. LOEB (pro hac vice)
Florida Bar No. 0668338
E. COLIN THOMPSON (pro hac vice)
Florida Bar No. 0684929
ALLISON DOUCETTE (pro hac vice)
Florida Bar No. 0085577
100 North Tampa Street, Suite 2050
Tampa, FL 33602
(813) 223-3888; Fax: (813) 228-6422
***Attorneys for the Bankers Entities***

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing document was served on all counsel of

record through this Court's CM/ECF system on this 3rd day of October, 2017.


/s/ Stephen D. Marx
**ATTORNEY**