## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF LOUISIANA

RONALD EGANA, SAMANTHA EGANA, and TIFFANY BROWN on behalf of themselves and those similarly situated,

      Plaintiffs,

v.

BLAIR'S BAIL BONDS, INC., et al.,

      Defendants.

**Case No. 2:17-cv-5899**

**HON. JANE TRICHE MILAZZO
SECTION "H"
HON. DANIEL E. KNOWLES (M-3)**

**CLASS ACTION**

**PLAINTIFFS RONALD EGANA, SAMANTHA EGANA, AND TIFFANY BROWN'S COMBINED OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS PLAINTIFFS' FIRST AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.      TABLE OF AUTHORITIES ........................................................................... ii

I.      INTRODUCTION ...................................................................................... 1

II.     STATEMENT OF FACTS AND RELEVANT PROCEDURAL BACKGROUND ......... 1

III.    LEGAL ARGUMENT ................................................................................ 3

        A.      The Amended Complaint Meets the Pleading Requirements of FRCP 8 ............... 3

        B.      Plaintiffs Properly State a Claim for Violation of the Truth in Lending Act .......... 5

                1.      The McCarran-Ferguson Act does not prevent the application of
                        TILA to Bonding Defendants' extension of credit ..................................... 5

                2.      Bonding Defendants are subject to TILA .................................................. 8

        C.      Plaintiffs Properly State a Claim for Violation of the Racketeer Influenced
                and Corrupt Organizations Act and Louisiana Racketeering Law ...................... 13

                1.      Plaintiffs have alleged sufficient facts to establish an
                        association-in-fact enterprise among Blair's, Bankers, and A2i ............... 13

                2.      Plaintiffs have alleged sufficient facts to establish a pattern of
                        conduct ........................................................................................... 18

                3.      Plaintiffs allege sufficient facts to establish the collection of unlawful
                        debt .................................................................................................. 25

                4.      Plaintiffs have alleged sufficient facts to establish a conspiracy
                        among Blair's, Bankers, and A2i ........................................................ 28

        D.      Plaintiffs Properly State a Claim That the Bail Bond Contract is Void ................ 30

        E.      Plaintiffs Properly State a Claim for Usurious Lending .................................... 32

        F.      Plaintiffs Properly State a Claim for False Imprisonment ................................. 33

        G.      Plaintiffs Properly State a Claim for Conversion .............................................. 34

IV.     CONCLUSION ......................................................................................... 35

i

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Abraham v. Singh*,
    480 F.3d 351 (5th Cir. 2007) .........................................................................23, 25

*Allstate Ins. Co. v. Plambeck*,
    802 F.3d 665 (5th Cir. 2015) ..................................................................................14

*Am. Dental Ass'n v. Cigna Corp.*,
    605 F.3d 1283 (11th Cir. 2010) ..............................................................................15

*Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*,
    No. 2:17-CV-00053, 2017 WL 2126593 (E.D. Wash. May 16, 2017).....................4

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009)..............................................................................................3, 4

*Bell Atl. v. Twombly*,
    550 U.S. 544 (2007)...................................................................................................3

*Bernofsky v. Tulane University Med. Sch.*,
    962 F.Supp. 895 (E.D. La.1997)..............................................................................34

*Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*,
    No. CV 15-2177, 2016 WL 4479507 (E.D. La. Aug. 25, 2016), *aff'd in part,*
    *rev'd in part*, 869 F.3d 381 (5th Cir. 2017) .............................................................4

*Bonfiglio v. Nugent*,
    986 F.2d 1391 (11th Cir. 1993) ................................................................................9

*Boyle v. United States*,
    556 U.S. 938 (2009).............................................................................................13, 14

*Bryan v. City of Dallas*,
    188 F. Supp. 3d 611(N.D. Tex. 2016) ....................................................................31

*Buckman v. Am. Bankers Ins. Co. of Fla.*,
    924 F. Supp. 1156 (S.D. Fla. 1997) ......................................................................6, 7

*Buckman v. Am. Bankers Ins. Co. of Fla.*,
    115 F.3d 892 (11th Cir. 1997) ..............................................................................7, 9

*Byerly v. Duke Power Co.*,
    217 F.2d 803 (4th Cir. 1954) ..................................................................................32

*Cacamo v. Liberty Mut. Fire Ins. Co.*,
   Nos. 2004-CA-0074-78 (La. App. 4 Cir. 9/28/2004);  885 So. 2d 1248 ...............................32

*Campanella v. Cty. of Monroe*,
   853 F. Supp. 2d 364 (W.D.N.Y. 2012) ...................................................................................4

*Campbell v. Gen. Fin. Corp*.,
   523 F. Supp. 989 (W.D. Va. 1981) ........................................................................................13

*Chrysler Credit Corp. v. Whitney Nat'l Bank*,
   51 F.3d 553 (5th Cir.1995) ...................................................................................................34

*Cody v. Cmty. Loan Corp. of Richmond Cnty.*,
   606 F.2d 499 (5th Cir. 1979) ............................................................................................6, 8

*Davis-Lynch, Inc. v. Moreno*,
   667 F.3d 539 (5th Cir. 2012) ...............................................................................................28

*Del Castillo v. PMI Holdings N. Am. Inc.*,
   No. 4:14-CV-03435, 2016 WL 3745953 (S.D. Tex. July 13, 2016) .........................................5

*Domain Vault LLC v. McNair*,
   No. 3:14-CV-1126-L, 2015 WL 5695519 (N.D. Tex. Sept. 28, 2015)...................................10

*Edwards v. Your Credit Inc.*,
   148 F.3d 427 (5th Cir. 1998) ................................................................................................7

*Erickson v. Pardus*,
   551 U.S. 89 (2007).................................................................................................................3

*F.T.C. v. Dixie Fin. Co.*,
   695 F.2d 926 (5th Cir. 1983) ................................................................................................6

*Fairley v. Turan-Foley Imports, Inc.*,
   65 F.3d 475 (5th Cir. 1995) .................................................................................................8

*First Acadiana Bank v. Fed. Deposit Ins. Corp.*,
   833 F.2d 548 (5th Cir. 1987) ..............................................................................................12

*Fontenot v. Lavergne*,
   365 So.2d 1168 (La.App. 3 Cir.1978) ..................................................................................33

*Gaunt v. La. Citizens Prop. Ins. Corp.*,
   512 F. Supp. 2d 493 (E.D. La. 2007)....................................................................................34

*Gibbs v. Hous. Auth. of New Haven (In re Gibbs)*,
   9 B.R. 758 (Bankr. D. Conn. 1981) ........................................................................................9

*Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*,
   No. 4:10-CV-04872, 2017 WL 3236110 (S.D. Tex. July 31, 2017) ......................................23

*Godfrey v. Nationwide Vinyl Siding & Home Imp., LLC*,
   912 F. Supp. 2d 1320 (S.D. Ala. 2012)................................................................................12

*Grp. Life & Health Ins. v. Royal Drug Co.*,
   440 U.S. 205 (1979)...............................................................................................................6

*H.J. Inc. v. Nw. Bell Tel. Co.*,
   492 U.S. 229 (1989)........................................................................................................18, 23

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*,
   634 F.3d 787 (5th Cir. 2011) ..................................................................................................4

*ISystems v. Spark Network Ltd.*,
   No. 10-10905, 2012 WL 3101672 (5th Cir. March 21, 2012)................................................15

*Janvier & Co. v. Fritz*,
   180 So. 172 (La. Ct. App. 1938)............................................................................................10

*Kelly v. W. Cash & Carry Bldg. Materials Store*,
   99-0102 (La. App. 4 Cir. 10/20/99); 745 So. 2d 743............................................................33

*La. Power & Light Co. v. United Gas Pipe Line Com.*,
   642 F. Supp. 781 (E.D. La. 1986)..........................................................................................24

*Labbe v. Premier Bank*,
   618 So.2d 45 (La. App. 3 Cir. 1993) ...............................................................................34, 35

*Ludwick v. Harbinger Grp., Inc.*,
   854 F.3d 400 (8th Cir. 2017) ..................................................................................................7

*Luxpro Corp. v. Apple Inc.*,
   No. C 10-03058, 2011 WL 3566616 (N.D. Cal. Aug. 12, 2011)..............................................4

*Malvino v. Delluniversita*,
   840 F.3d 223 (5th Cir. 2016) ................................................................................................24

*McCaleb v. Peerless Ins. Co.*,
   250 F. Supp. 512 (D. Neb. 1965)...........................................................................................24

*Morris v. Novastar Mortg., Inc.*,
   No. 05-00791-CV-W-SOW, 2006 WL 2707349 (W.D. Mo. Sept. 19, 2006)......................13

*Munich Am. Reinsurance Co. v. Crawford*,
   141 F.3d 585 (5th Cir. 1998) ..................................................................................................5

iv

*Overseas Inns S.A.P.A. v. United States*,
  911 F.2d 1146 (5th Cir. 1990). ...........................................................................3

*Pendleton v. Am. Title Brokers, Inc.*,
  754 F. Supp. 860 (S.D. Ala. 1991)......................................................................12

*Perry v. Fid. Union Life Ins. Co.*,
  606 F.2d 468 (5th Cir. 1979) ................................................................................6

*Reves v. Ernst & Young*,
  507 U.S. 170 (1993).............................................................................................17

*Salinas v. United States*,
  522 U.S. 52 (1997)...............................................................................................28

*Samsung Elecs. Am., Inc. v. Yang Kun Chung*,
  No. 3:15-CV-4108-D, 2017 WL 635031 (N.D. Tex. Feb. 16, 2017) .....................23

*Snow Ingredients, Inc. v. SnoWizard, Inc.*,
  833 F.3d 512 (5th Cir. 2016) ...............................................................................27

*Sprint Sols., Inc. v. Fils-Amie*,
  44 F. Supp. 3d 1224 (S.D. Fla. Sept. 12, 2014) ..............................................4, 5

*St. Gregory Cathedral Sch. v. LG Elecs., Inc.*,
  No. 6:12-cv-739, 2015 WL 11121531 (E.D. Tex. Mar. 13, 2015) .........................15

*State v. Davenport*,
  No. 2016-KA-0223 (La. App. 4 Cir. 10/18/17); 2017 WL 4700652......................14

*State v. Dupre*,
  369 So. 2d 1303 (La. 1979) ................................................................................20

*State v. Felton*,
  339 So. 2d 797 (La. 1976) ...................................................................................21

*State v. Hunter*,
  454 So. 2d 131 (La. Ct. App. 1984)......................................................................20

*State v. Polk*,
  376 So. 2d 151 (La. 1979) ...................................................................................20

*State v. Touchet*,
  99-146 (La. App. 3 Cir. 4/5/00); 759 So. 2d 194.................................................13

*Stefanski v. Mainway Budget Plan, Inc.*,
  456 F.2d 211 (5th Cir. 1972) .................................................................................8

*Trahan v. City of Scott*,
  00-1246 (La. App. 3 Cir. 3/14/01); 802 So.2d 24 .................................................................33

*United States v. Booker*,
  334 F.3d 406 (5th Cir. 2003) ........................................................................................28

*United States v. Brown*,
  727 F.3d 329 (5th Cir. 2013) ....................................................................................28, 29

*United States v. Chapman*,
  851 F.3d 363 (5th Cir. 2017) ........................................................................................28

*United States v. Elliott*,
  571 F.2d 880 (5th Cir. 1978) ........................................................................................29

*United States v. Grant*,
  683 F.3d 639 (5th Cir. 2012) ........................................................................................28

*United States v. Jennings*,
  195 F.3d 795 (5th Cir. 1999) ........................................................................................21

*United States v. Nakaladski*,
  481 F.2d 289 (5th Cir. 1973) ....................................................................................21, 22

*United States v. Nardello*,
  393 U.S. 286 (1969) ......................................................................................................22

*United States v. Phea*,
  755 F.3d 255 (5th Cir. 2014) ........................................................................................22

*United States v. Posada-Rios*,
  158 F.3d 832 (5th Cir. 1998) ........................................................................................17

*United States v. Thompson*,
  No. 99-41007, 2001 WL 498430 (5th Cir. 2001) ..........................................................17

*United States v. Turkette*,
  452 U.S. 576 (1981) ......................................................................................................13

*United States v. Villarreal*,
  764 F.2d 1048 (5th Cir. 1985) ......................................................................................21

*United States v. Wallace*,
  759 F.3d 486 (5th Cir. 2014) ........................................................................................28

*Wells Fargo Bus. Credit v. Ben Kozloff, Inc.*,
  695 F.2d 940 (5th Cir. 1983) ........................................................................................18

vi

*Zilbert v. Sasol N. Am., Inc.*,
    No. 2:11 CV 00862, 2012 WL 1950144 (W.D. La. May 29, 2012)......................................13

**Statutes**

15 U.S.C. § 1012(b) ...........................................................................................................5

15 U.S.C. § 1601 ....................................................................................................... *passim*

15 U.S.C. § 1601(a) .........................................................................................................5, 6

15 U.S.C. § 1602(f) ...............................................................................................................8

15 U.S.C. § 1602(g) .........................................................................................................9, 10

15 U.S.C. § 1605 .................................................................................................................10

15 U.S.C. § 1635 ...................................................................................................................7

18 U.S.C. § 891(7) ...............................................................................................................23

18 U.S.C. § 894 ..............................................................................................................19, 22

18 U.S.C. § 1951 ..................................................................................................................19

18 U.S.C. § 1952 ............................................................................................................19, 22

18 U.S.C. § 1961(1) .............................................................................................................19

18 U.S.C. § 1961(6) .............................................................................................................25

18 U.S.C. § 1962 ........................................................................................................ *passim*

18 U.S.C. § 1962(c) ..............................................................................................18, 19, 23, 25

18 U.S.C. § 1962(d) .............................................................................................................19

La. Civ. Code Ann. art. 7 .....................................................................................................30

La. Civ. Code Ann. art. 1968 ...............................................................................................30

La. Code Crim. Proc. Ann. art. 331 .....................................................................................24

La. Rev. Stat. Ann. § 9:3505(5) ...........................................................................................26

La. Rev. Stat. Ann. § 22:855 ................................................................................................35

La. Stat. Ann. § 9:3512 ........................................................................................................26

La. Stat. Ann. § 9:3512(35) ..................................................................................................26

La. Stat. Ann. § 9:3516(12) .......................................................................26, 33

La. Stat. Ann. § 9:3516(16) ..............................................................................26

La. Stat. Ann. § 9:3520 .....................................................................................27

La. Stat. Ann. § 13:718(I)(2)(a) ..................................................................30, 31

La. Stat. Ann. § 14:44 .......................................................................................20

La. Stat. Ann. § 14:45 .......................................................................................19

La. Stat. Ann. § 14:45(A)(1) .............................................................................19

La. Stat. Ann. § 14:52 .......................................................................................30

La. Stat. Ann. § 14:66 ..................................................................................19, 20

La. Stat. Ann. § 15:1351 .....................................................................................1

La. Stat. Ann. § 22:855 ........................................................................10, 31, 32

La. Stat. Ann. § 22:855(A) ................................................................................31

La. Stat. Ann. § 22:855(B)(1) ...........................................................................31

La. Stat. Ann. § 22:855(B)(2)(a) .......................................................................32

La. Stat. Ann. § 22:855(B)(2)(b) .......................................................................30

La. Stat. Ann. § 22:1443 ..............................................................................30, 31

La. Stat. Ann. 22:1452 ......................................................................................30

La. Stat. Ann. § 22:1542(3) ...............................................................................10

La. Stat. Ann. § 22:1558 ...................................................................................10

La. Stat. Ann. § 22:1564 ...................................................................................10

La. Stat. Ann. § 22:1585 ...................................................................................24

**Rules and Regulations**

12 C.F.R. § 1026.1(c)(1) .....................................................................................8

12 C.F.R. § 1026.2(a)(14) ...................................................................................8

12 C.F.R. § 1026.2(a)(17)(v) .............................................................................10

12 C.F.R. § 1026.4(a)(1)(i) ............................................................................12

61 Fed. Reg. 49, 237-02 (Sept. 19, 1996) ....................................................12

61 Fed. Reg. 49, 239-02 (Sept. 19, 1996) ....................................................12

Fed. R. Civ. P. 8(a)(2) ....................................................................................3

Fed. R. Civ. P. 8(d)(2) ..................................................................................31

**Other Authorities**

Restatement (First) of Contracts § 75 (1932) ..............................................32

## I.       INTRODUCTION

Ronald Egana, Samantha Egana, and Tiffany Brown (collectively, "Plaintiffs") have filed this action on behalf of themselves and all individuals whose rights under federal and state law were violated when they contracted with Defendants for a bail bond to secure their own or their loved ones' release from jail.  The Amended Complaint describes the process through which Defendants Blair's Bail Bonds, Inc. and New Orleans Bail Bonds, L.L.C. (collectively, "Blair's") and Bankers Insurance Company, Inc., Bankers Surety Services, Inc., and Bankers Underwriters, Inc. (collectively, "Bankers") utilized standard contracts that violate the Truth in Lending Act, 15 U.S.C. § 1601 *et seq.* ("TILA") by failing to make necessary disclosures, and state contract, conversion, and usury laws by requiring payment of amounts above what state law allows, including paying daily fees for ankle monitors supplied by A2i, L.L.C., Alternative to Incarceration, Inc., and Alternative to Incarceration NOLA, Inc. (collectively, "A2i").  The Amended Complaint also describes how Defendants violated the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO") and the Louisiana Racketeering Act, La. Stat. Ann. § 15:1351, by conspiring to employ or contract with bounty hunters to kidnap, detain, and threaten to jail principals unless they or their loved ones paid money that was distributed between Defendants.  As discussed in greater detail below, Plaintiffs have sufficiently pleaded the above claims, and Defendants' motions to dismiss should be denied.

## II.      STATEMENT OF FACTS AND RELEVANT PROCEDURAL BACKGROUND

On June 17, 2016, after learning that her son, Ronald Egana, was in jail, Samantha Egana went with her son's friend, Tiffany Brown, to the office of Blair's Bail Bonds, Inc. to obtain a bail bond to secure his release from jail.  Am. Compl. (ECF No. 26) ¶ 49.  Ms. Egana and Ms. Brown signed as "indemnitors" on several form contracts that included references and obligations to Blair's and Bankers (collectively, the "Bonding Defendants").  *Id*. ¶¶ 49-50.  The contracts

1

obligated Plaintiffs to pay a $3,275 nonrefundable bail bonding fee comprised of a 12% premium, a $25 administration fee, and $130 of undisclosed charges.  Because they could not afford to pay the entire bail bonding fee at once, they owed a balance of $1,660.  *Id*. ¶ 54.  Bonding Defendants extended credit for the $1,660 balance, to be repaid in biweekly installments of $300, and told Ms. Egana and Ms. Brown that they would either have to post real property as collateral, or Mr. Egana would have to wear an ankle monitor, though none had been ordered by the court.  *Id*.  The contracts also stated in small print that any money paid would be applied to outstanding balances on this and previous bonds posted for Mr. Egana.  *Id*. ¶ 61.

Mr. Egana was released from jail the following day.  *Id*. ¶ 55.  Shortly after, he went to the Blair's office to sign the form contracts his mother and friend had already signed.  He met with Marcell Compass, a Blair's employee, who told him he would have to wear an ankle monitor and revealed for the first time that it would cost $10 per day.  The ankle monitor was provided by A2i. *Id*. ¶¶ 56.  Yet, Mr. Egana did not sign a contract with A2i until several months later.  *Id.* ¶ 82.

Unbeknownst to Plaintiffs, the contracts they signed violated state and federal law by failing to disclose key terms of the loan, charging above the statutory limit on bail bond premiums, and imposing usurious interest.  *Id*. ¶¶ 129, 175-76, 181-185, 189-192.  In the months that followed, Defendants further violated state and federal racketeering laws by sending armed bounty hunters to threaten Mr. Egana and, on three separate occasions, seize him against his will, detain him in handcuffs at the Blair's office, and make him call his mother and friend to tell them he would be taken back to jail unless they brought money right away.  They seized him while he was at work, on the day after Christmas at his relative's home, and as he was going through security to make an appearance at the Orleans Parish courthouse, telling him, "We're going to see how much money you can bring today."  *Id*. ¶¶ 70-81.  In total, Plaintiffs paid at least $6,000—well beyond

the $3,275 bail bonding fee set forth in the contracts they signed.  Finally, on May 23, 2017, Defendants' bounty hunters seized Mr. Egana and surrendered him to the St. Bernard jail.  When asked why, Blair's staff said that the insurance company (Bankers) did not want to have anything further to do with Mr. Egana.  *Id.* ¶¶ 90-91.

Operating as an enterprise, Defendants illegally squeezed money out of many others by similarly requiring them to sign contracts that violate state and federal law and by extorting friends and family members for payments.  On June 16, 2017, Plaintiffs brought this action on behalf of themselves and all others who had been victimized by Defendants' practices.  Compl. (ECF No. 1). Plaintiffs amended their complaint on September 12, 2017.  Am. Compl.[1]  On October 3, Bankers, Blair's, and A2i filed motions to dismiss.   Bankers Mot. (ECF No. 45-1); Blair's Mot. (ECF No. 44-1); A2i Mot. (ECF No. 43-1).

## III.    LEGAL ARGUMENT

### A.    The Amended Complaint Meets the Pleading Requirements of FRCP 8

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief."  *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009).  A complaint simply needs to contain enough factual allegations to render the claims "plausible."  *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (citing *Iqbal*, 556 U.S. at 679).  The Supreme Court has clarified that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'"  *Erickson v. Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555).  The facts pleaded "need only

---

[1] Blair's contends that the Amended Complaint should be treated as Plaintiffs' second amended complaint, but cites to no law to support this claim.  Blair's Mot. at 2.  This claim is baseless, as this is Plaintiffs' first amendment in this action.  Perhaps recognizing that their position is unsupported, Blair's encourages the Court to disallow any "future" amendments to the complaint.  Blair's Mot. at 16.  Their argument ignores the text of Rule 15, indicating that "the court should freely give leave [to amend] when justice so requires," and requiring an inquiry into the prejudice caused by the potential amendment and other factors that can only be assessed when the amended pleadings are presented.  *See e.g.*, *Overseas Inns S.A.P.A. v. United States*, 911 F.2d 1146, 1150-51 (5th Cir. 1990).

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.*

Moreover, "[t]he plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S. at 678. As the Fifth Circuit has observed, under *Iqbal*, "[a] claim for relief is plausible on its face 'when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged.'" *Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787, 795-96 (5th Cir. 2011) (citations omitted).

Contrary to Bankers' position, when a court considers whether sufficient factual content has been pleaded to allow a "reasonable inference that the defendant is liable for the misconduct alleged," allegations based on hearsay are properly considered. *See, e.g.*, *Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, No. 2:17-CV-00053, 2017 WL 2126593, at *3, *5 (E.D. Wash. May 16, 2017) ("the fact the Complaint relies on hearsay is immaterial in a motion to dismiss"); *Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012); *Luxpro Corp. v. Apple Inc.*, No. C 10-03058, 2011 WL 3566616, at *3 (N.D. Cal. Aug. 12, 2011).

Although many allegations in the Amended Complaint refer to "Bonding Defendants" as a group, Plaintiffs allege sufficient facts to support a "reasonable inference" that each defendant is liable for the misconduct. As this Court has noted, a "complaint that contains 'group allegations' and 'lumps together' defendants is not ipso facto in violation of Rule 8." *Body by Cook, Inc. v. State Farm Mut. Auto. Ins.*, No. CV 15-2177, 2016 WL 4479507, at *3 (E.D. La. Aug. 25, 2016), *aff'd in part, rev'd in part*, 869 F.3d 381, 385 (5th Cir. 2017). "[A] plaintiff may plead claims against multiple defendants by referring to them collectively, for example by referring to a group of defendants as 'defendants.' These collective allegations are construed as applying to each defendant individually." *Sprint Sols., Inc. v. Fils-Amie*, 44 F. Supp. 3d 1224, 1227 (S.D. Fla. Sept. 12, 2014) (citations omitted). Relying on collective allegations "only runs afoul of the applicable

4

pleading standard where it results in a complaint that fails to give each defendant notice of the claims against it."[2]  *Id.*

**B.     Plaintiffs Properly State a Claim for Violation of the Truth in Lending Act**

Plaintiffs entered into a deferred payment plan for the $1,660 balance owed to Bonding Defendants, conditioned on payment of $10 daily ankle monitoring fees and of Mr. Egana's prior outstanding balances with Blair's.  Am. Compl. ¶¶ 40, 54, 56, 65-66, 68.  Defendants incorrectly argue that the McCarran-Ferguson Act ("MFA") prevents the application of TILA to this credit arrangement and that, even if not, the transactions at issue are not subject to TILA.  Their position mischaracterizes the nature of the agreements at issue and ignores Fifth Circuit precedent holding that TILA regulates the financing of insurance premiums.

**1.     The McCarran-Ferguson Act does not prevent the application of TILA to Bonding Defendants' extension of credit**

The MFA creates a narrow exception to federal preemption of state law, permitting a state law to "reverse pre-empt a federal statute" only if three conditions are met: "(1) the federal statute does not specifically relate to the 'business of insurance,' (2) the state law was enacted for the 'purpose of regulating the business of insurance,' and (3) the federal statute operates to 'invalidate, impair, or supersede' the state law."  *Munich Am. Reinsurance Co. v. Crawford*, 141 F.3d 585, 590 (5th Cir. 1998) (quoting 15 U.S.C. § 1012(b)).

The express purpose of TILA is "to assure a meaningful disclosure of credit terms so that the consumer will be able to compare more readily the various credit terms available to him." 15

---

[2] Defendants' reliance on *Del Castillo v. PMI Holdings N. Am. Inc.* is misplaced because there, the complaint failed to explain the roles of the eight distinct defendants, and none of the allegations was sufficient to state a claim against any of them.  No. 4:14-CV-03435, 2016 WL 3745953 (S.D. Tex. July 13, 2016).  Here, in contrast, the Amended Complaint explains the respective involvement of each of the three Bankers entities in serving as a surety for bonds issued by Blair's.  Am. Compl. ¶ 33.  The entities work jointly to provide bail bonds through their agent, Blair's.  It is neither appropriate nor necessary for Plaintiffs to repeat the roles of each entity when alleging each instance of wrongful conduct.  The Amended Complaint does not deprive any Defendant of sufficient notice to permit it to affirm or deny the allegations made against it.

U.S.C. § 1601(a).  While it is well-settled that TILA does not specifically relate to the business of insurance, Bonding Defendants fail to satisfy both of the other two necessary elements under the limited MFA exception by identifying any state law impaired by application of TILA.

       a.     *The Fifth Circuit has held that the McCarran-Ferguson Act does not prevent the application of TILA to insurance premium financing*

As the Fifth Circuit has held, the MFA does not prevent TILA from regulating the *financing* of insurance premiums, which does not constitute the "business of insurance."  *See*, *e.g.*, *Perry v. Fid. Union Life Ins. Co.*, 606 F.2d 468 (5th Cir. 1979).  Indeed, the Fifth Circuit has held that the MFA does not prevent the application of TILA even when the same company that provides insurance also finances the premium.  *Cody v. Cmty. Loan Corp. of Richmond Cty.*, 606 F.2d 499, 503 (5th Cir. 1979) ("The mere fact that [the insurance company] sold the policies that it financed does not preclude application of TIL[A], since the financing is insufficient to invoke the McCarran Act exemption."); *Perry*, 606 F.2d at 468; *accord F.T.C. v. Dixie Fin. Co.*, 695 F.2d 926, 930 (5th Cir. 1983) ("The Fifth Circuit has consistently held . . . that the lending activities are apart from any insurance activities a company may engage in.").  This comports with the Supreme Court's admonition that "the [MFA] exemption is for the 'business of insurance,' not the 'business of insurers.'"[3] *Grp. Life & Health Ins. Co. v. Royal Drug Co.,* 440 U.S. 205, 211 (1979).

Plaintiffs argue not that TILA is applicable to all bail bond agreements, but that it is applicable where, as here, Plaintiffs entered into a separate agreement to defer payment of the total amount owed for the bail fee.  Thus, Bonding Defendants' reliance on *Buckman v. Am. Bankers Ins. Co. of Fla.*, 924 F. Supp. 1156 (S.D. Fla. 1996) is misplaced.  Unlike the transactions at issue in this lawsuit and in *Cody* and its progeny, *Buckman* did not involve an extension of credit; the

---

[3] Importantly, Plaintiffs do not contest that bail bond agents and underwriters are regulated by the Department of Insurance in extending bail bonds, which is separate from their credit and lending activities.  Any actions taken by Plaintiffs' counsel to invoke the oversight of that Department over its licensees, *see* Blair's Mot. at 9, is irrelevant to the specific contentions related to credit agreements and disclosure here.

*Buckman* plaintiff paid the entire bail bond premium up front. *See id.* at 1157; *see also Buckman v. Am. Bankers Ins. Co. of Fla.*, 115 F.3d 892, 893 (11th Cir. 1997). Plaintiff's claim was that TILA applied to a promissory note that was a part of the "standard bail bond transaction," where "she agree[d] to be obligated to the surety should the accused fail to appear in court." *Buckman*, 115 F.3d at 894. This was a contingent obligation, not an extension of credit; it was solely an agreement "to facilitate any indemnification that may become necessary." *Id.* at 894.[4]

Bonding Defendants have identified no Louisiana insurance law that relates to the financing of bail premiums or the extension of credit in bail bond transactions, and therefore no law that thus would be "invalidate[d], impair[ed], or supersede[d]" by applying TILA's disclosure requirements to credit agreements. Bonding Defendants detail various laws that govern the relationship between a bail bond agent, surety, and individual seeking release from jail (Blair's First Mot. (ECF No. 20-1) at 13-14; Bankers Mot. at 12-13), but none concern the financing or consumer credit activities challenged under TILA in this case, let alone disclosures required pursuant to those activities.[5]

The Fifth Circuit has found no direct impairment of state law with TILA where the laws "were enacted for different purposes to serve different ends": TILA "is a disclosure law" that does not conflict with a state law that "governs the essentials of the transaction itself." *Edwards v. Your Credit, Inc.*, 148 F.3d 427, 434 (5th Cir. 1998) (internal citations and quotation marks omitted).[6]

---

[4] Furthermore, the district court's scant treatment of the MFA warns against finding its analysis on this issue persuasive. The district court omitted critical elements of the MFA inquiry in its analysis by failing to consider whether TILA would impair the state law in question. *Buckman*, 924 F. Supp. at 1157. On appeal, the Eleventh Circuit did not address the lower court's holding on the MFA. *See Buckman*, 115 F.3d at 894 n.1.

[5] It is for this reason that Defendants' reliance on *Ludwick v. Harbinger Grp., Inc.*, 854 F.3d 400, 404 (8th Cir. 2017), is misplaced. There, the court found that plaintiff's claims were "about insurance companies' solvency," which it found were "squarely within the regulatory oversight by state insurance departments."

[6] Nor is Blair's correct that the MFA is satisfied by another section of TILA, not applicable to Plaintiffs' transaction, that allows a three day right of rescission for transactions secured by a home. *See* Blair's First Mot. at 18-19. This provision only applies to "credit transaction[s]." 15 U.S.C. § 1635. The credit transaction here is the agreement to

2.   <u>Bonding Defendants are subject to TILA</u>

The bail bond premium transaction in which Plaintiffs were extended credit satisfies all the elements required under TILA.  TILA "applies to each individual or business that offers or extends credit," and is not otherwise excluded from coverage by statute, when four conditions are met:

> (i) The credit is offered or extended to consumers; (ii) The offering or extension of credit is done regularly; (iii) The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (iv) The credit is primarily for personal, family, or household purposes.

12 C.F.R. § 1026.1(c)(1).  Moreover, "TILA is to be enforced strictly against creditors and construed liberally in favor of consumers."  *Fairley v. Turan-Foley Imports, Inc.*, 65 F.3d 475, 482 (5th Cir. 1995).  As discussed below, the transaction at issue meets all four of these conditions, and Bonding Defendants' arguments to the contrary are not well-taken.

a.   *Bonding Defendants' agreement to defer payment of the bail premium is an extension of credit to consumers under TILA*

An agreement to defer payment of the bail fee constitutes "credit" under TILA.  "The term 'credit' means the right granted by a creditor to a debtor to defer payment of debt or to incur debt and defer its payment."  15 U.S.C. § 1602(f); *see also* 12 C.F.R. § 1026.2(a)(14).  Bonding Defendants acknowledge that Plaintiffs did not pay the bail fee up front and instead entered into an agreement to pay over time.  Blair's First Mot. at 3; Bankers Mot. at 3-4.  The Fifth Circuit has held that agreements to defer payment of insurance premiums and repay over time constitute "credit" under TILA.  *See Cody*, 606 F.2d at 504-05; *Stefanski v. Mainway Budget Plan, Inc.*, 456 F.2d 211 (5th Cir. 1972).

---

finance a bail bond. However, even if a consumer could rescind the agreement to finance the premiums, he could not rescind the underlying bond agreement and would still owe the bail fee.  Blair's could demand full payment of the premium, extend a new financing agreement, or take other appropriate action.  This would not interfere with any Louisiana statutory right.

Bonding Defendants again cite to *Buckman* for the proposition that a bail bond transaction is not an extension of credit under TILA.  However, as discussed *supra* at Section III(B)(1)(a), the transaction at issue in *Buckman* was not an agreement to defer a bail bonding premium.  *See Buckman*, 115 F.3d at 893.  In fact, the *Buckman* court explained that the lack of a credit arrangement—or the liability for a debt regardless of a condition being met—was the exact flaw in the *Buckman* plaintiff's TILA argument.  *Id.* at 894 (because "no amount is due (that is, there is no 'debt') unless and until the bond is forfeited by the court," the plaintiff only became liable "by court order when the bond was breached").  In contrast, Plaintiffs became liable to Bonding Defendants for the credit agreement as soon as the paperwork was signed, without their liability being premised on any contingency or court order.  Such an agreement constitutes "credit" under TILA.[7]

> b.  *Bankers is a creditor*

Plaintiffs plausibly allege that Bankers is a creditor under TILA.[8]  A creditor both:

(1) [R]egularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit

---

[7] Blair's relies on two additional cases that provide no support for its argument.  Blair's Mot. at 10-11.  In the first, a bankruptcy court found that the repayment agreement in that case did not constitute "consumer credit," with no explanation of this finding.  *Gibbs v. Hous. Auth. of New Haven (In re Gibbs)*, 9 B.R. 758, 765 (Bankr. D. Conn. 1981).  It then found that the amount that the debtor claimed constituted a "finance charge" was actually a late fee outlined in the original lease.  *Id.*  Blair's places great weight on the court's statement that "[t]he Authority's business is to furnish low-cost rental housing to those in need of it, not to extend credit," but does not explain how this statement is relevant to the TILA analysis.  *Id.*  Instead, the only requirements to be a "creditor" under TILA involve the regular extension of covered credit and that the debt is payable to that entity.  *See* Section III(B)(2)(b), *infra* (citing 15 U.S.C. § 1602(g)).

The second case, *Bonfiglio v. Nugent*, 986 F.2d 1391, 1393 (11th Cir. 1993), is clearly distinguishable.  In *Bonfiglio*, the Eleventh Circuit affirmed a district court's dismissal of a TILA claim because the plaintiff sought to apply TILA to a court order to pay an opposing party.  The court relied on official staff interpretations that TILA did not cover court judgments or orders.  *Id.*  In no way can Bonding Defendants' agreement to defer payment of the bail fee be considered an obligation to pay a court debt pursuant to court order.  Bonding Defendants arranged the credit transaction to pay the bail fee and offered it directly to Plaintiffs as consumers, and Plaintiffs were not obligated to pay Bonding Defendants until they signed the agreement.

[8] Blair's does not challenge that Plaintiffs have satisfied this element of TILA.

> transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.

15 U.S.C. § 1602(g).  "A person regularly extends consumer credit only if it extended credit . . . more than 25 times . . . in the preceding calendar year."  12 C.F.R. § 1026.2(a)(17)(v).

Bankers argues that any credit is not "initially payable" to it because its name does not appear at the top of the "Payments Arrangements" document.  However, this document does not contain the entirety of the terms of the credit agreement between Plaintiffs and Bonding Defendants.[9]  The letterhead bears Blair's name, but the document does not indicate *to whom* Plaintiffs owe the balance.  This document indicates only that Plaintiffs "acknowledge that the balance due on this bond needs to be paid."  The "balance" is comprised of the "PREMIUM @ 12.0%" ($3,120), the "ADMINISTRATION FEE" ($25), plus another undisclosed fee.

Blair's acts as Bankers' agent under law.  Am. Compl. ¶ 32; *see also* La. Stat. Ann. § 22:1558 (requiring all acting as "agent of an insurer" to be appointed as producers).[10]  Louisiana has long recognized that such agents act on behalf of the insurer when collecting premiums;[11] producers do not retain the premium, but are instead paid a percentage of the premium as "commission" by the insurer.[12]  Without knowing, for instance, whether Blair's prepaid the

---

[9] The document also is signed only by Plaintiffs, not by any Bonding Defendants or their agents.  Am. Compl. ¶ 65.

[10] Blair's Bail Bonds, Inc., Blaire Boutte, Marcell Compass, Alroy Allen, and others are listed as Bankers' producers in official records of the Department of Insurance.  *See* https://www.ldi.la.gov/LicenseeReports/ProducersBailBond.xls; *see also Domain Vault LLC v. McNair*, No. 3:14-CV-1126-L, 2015 WL 5695519, at *3 (N.D. Tex. Sept. 28, 2015) (court may take judicial notice of documents available from official government website) (citing cases).

[11] *See* La. Stat. Ann. § 22:855 (recognizing respective responsibilities in pricing of insurance: premium quoted by insurer; agency fee and other expenses charged by producer; no other fees charged by either insurer or its producer); La. Stat. Ann. § 22:1564 (recognizing "obligations and duties" of producers of record—those authorized to act as producers only for certain transactions—to collect and remit any premiums to insurer); *see also Janvier & Co. v. Fritz*, 180 So. 172, 173 (La. Ct. App. 1938) (premium ordinarily owed to insurance company, not to agent).

[12] *See* La. Stat. Ann. § 22:1542(3).

premium to Bankers or whether Bankers also agreed to extend credit for its premium through its agent, it is plausible that both are creditors.

Moreover, the Amended Complaint alleges that Bankers "participates in setting the terms of the contracts signed by principals and indemnitors." Am. Compl. ¶ 120. Blair's employees also represented to Plaintiffs that the insurance company (Bankers) was the entity deciding whether and when Mr. Egana's ankle monitor could be removed based on nonpayment of the balance owed. Am. Compl. ¶ 81. Thus, it is plausible to infer from these allegations that at least some of the money due and collected under the credit agreement was to be paid to Bankers. Similarly, Plaintiffs plausibly allege that Bankers and Blair's entered into agreements to defer bond premiums well over 25 times in 2015 and 2016, which qualifies them as creditors under TILA. Am. Compl. ¶ 45. Bonding Defendants regularly defer payment of the bail bond premium into periodic payments that result in more than four installments and additional fees, as they did with Plaintiffs. *Id.* ¶¶ 62, 65; *see also infra* Section III(B)(2)(c) (describing finance charge).

c.   *Ankle monitor fees, unexplained fees, and outstanding balances constitute finance charges under TILA*

Bonding Defendants are also subject to TILA's disclosure requirements because they required payment of finance charges. *Id.* A "finance charge" is defined as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit." 15 U.S.C. § 1605. Bonding Defendants charged Plaintiffs multiple fees as incident to deferring payment of the bail fee.

*First*, the unexplained $130 of charges are plausibly finance charges, as the documents do not identify their purpose or even disclose the charge. Am. Compl. ¶¶ 52, 65. *Second*, fees charged for the ankle monitor requirement are finance charges under TILA because, as Plaintiffs have alleged, they are a condition of the extension of credit. Am. Compl. ¶¶ 40, 45. No allegation

supports Blair's arguments that ankle monitoring was "separate" from the credit agreements or

that ankle monitoring would have been required in a "comparable cash transaction," where

individuals paid the bail fee in full.[13]  Plaintiffs allege that they would not have been able to enter

into the credit agreement for the bail fee without the ankle monitoring arrangement.  Am. Compl.

¶¶ 40, 54.  Plaintiffs were told that the ankle monitor and fees would be required until Plaintiffs

had paid most of the total owed, Am. Compl. ¶ 56, and the monitor was used to locate principals

and extract payments.  Am. Compl. ¶¶ 81-88.

 Blair's argues that ankle monitoring fees are not finance charges under TILA because it

ultimately forwards the fees to A2i.  Even if true, Blair's cites no authority for this proposition, and

with good reason: a fee set and retained by a third party is considered a finance charge where

required as a condition of or incident to the extension of credit.  12 C.F.R. § 1026.4(a)(1)(i); *First*

*Acadiana Bank v. Fed. Deposit Ins. Corp.*, 833 F.2d 548, 550 (5th Cir. 1987).

 *Finally*, the requirement that Plaintiffs pay Mr. Egana's previous outstanding balances

renders them finance charges under TILA because this was a prerequisite to the extension of new

credit, regardless of whether, as Blair's protests, no interest was ever charged on these prior

balances.  As to Mr. Egana, an existing, unsecured debt became a debt secured by the threat of

arrest and incarceration, including forfeiture of the current bond, if payments were not met.  As to

Ms. Brown and Ms. Egana, who had no liability for Mr. Egana's prior balance until they signed as

indemnitors on his new loan, these were additional costs of credit.  *See, e.g.*, *Morris v. Novastar*

---

[13] Blair's reliance on *Godfrey v. Nationwide Vinyl Siding & Home Imp., LLC*, 912 F. Supp. 2d 1320, 1334 (S.D. Ala. 2012), is thus misplaced.  As Blair's acknowledges, installation of the heat pump in *Godfrey* was performed by a third party selected by the debtor and was not specifically required by the bank.  *Id.*  In contrast, Plaintiffs were required to obtain the ankle monitor and pay the fees imposed.  The mere fact that Plaintiffs may have had the "option" of avoiding these fees if they could provide real property as collateral does not change the fact that the ankle monitoring fees became a requirement of this credit transaction.  *See* 61 Fed. Reg. 49, 237-02, 49, 239-02 (Sept. 19, 1996) ("[E]ven though a lender may not require a particular loan feature, the feature may become a term of the credit if it is included."); *Pendleton v. Am. Title Brokers, Inc.*, 754 F. Supp. 860, 863-64 (S.D. Ala. 1991).

*Mortg., Inc.*, No. 05-00791-CV-W-SOW, 2006 WL 2707349, at *4 (W.D. Mo. Sept. 19, 2006);

*Campbell v. Gen. Fin. Corp.*, 523 F. Supp. 989, 992-93 (W.D. Va. 1981).

### C.   Plaintiffs Properly State a Claim for Violation of the Racketeer Influenced and Corrupt Organizations Act and Louisiana Racketeering Law.

Defendants argue that Plaintiffs' second, third, and fourth claims alleging violations of

RICO and Louisiana racketeering law should be dismissed.  For the reasons set forth *infra*, their

motions should be denied.[14]

### 1.   Plaintiffs have alleged sufficient facts to establish an association-in-fact enterprise among Blair's, Bankers, and A2i

#### a.   *There is no requirement that a RICO enterprise have a "hierarchical structure" or a purpose "separate and apart from the pattern of racketeering"*

Bonding Defendants' position that an association-in-fact enterprise requires proof of an

"ongoing organization" that "functions as a continuing unit over time through a hierarchical or

consensual decision-making structure," and that the enterprise must be "separate and apart from

the pattern of racketeering," (Bankers Mot. at 17; Blair's Mot. at 3-4) has been explicitly rejected

by the Supreme Court in *Boyle v. United States*, 556 U.S. 938 (2009).

In *Boyle*, the Supreme Court held that the "structure" of an association-in-fact enterprise

need not go beyond "that inherent in the pattern of racketeering activity in which its members

engage." *Id.* at 945, 947 (quotation marks omitted).  Specifically, the Court held that "the evidence

used to prove the pattern of racketeering activity and the evidence establishing an enterprise 'may

in particular cases coalesce.'"  *Id.* at 947 (quoting *United States v. Turkette*, 452 U.S. 576, 583

(1981)).

---

[14] Louisiana racketeering laws are modeled upon federal RICO legislation.  *Zilbert v. Sasol N. Am., Inc.*, No. 2:11 CV 00862, 2012 WL 1950144, at *2 (W.D. La. May 29, 2012).  Given the "parallel between the RICO and Louisiana's statutes," and the limited Louisiana jurisprudence, "federal decisions in this area are persuasive." *Id.* (citing *State v. Touchet*, 99-146 (La. App. 3 Cir. 4/5/00); 759 So. 2d 194, 197).  Thus, for the reasons Defendants' motions fail under federal law, they also fail under Louisiana state law.

The Supreme Court also rejected Bonding Defendants' argument that an association-in-fact enterprise must have a hierarchy or other such organizational features, holding that:

> [A]n association-in-fact enterprise . . . . need not have a hierarchical structure or a "chain of command" . . . . Members of the group need not have fixed roles; different members may perform different roles at different times. . . . While the group must function as a continuing unit and remain in existence long enough to pursue a course of conduct, nothing in RICO exempts an enterprise whose associates engage in spurts of activity punctuated by periods of quiescence.

*Id.* at 948. *Boyle* thus overruled any possible requirement to show longevity beyond the predicate acts or sophisticated hierarchical decision-making. Plaintiffs need only prove that Defendants' enterprise had (1) a purpose, (2) relationships among those associated with the enterprise, and (3) longevity sufficient to accomplish the enterprise's purpose. *See Allstate Ins. Co. v. Plambeck*, 802 F.3d 665, 674 (5th Cir. 2015) (quoting *Boyle*, 556 U.S. at 946).

Even if Bonding Defendants were correct that Plaintiffs must show that the enterprise has a hierarchical structure and operates separately from its pattern of racketeering, Plaintiffs allege facts sufficient to meet these abrogated standards.[15] Plaintiffs plead facts that demonstrate the organizational structure of the enterprise. *See, e.g.*, Am. Compl. ¶¶ 115-24. Plaintiffs allege, among other things, that Blair's collects and distributes money to the other enterprise members, *id.* ¶ 118, that Bankers identifies individuals who will be required to pay pre-existing balances and also decides how much each individual who is behind in payments must pay to avoid jail, *id.* ¶ 120, and that A2i determines the ankle monitoring fees that will be collected by Blair's, *id.* ¶ 122. And Plaintiffs indeed allege that the enterprise has purposes other than the predicate acts: the "RICO Enterprise has an ongoing relationship with the common purpose of providing bail bonds to

---

[15] For the same reasons, Plaintiffs have met the relevant standard with respect to their Louisiana RICO claim. *See State v. Davenport*, No. 2016-KA-0223 (La. App. 4 Cir. 10/18/17); 2017 WL 4700652. For a discussion of how the enterprise has functioned as a continuing unit over time, *see* Section III(C)(2)(c), *infra*.

14

persons in the greater New Orleans area." *Id.* ¶ 115.[16]

Bankers is misguided in relying on *ISystems v. Spark Network Ltd.*, No. 10-10905, 2012 WL 3101672 (5th Cir. March 21, 2012) and *St. Gregory Cathedral Sch. v. LG Elecs., Inc.*, No. 6:12-cv-739, 2015 WL 11121531 (E.D. Tex. Mar. 13, 2015) to argue that Plaintiffs' allegations against the three Bankers entities are insufficient to allege an enterprise. These cases deal with the entirely separate issue of whether the plaintiff named a distinct RICO person and enterprise where the enterprise was made up entirely of entities in parent-subsidiary relationships. In contrast, Plaintiffs clearly allege an enterprise made up not only of Bankers entities, but also including Blair's and A2i, and thus have alleged that Defendants "operate[d] through a network of separate corporate entities [to] facilitate[] the alleged racketeering activity." *St. Gregory Cathedral Sch.*, 2015 WL 11121531, at *4.

> b.   *The Amended Complaint does not rely on "unwarranted deductions of fact"*

Next, Bankers dismisses Plaintiffs' allegations as "unwarranted deductions of fact" that "are not supported by any ultimate facts, or even any theory of *why*" Bankers would be so "intimately involved" in the enterprise. Bankers Mot. at 17-18 (emphasis in original). This misses the mark, not in the least because the "ultimate facts" are to be determined by the finder of fact and are irrelevant at this stage of the proceeding.[17] *Am. Dental Ass'n v. Cigna Corp.*, which Bankers cites for the proposition that "deductions of fact" are improper in a complaint, is wholly inapposite here. 605 F.3d 1283 (11th Cir. 2010). There, the plaintiff alleged a conspiracy based entirely on only a logical deduction— that the defendant must have participated in the conspiracy because,

---

[16] A2i has not argued that a hierarchical structure is necessary, or that the enterprise must operate separately from the pattern of racketeering, but *see* Section III(C)(2)(b) *infra* regarding A2i's participation in the predicate acts constituting a RICO violation. Blair's has made no other arguments as to the enterprise element.

[17] Also, Bankers' motivation for its participation in the enterprise is not an element of RICO—nothing in the statute requires a plaintiff to plead a theory of why a defendant participated in the enterprise.

otherwise, the conspiracy would not have been successful.  *See id.* at 1294.  By contrast, Plaintiffs

allege that Bankers conspired to, and did, commit the predicate acts.  *See* Sections III(C)(2)(b) and

III(C)(4), *infra*.  Thus, unlike in *Cigna*, any required deductions here are supported by specific

factual allegations.

c.     *Plaintiffs have alleged predicate acts that go beyond a mere*
*commercial relationship among Defendants*

Bankers and A2i argue that Plaintiffs' allegations describe a mere commercial relationship

between Defendants, not a RICO enterprise.  *See* Bankers Mot. at 17-18; A2i Mot. at 9.  A plain

reading of the Amended Complaint demonstrates why this argument fails.  Bankers is an insurance

company; presumably its legitimate business affairs pertain to the provision of insurance.  But

Plaintiffs allege that Bankers: (1) identifies clients who have balances due on pre-existing bail

bonds and contracts to require them to pay those balances as a condition of extension of new credit,

resulting in violations of Louisiana consumer credit law and TILA; (2) decides when to require

clients to wear and pay for ankle monitors as a condition of extending new credit, resulting in

violations of Louisiana consumer credit law and TILA;  (3) decides, with Blair's, how much

money to collect from clients and their indemnitors in exchange for not surrendering the client to

jail; and (4) accepts money collected by Blair's through extortionate means.  Am. Compl. ¶¶

118-21.  Plaintiffs allege that Bankers' actions constitute "kidnapping, extortion, and extortionate

collection of extension of credit," and that Bankers "commits the unlawful collection of debt."  *Id.*

This is not business conduct within the typical realm of insurance.

With respect to A2i, Plaintiffs similarly allege conduct falling outside the typical

vendor-customer relationship.  Specifically, Plaintiffs allege that A2i (along with Bankers and

Blair's) "employ[s] agents and bounty hunters to seize, detain, and surrender to jail principals and

make threats to do so in order to coerce payment of bail bonding fees and fees associated with the

16

ankle monitor" and that "agents employed by A2i, including those from WC Bryant Enterprizes, regularly engage in these actions." *Id*. ¶ 46.  Plaintiffs also allege that A2i, in employing or directing bounty hunters, communicates with Blair's regarding the amount of money required from principals' family and friends to secure their release.[18]  Am. RICO Stmt. 15.

> d.    *There is no requirement that Plaintiffs prove a particular Defendant operated or managed the enterprise*

Finally, A2i argues that Plaintiffs have not satisfied the "operation or management test" because they "do not allege any facts showing that A2i operated or managed the affairs of this enterprise."  A2i Mot. at 8.  A2i relies upon *Reves v. Ernst & Young*, for the proposition that A2i must have directed the affairs of the enterprise in order to play a role in its operation or management.  507 U.S. 170, 179 (1993).  But the Fifth Circuit has specifically held that "*Reves* does not require that a defendant direct the affairs of the enterprise."  *United States v. Thompson*, No. 99-41007, 2001 WL 498430, at *8 (5th Cir. 2001) (citations omitted).  Rather, "*Reves* only requires that a defendant 'take part in' the operation of the enterprise, not that he direct its affairs." *United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998).

Plaintiffs nevertheless allege facts to show that A2i directed portions of the enterprise. Specifically, Plaintiffs allege that Defendants committed the predicate act of collection of unlawful debt for ankle monitoring fees and that A2i, specifically, set the fees which constitute the unlawful debt.  Am. Compl. ¶ 122.  A2i also sent bounty hunters to appear at clients' "homes, workplaces, and court hearings, frequently visibly bearing firearms, to seize and detain them until A2i was satisfied with the amount of money [clients] or their indemnitors had produced."  *Id.* ¶¶ 169-70.  By this conduct, A2i participated in the direction of the enterprise.

---

[18] *See* Section III(C)(2)(b) *infra* for a more detailed discussion of A2i's conduct that constitutes predicate acts in violation of RICO.

2.      Plaintiffs have alleged sufficient facts to establish a pattern of conduct

To establish a pattern of conduct under 18 U.S.C. § 1962(c), Plaintiffs must show "at least two racketeering predicates that are related and that amount to, or threatened the likelihood of, continued criminal activity." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 229 (1989).  Plaintiffs have satisfied these obligations.

a.      *Plaintiffs sufficiently allege an agency relationship between Bankers and Blair's*

Bankers argues that "there is no basis to extend the alleged bad acts" of Blair's to Bankers because Plaintiffs have not alleged facts indicating that an agency relationship exists between them.  Bankers Mot. at 10-11.  That is incorrect.  An agent's authority may be actual (either express or implied) or apparent.  *Wells Fargo Bus. Credit v. Ben Kozloff, Inc.*, 695 F.2d 940, 944 (5th Cir. 1983).  The facts, as pled in the Amended Complaint, are sufficient to show that Blair's had actual authority from Bankers.

To create an agency relationship based on actual authority, the principal must directly authorize the agent to do a delegable act, or the authority must be implied from "some manifestation by the principal" based on "the facts and circumstances attending the transaction in question." *Id.* at 944-45.  Plaintiffs allege several times that Blair's serves as an agent of Bankers.  Am. Compl. ¶¶ 26, 32, 51.  Beyond those direct allegations, they also plead facts sufficient to show that Bankers conferred actual authority upon Blair's to conduct portions of the bail bonding business on its behalf.  As discussed *supra* at Section III(B)(2), Blair's and its employees are Bankers' appointed producers, indicating their relationship as the "agent of an insurer" under Louisiana law.  In addition, Plaintiffs allege that a Blair's employee, Mr. Compass, told Mr. Egana that the insurance company (Bankers) was requiring him to wear an ankle monitor.  Am. Comp. ¶ 81.  Mr. Compass then installed the ankle monitor on Mr. Egana on behalf of Bankers.  *Id.* ¶ 84.

When Mr. Egana asked to have the ankle monitor removed, Mr. Compass told him that he had to consult with Bankers first.  *Id.* ¶ 86.  But because Bankers "would not allow the ankle monitor to be removed," Mr. Compass refused Mr. Egana's request to remove it.  *Id.* ¶ 87.  When Blair's ultimately surrendered Mr. Egana to jail, it was at Bankers' direction—Bankers decided it did not "want to have anything to do with [Mr. Egana] anymore."  *Id.* ¶ 91.  These facts, taken as true, suggest that Blair's and Bankers were in frequent contact, with Bankers making major decisions and Blair's acting on Bankers' directives.

> b.  *Plaintiffs sufficiently allege that Bankers and A2i engaged in predicate acts of racketeering under 18. U.S.C. § 1961(1)*

Bankers and A2i argue that Plaintiffs fail to specifically allege that they engaged in the predicate acts under 18 U.S.C. § 1962(c) & (d).  That is incorrect.  The Amended Complaint contains specific allegations as to how Bankers and A2i engaged in six predicate acts: (1) simple kidnapping under Louisiana state law, La. Stat. Ann. § 14:45; (2) aggravated kidnapping under Louisiana state law, La. Stat. Ann. § 14:44; (3) extortion under the Hobbs Act, 18 U.S.C. § 1951; (4) extortion under Louisiana state law, La. Stat. Ann. § 14:66; (5) extortion under the Travel Act, 18 U.S.C. § 1952; and (6) extortionate collection of extension of credit under federal law, 18 U.S.C. § 894.  Am. Compl. ¶¶ 29-95, 115-24, 142-157; Am. RICO Stmt. 4-5, 9-14.

> i.  Simple and aggravated kidnapping

First, Plaintiffs allege that Bankers and A2i, directly and through their agents (including Blair's), engaged in the predicate acts of simple and aggravated kidnapping.  Under Louisiana law, kidnapping includes "[t]he intentional and forcible seizing and carrying of any person from one place to another without his consent."  La. Stat. Ann. § 14:45(A)(1).  Aggravated kidnapping, meanwhile, is the "forcible seizing and carrying of any person from one place to another" or the "imprisoning or forcible secreting of any person," performed "with the intent thereby to force the

victim, or some other person, to give up anything of . . . value . . . in order to secure a release of the person under the offender's actual or apparent control."  La. Stat. Ann. § 14:44.  "The intent to extort" elevates simple kidnapping to aggravated kidnapping.  *State v. Hunter*, 454 So. 2d 131, 133 (La. Ct. App. 1984) (citing *State v. Polk*, 376 So. 2d 151, 152 n.1 (La. 1979); *State v. Dupre,* 369 So. 2d 1303 (La. 1979).

The Amended Complaint specifically alleges participation by Bankers, A2i, and their agents in simple and aggravated kidnapping.  Am. Compl. ¶¶ 46, 70, 74-76, 79-81, 95, 122-123; Am. RICO Stmt. 9-10.  Bankers directed Blair's to install on Mr. Egana the A2i ankle monitor, which was used to locate Mr. Egana for the purpose of seizing, transporting, and extorting him.  *Id.* ¶¶ 54, 56, 70, 72, 74-77, 79-87, 122-123.  Bankers also oversaw Mr. Egana's bail bond account and, in consultation with Blair's, decided when Blair's bounty hunters should seize Mr. Egana and whether they should surrender him or further detain him until his indemnitors brought more money.  *Id.* ¶¶ 81, 91, 120-121; Am. RICO Stmt. 9-10.  A2i, or individuals acting on its behalf, called Mr. Egana to demand payment of ankle monitor fees.  Am. Compl. ¶ 85.  Both Blair's and A2i's bounty hunters, including those from W.C. Bryant Enterprizes, regularly "seize, detain, and surrender to jail principals and make threats to do so in order to coerce payment of bail bonding fees and fees associated with the ankle monitor."  *Id.* ¶ 46.  These allegations, taken as true, elevate Plaintiffs' claims regarding Bankers' and A2i's involvement in the predicate kidnapping acts beyond mere speculation.

ii.     Extortion

Plaintiffs also sufficiently allege Bankers' and A2i's involvement in the three extortion-related predicate acts.  Extortion under Louisiana law is "the communication of threats to another with the intention thereby to obtain anything of value or any acquittance, advantage, or immunity of any description."  La. Stat. Ann. § 14:66(A).  Many types of threats qualify as

extortion, including "[a] threat to do any unlawful injury to the person or property of the individual threatened or of any member of his family or of any other person held dear to him" and "[a] threat to do any other harm." *Id.*; *see also State v. Felton*, 339 So. 2d 797, 799-800 (La. 1976).

Plaintiffs specifically plead that Bankers and A2i, or their agents, communicated threats to obtain payments from them.  Plaintiffs allege that individuals associated with Bankers and A2i, including Alroy Allen, illegally seized Mr. Egana and contacted Ms. Egana and Ms. Brown threatening to surrender Mr. Egana to jail unless they made payments toward the unlawful debt Bankers and A2i were collecting.  Am. Compl. ¶¶ 70, 74, 80-81.  And bounty hunters who seized Mr. Egana illegally on prior occasions, acting on Defendants' behalf, also threatened Mr. Egana that they would be "coming to get [him]" based on his failure to pay.  Am. Compl. ¶ 89.

Plaintiffs also sufficiently allege Bankers' and A2i's involvement in the Hobbs Act violation.  A Hobbs Act violation requires three elements: (1) the defendant induced the victim to part consensually with property, (2) either through the wrongful use of actual or threatened force, violence or fear or under color of official right, and (3) in such a way as to adversely affect interstate commerce.  *United States v. Nakaladski*, 481 F.2d 289, 298 (5th Cir. 1973).  The allegations of extortion under Louisiana state law discussed above are sufficient to meet the first two elements.  As for the third element, the Fifth Circuit has repeatedly emphasized that "[t]he Hobbs Act only requires a minimal interference with interstate commerce."  *United States v. Villarreal*, 764 F.2d 1048, 1052 (5th Cir. 1985); *see also United States v. Jennings*, 195 F.3d 795, 800-01 (5th Cir. 1999) (holding that a court must consider aggregate effect of many repeated instances of extortion on interstate commerce).  By overcharging and subsequently extorting thousands of dollars from Plaintiffs, Defendants prevented Plaintiffs from purchasing goods or

undertaking various activities that plausibly affect interstate commerce.  *See* Am. RICO Stmt. 17; *United States v. Nakaladski*, 481 F.2d 289, 298-99 (5th Cir. 1973).

For many of the same reasons, Plaintiffs sufficiently allege that Bankers and A2i violated the Travel Act.  The Travel Act incorporates the relevant state law definition of extortion and further criminalizes "interstate and foreign travel or transportation in aid of racketeering enterprises," providing that "[w]hoever travels in interstate or foreign commerce or uses the mail or any facility in interstate or foreign commerce with intent to" perform or further "any unlawful activity," including extortion, is guilty of violating its terms.  18 U.S.C. § 1952; *see also United States v. Nardello*, 393 U.S. 286, 290 (1969).  Importantly, the Fifth Circuit has held that this language in the Travel Act includes the use of telephones.  *United States v. Phea*, 755 F.3d 255, 266 & n. 32 (5th Cir. 2014) ("The district court correctly stated the law that telephones, the Internet, and hotels that service interstate travelers are all means or facilities of interstate commerce sufficient to establish the requisite interstate nexus.").  Here, Plaintiffs allege numerous instances of Bankers, A2i, and their respective agents, communicating extortionate threats by telephone, including with Bankers, which is located in Florida.  Am. Compl. ¶¶ 70, 74, 80; Am. RICO Stmt. 17.  The Amended Complaint also states that Plaintiffs conducted numerous banking transactions at the direction (both formal and otherwise) of Blair's, Bankers, and A2i for the purpose of making extorted payments to Defendants.  Am. Compl. ¶¶ 70, 73-74, 80, 85, 94.

### iii.    Extortionate collection of extension of credit

Finally, Plaintiffs sufficiently plead that Bankers and A2i engaged in the extortionate collection of extension of credit, which makes it illegal to participate, or conspire, "in the use of any extortionate means (1) to collect or attempt to collect any extension of credit, or (2) to punish any person for the nonrepayment thereof."  18 U.S.C. § 894.  Under that statute, "extortionate means" includes "any means which involves the use, or an express or implicit threat of use, of

22

violence or other criminal means to cause harm to the person, reputation, or property of any person."  18 U.S.C. § 891(7).

Plaintiffs sufficiently plead allegations relating to Bankers' and A2i's roles in arranging for the extension of credit to Mr. Egana, including the requirement that he wear an ankle monitor and pay daily fees, which Defendants later attempted to collect on numerous occasions through extortionate means.  Those means included unlawful arrests and improper detentions on September 27, 2016, December 26, 2016, and March 31, 2017, respectively, constituting kidnapping of Mr. Egana, for the purpose of extorting payments from him, his mother, and his friend.  Am. Compl. ¶¶ 46, 70, 74-76, 79-81, 95, 122-123; Am. RICO Stmt. 9-10.

> c.    *Plaintiffs satisfy the "continuity prong" under § 1962(c)*

A plaintiff can demonstrate continuity of racketeering activity in a variety of ways, and the alleged period of continuity may be closed- or open-ended.  *H.J. Inc.*, 492 U.S. at 230.  The Fifth Circuit has declined to transform the "continuity prong into a stringent pleading requirement." *Abraham v. Singh*, 480 F.3d 351, 355-56 (5th Cir. 2007).  The Amended Complaint demonstrates both closed- and open-ended continuity of Defendants' racketeering activities.

Specifically, Plaintiffs allege that members of the Unlawful Debt, Ankle Monitor, and Kidnapped Subclasses suffered from Defendants' pattern of racketeering activities from June 2013 through the present, sufficient to establish closed-ended continuity.  *See* Am. RICO Stmt. 4-5, 9-14.  This circuit and the district courts within it have held that racketeering acts extending approximately two years—significantly less than the four years alleged here—suffice.  *See Abraham*, 480 F.3d at 355-56; *Gil Ramirez Grp., L.L.C. v. Houston Indep. Sch. Dist.*, No. 4:10-CV-04872, 2017 WL 3236110, at *10 (S.D. Tex. July 31, 2017); *Samsung Elecs. Am., Inc. v. Yang Kun Chung*, No. 3:15-CV-4108-D, 2017 WL 635031, at *8 (N.D. Tex. Feb. 16, 2017). Moreover, Plaintiffs' class allegations describe exactly the type of organized, continuous

wrongdoing RICO is designed to target.  *See La. Power & Light Co. v. United Gas Pipe Line Co.*, 642 F. Supp. 781, 809-10 (E.D. La. 1986) ("RICO is meant to punish those who harm others in a continuous systematic way.").  In these ways, Plaintiffs' RICO allegations include all the hallmarks of closed-end continuity.

Blair's argues that Plaintiffs fail to demonstrate continuity because "all of the arrests of Mr. Egana and applications of an ankle monitor were reasonable and legal."  Blair's Mot. 7.  This misses the mark, for several reasons.  Beside the fact that Mr. Egana's arrests were not lawful, Blair's also misconstrues Plaintiffs' argument regarding Mr. Egana's ankle monitor.  On three separate occasions—September 27, 2016, December 26, 2016, and March 31, 2017—Defendants' agents arrested Mr. Egana, took him to the Blair's office, and demanded his indemnitors pay for his release. Am. Compl. ¶¶ 69-80.  While Louisiana law recognizes a bail bondsman's authority to surrender a principal to the court for nonpayment of a bond premium, *see* La. Code Crim. Proc. Ann. art. 331; La. Stat. Ann. § 22:1585, nothing in the law permits bondsmen to make an arrest for purposes other than such a surrender (such as to coerce payments).  *See, e.g.*, *McCaleb v. Peerless Ins. Co.*, 250 F. Supp. 512, 515 (D. Neb. 1965) ("The bondsman has the right to arrest, but only for the purpose of surrender and exoneration of his bond.").

Plaintiffs have also demonstrated open-ended continuity.  Plaintiffs can demonstrate open-ended continuity either by showing: (1) a specific threat of repetition extending indefinitely into the future; or (2) that the predicates are a regular way of conducting a defendant's ongoing legitimate business.  *Malvino v. Delluniversita*, 840 F.3d 223 (5th Cir. 2016).  Plaintiffs have alleged that Defendants' RICO enterprise has treated—and likely continues to treat—other clients in the same manner as Mr. Egana.  Am. Compl. ¶ 100; Am. RICO Stmt. 8.  While discovery is needed to ascertain exactly how many individuals have been victimized by the enterprise, the class

allegations which include conduct as far back as four years prior to the filing of this action, Am. Compl. ¶ 105, suggest open-ended continuity in line with the court's opinion in *Abraham*.  *See Abraham*, 480 F.3d at 356 (holding that allegations satisfied "continuity prong"; there were multiple victims and no reason to suppose that alleged criminal conduct would not have continued indefinitely absent the lawsuit).  For the abovementioned reasons, Plaintiffs have satisfied the "continuity prong" under § 1962(c).

### 3.   Plaintiffs allege sufficient facts to establish the collection of unlawful debt

In addition to their pattern of racketeering activity, Blair's and Bankers' collection of unlawful debt provides an independent basis for liability under RICO.  18 U.S.C. § 1962(c). "unlawful debt" is defined as debt that is (1) unenforceable in whole or in part under state or federal usury law, and (2) incurred in connection with the business of lending money at a usurious rate at least twice the enforceable rate.  18 U.S.C. § 1961(6).  The Amended Complaint and Amended RICO Statement articulate Defendants' conduct amounting to the collection of unlawful debt: as a condition of deferring payment of certain clients' bail bond premiums, Bankers and Blair's required those clients to pay ankle monitoring fees, outstanding balances on prior bail bond contracts, and other unexplained fees.  Am. Compl. ¶¶ 34, 37-45, 52-56; Am. RICO Stmt. 8-9, 17, 20.  Cumulatively, these additional fees and conditions of credit can amount to more than double the enforceable rate under Louisiana law, as they did for Mr. Egana.  Am. Compl. ¶¶ 133-140. And Bankers, Blair's, and A2i worked together to collect this unenforceable debt.  *Id*. ¶¶ 40-42, 45-46, 51-56, 70, 74, 79-82, 84-85; Am. RICO Stmt. 8-9.

### a.   *Ankle monitoring fees are properly included in the calculation of the interest rate*

Bankers argues that fees charged by A2i for ankle monitoring services are excepted from calculation of the interest rate and therefore cannot contribute to the 12% (or 12.5%) bail bond

premium or 24% annual interest on a credit sale permissible under Louisiana law.  Notably, Bankers does not challenge Plaintiffs' allegations that additional fees, along with the obligation to pay pre-existing debt, are properly included in the interest rate.  Bankers' lone argument—that the ankle monitoring fees do not count because A2i collected them instead of Bankers or Blair's—is simply wrong because it relies on general usury law, rather than the more specific consumer credit law that applies here.

Under Louisiana law, a consumer credit sale is defined as the sale of a thing[19] in which a credit service charge is charged and the consumer may defer all or part of the purchase price in installments.  La. Stat. Ann. § 9:3516(12).  The sale of insurance is excepted from the consumer credit law, but not where the insurance agent charges a credit service charge and payment is deferred in more than two installments, excluding the down payment.  La. Stat. Ann. § 9:3512. The bail bonding arrangement between Bankers and Blair's, on one hand, and their clients, on the other, is clearly a credit sale under this definition.  Bankers and Blair's sell a "thing" (*i.e.*, bail bond services) to clients (*i.e.*, Plaintiffs), and allow clients to pay down the purchase price of that thing in installments.

The statute Bankers cites for the proposition that ankle monitoring charges paid to A2i should be excluded under general usury law, La. Rev. Stat. Ann. § 9:3505(5), is inapposite. Consumer credit sales are regulated by the Louisiana Consumer Credit Law, which sets forth the maximum amount that can be leveed as a "credit service charge" for the sale of consumer credit.  A "credit service charge" is the sum of all charges "payable directly or indirectly by the consumer and imposed *directly or indirectly* by the seller as an incident to the extension of credit."  La. Stat. Ann. § 9:3516(16) (emphasis added).  The definition includes a discrete list of exclusions,

---

[19] The definition of a "thing" includes property, goods, or services.  La. Stat. Ann. § 9:3512(35).

including default, delinquency, and deferral charges, but notably does not carve out charges payable in whole or in part to a third-party provider. *Id.* Here, Bankers and Blair's required that Mr. Egana wear and pay for an ankle monitor as a condition of allowing him to pay down his bail bonding fees over time. Am. Compl. ¶ 54-56. Those fees, even if imposed indirectly because Plaintiffs could not post collateral, constitute part of the total credit service charges imposed and exceed the maximum 24% permitted by law. La. Stat. Ann. § 9:3520.

> b. *A2i engaged in the collection of unlawful debt*

A2i argues that Plaintiffs fail to allege that A2i participated in the collection of unlawful debt with "guilty knowledge." A2i Mot. at 10. But the Amended Complaint and Amended RICO Statement detail A2i's integral part in charging and collecting ankle monitoring fees. Plaintiffs specifically allege that A2i coordinates all relevant aspects of its ankle monitoring business with Bankers and Blair's. Am. Compl. ¶¶ 42-44, 46; Am. RICO Stmt. 3-5. Moreover, A2i actively participates in collecting unlawful bail bonding and ankle monitoring fees. Am. Compl. ¶¶ 42-44, 46, 85; Am. RICO Stmt. 8-9. Using A2i ankle monitors, bounty hunters employed by A2i and Blair's locate, seize, detain, and extort clients in order to secure payment of ankle monitoring and bail bonding fees. Am. Compl. ¶¶ 42-44, 46; Am. RICO Stmt. 3-5. Taken as true, these allegations are more than sufficient to meet Plaintiffs' pleading obligations.

These allegations also serve to distinguish this case from *Snow Ingredients, Inc. v. SnoWizard, Inc.*, where the court held that plaintiff sought to transform mere "litigation activity" into criminal conduct constituting the predicate acts of obstruction of justice and witness tampering. 833 F.3d 512, 524-25 (5th Cir. 2016). In other words, unlike here, the pleadings in *Snow Ingredients* did not even allege unlawful activity. *Id.* at 525.

4.    <u>Plaintiffs have alleged sufficient facts to establish a conspiracy among Blair's, Bankers, and A2i</u>

Defendants argue that Plaintiffs fail to plead facts sufficient to show that Blair's, Bankers, and A2i conspired to violate RICO.  Blair's Mot. at 8-9; Bankers Mot. at 19; A2i Mot. at 13-14. The Amended Complaint, however, is replete with factual allegations that, taken as true, prove a RICO conspiracy.  To demonstrate a civil RICO conspiracy, "a claimant must show that: (1) two or more persons agreed to commit a substantive RICO offense, and (2) the defendant knew of and agreed to the overall objective of the RICO offense."  *Davis-Lynch, Inc. v. Moreno*, 667 F.3d 539, 551 (5th Cir. 2012), as revised (Jan. 11, 2012).

Defendants need not "agree to commit or facilitate each and every part of the substantive offense," nor do they each need to commit or agree to commit two or more predicate acts.  *Salinas v. United States*, 522 U.S. 52, 63-65 (1997).  They need only "adopt the goal of furthering or facilitating" the endeavor and may divide up the work.  *See id.* at 64-65.  An agreement between conspirators "may be silent and need not be formal or spoken" and "may be inferred from concert of action."  *United States v. Grant*, 683 F.3d 639, 643 (5th Cir. 2012) (citations and quotation marks omitted).  Indeed, even those who played only a minor role in the larger conspiracy are not shielded from liability.  *United States v. Chapman*, 851 F.3d 363, 378 (5th Cir. 2017) (citing *United States v. Brown*, 727 F.3d 329, 339 (5th Cir. 2013)) (finding that "errand boy" was not shielded from liability merely because his role in the conspiracy was limited).

With respect to the knowledge element, an alleged co-conspirator "need not know all the details of the unlawful enterprise or know the exact number or identity of all the co-conspirators, so long as he knowingly participates in some fashion in the larger objectives of the conspiracy." *United States v. Wallace*, 759 F.3d 486, 491 (5th Cir. 2014) (citing *United States v. Booker*, 334 F.3d 406, 409 (5th Cir. 2003)).  Plaintiffs need only demonstrate that a co-conspirator

"[participated in the conspiracy with] knowledge of the *essential nature* of the plan."  *United States v. Elliott*, 571 F.2d 880, 903-904 (5th Cir. 1978) (emphasis added).  Such "knowledge may be inferred from surrounding circumstances."  *Brown*, 727 F.3d at 339 (internal citations omitted).

Plaintiffs sufficiently allege that each of Blair's, Bankers, and A2i had knowledge of the essential nature of the RICO conspiracy and agreed to undertake some act that furthered it. Plaintiffs allege that Blair's requires certain clients and their indemnitors to sign a contract obligating them to pay balances on pre-existing bonds on pain of being surrendered to jail for nonpayment, even though Blair's had no existing right to seize and surrender the clients for failure to pay those debts.  Am. Compl. ¶¶ 38, 61; Am. RICO Stmt. 2, 15, 18.  That contract provides that Bankers will issue the bail bond and act as surety, and Plaintiffs allege that Bankers works with Blair's to provide bail services, including by participating in setting the terms and identifying clients who will be required to pay down pre-existing debts.  Am. Compl. ¶ 33, 120; Am. RICO Stmt. 2-3, 18.  Blair's and Bankers also require some clients to wear and pay for ankle monitors, even where no court has required them to do so, which drives the interest rate on credit far in excess of the rates allowable under Louisiana law.  Am. Compl. ¶¶ 40, 56, 81, 120; Am. RICO Stmt. 2-4, 18.  A2i, which installs the ankle units and monitors clients on behalf of Bankers and Blair's, charges its own monitoring fees, knowing those fees to be excessive and contrary to Louisiana law.  Am. Compl. ¶¶ 40-43, 56, 122; Am. RICO Stmt. 3, 15, 18.

Then, when clients fail to pay—either the pre-existing debt owed to Bankers and Blair's, the current balance owed to Bankers and Blair's, or the ankle monitoring fees owed to A2i—Blair's and A2i use the ankle monitors provided by A2i and required by Bankers to locate the clients and send bounty hunters to seize them.  Am. Compl. ¶¶ 46, 70, 74, 118, 122; Am. RICO Stmt. 5, 15, 18.  Instead of surrendering clients to jail, though, Blair's and A2i detain them at the

Blair's office, where they routinely threaten them with jail and refuse to release them unless they or their indemnitors pay.  Am. Compl. ¶¶ 70, 74, 79, 118; Am. RICO Stmt. 5, 15, 18.  Together, Bankers and Blair's determine how much money to collect and whether or not to surrender the client to jail, and Blair's distributes the money collected to the others, including A2i.  Am. Compl. ¶¶ 72, 92, 118, 120; Am. RICO Stmt. 2-3, 5, 18.  A2i also employs its own bounty hunters to coerce payment of ankle monitoring fees by threatening clients with jail.  Am. Compl. ¶ 122; Am. RICO Stmt. 3.  Thus, and as Plaintiffs specifically allege in their RICO Statement, "[a]ll defendants know and intend that [their] acts of racketeering will be committed through their participation in the enterprise and profit from the conduct of the enterprise."  Am. RICO Stmt. 15.

### D.    Plaintiffs Properly State a Claim That the Bail Bond Contract is Void

Plaintiffs have stated a claim against Bankers and Blair's for violating Louisiana contract law by overcharging principals and their indemnitors in violation of limits put in place by the state legislature to protect the public interest.  The Louisiana Civil Code provides that any act in derogation of a law enacted for the protection of the public interest is "an absolute nullity."  La. Civ. Code Ann. art. 7; *see also*, La. Civ. Code Ann. art. 1968.

Louisiana law caps the amount that bail bonding insurers and producers may charge to a premium of 12% of the total value of the bail bond, La. Stat. Ann. § 22:1443, and 12.5% in Jefferson Parish, *id*. § 13:718(I)(2)(a).  In addition, they may not charge more than $25 in agency fees.  *Id*. at § 22:855(B)(2)(b).  These limitations were created specifically to protect the public interest.  *See* La. Stat. Ann. 22:1452 ("The purpose of this Subpart is to promote the public welfare by regulating insurance rates to the end that they shall not be excessive, inadequate, or unfairly discriminatory. . . .").

However, as detailed *supra* at Section II, Plaintiffs, and those similarly situated, were required to pay well in excess of that amount when they contracted for a bail bond with Bankers

and Blair's.  Bonding Defendants' form contracts contain numerous requirements to pay amounts beyond the statutory limits, including requirements to pay balances owed on previous bonds, Am. Compl. ¶ 38, undisclosed fees, Am. Compl. ¶ 52, and ankle monitoring fees, Am. Compl. ¶¶ 56, 82.  By requiring Plaintiffs to enter into contracts providing for these charges in excess of the 12% statutory limit on bail premiums, Bankers and Blair's violated state contract law.[20]

Bankers argues that because it is not a producer, it is not subject to the limits set forth in La. Stat. Ann. § 22:855.  Bankers Mot. at 21.  However, the statute explicitly reaches insurers, not just producers.  La. Stat. Ann. § 22:855(B)(1) ("No *insurer* or its officer, employee, producer, or other representative shall charge or receive *any* fee, compensation, or consideration for insurance which is not included in the premium quoted to the insured.") (emphasis added).  Moreover, the statute indicates that the premium is "quoted by the insurer," *id*. § 22:855(A), consistent with the provision that sets the 12% premium limit on "commercial surety underwriters writing criminal bail bonds." *Id.* § 22:1443; *see also id.* § 13:718(I)(2)(a) (12.5% in Jefferson Parish).  Read as a whole, these statutes forbid insurers, producers, and all other representatives from collecting any fee or charge that is not explicitly authorized by the statute or is beyond the statutory limits.

In the same fashion, Bankers argues that the requirement to pay "prior outstanding balances" included in the standard contract and requirement to pay ankle monitoring fees is not covered by § 22:855.  Bankers Mot. at 22.  Again, their reading of this statute overlooks that it is written to require producers and insurers to charge only those "fees, compensation, or consideration for insurance" are included in the quoted premium and subject to the statutory limit, or otherwise explicitly authorized by the statute.  Indeed, the terms "compensation" and

---

[20] Plaintiffs allege that each of these fees was imposed as a condition of credit and thus comprise the finance charge under TILA, *see supra* at Section III(B)(2)(c).  Bonding Defendants maintain that these payments were not required or incident to the extension of credit. Blair's Mot. at 15.  Plaintiffs plead their contract claim in the alternative if any of these fees are considered part of the bail agreement. *See* Fed. R. Civ. P. 8(d)(2); *Bryan v. City of Dallas*, 188 F. Supp. 3d 611, 619 (N.D. Tex. 2016) ("[T]he Federal Rules permit plaintiffs to plead alternative, inconsistent claims.").

"consideration" sweep broadly to protect consumers against all other charges,[21] and it would be impractical for a statute to specifically name each type of fee, compensation, or consideration it intends to be reach.  The agreement in the contract documents signed by Plaintiffs to pay prior outstanding balances is consideration, and thus disallowed by § 22:855.  Ms. Brown and Ms. Egana were made to sign this provision even though the balances were not in their names.  Am. Compl. ¶ 61, 66.  For Mr. Egana, this requirement converted what had previously been unsecured debt into debt which Defendants could enforce through Mr. Egana's imprisonment—a substantial modification of his previous legal obligations, too.  Thus, this requirement clearly constitutes consideration prohibited under § 22:855.[22]

### E.    Plaintiffs Properly State a Claim for Usurious Lending

Bankers is the only Defendant which contends that Plaintiffs' usury claim fails to state a claim.  Bankers first argues that Plaintiffs have not made any allegations tying Bankers to the fees for ankle monitoring and the requirement that principals and indemnitors repay outstanding balances.  Bankers Mot. at 23-24.  This is untrue.  The Amended Complaint alleges that Blair's serves as an agent of Bankers, and that Bankers is involved in serving as a surety for bonds issued by Blair's.  Am. Compl. ¶ 32.  When principals and their indemnitors cannot pay all of the bail bonding fees immediately, Bankers and Blair's extend credit to cover the remaining balance, which must be repaid in installments.  *Id.* ¶ 37.  The form documents also require payment of all

---

[21] *See* Restatement (First) of Contracts § 75 (1932) ("Consideration for a promise is (a) an act other than a promise, or . . . (c) the creation, modification, or destruction of a legal relation"); *see also Byerly v. Duke Power Co.*, 217 F.2d 803, 808-09 (4th Cir. 1954) ("Consideration, however, does not consist necessarily of a payment or a promise.  It may consist of any act or forbearance constituting benefit to the promisor or detriment to the promisee.").

[22] Moreover, the requirements to pay outstanding balances and ankle monitoring fees are not reimbursable fees allowed by § 22:855(B)(2)(a).  Louisiana courts have clarified that reimbursable expenses are fees for services performed "solely" for the convenience of policyholders who want insurance.  *Cacamo v. Liberty Mut. Fire Ins. Co.*, Nos. 2004-CA-0074-78 (La. App. 4 Cir. 9/28/2004); 885 So. 2d 1248, 1256.  These fees are ones that the insured is "free to accept or reject."  *Id.* at 1251.  Both requirements at issue were not expenses for Plaintiffs' convenience, and they were not free to reject these terms.  Thus, the contractual requirements to pay outstanding balances and ankle monitoring fees are in derogation of laws protecting the public interest and are an absolute nullity.

outstanding prior balances. *Id.* ¶ 61. Moreover, Bankers required Mr. Egana to wear an ankle monitor, which resulted in $10 daily fees. *Id.* ¶¶ 81, 87. These allegations clearly tie Bankers to the fees that resulted in a usurious rate of interest.[23]

Bankers further argues that the limit on interest rates for consumer credit sales does not apply to the credit extended to Plaintiffs because credit extended to cover the unpaid balance of a bail bond premium is not the sale of a thing or immovable property under La. Stat. Ann. § 9:3516(12). For the reasons discussed *supra* at Section III(C)(3)(a), this argument fails. Deferment of bail bonding fees by insurers and producers constitutes a credit sale under Louisiana law. Accordingly, Plaintiffs have stated a claim for usurious lending.

## F. Plaintiffs Properly State a Claim for False Imprisonment

A2i and Bankers assert that Plaintiffs have not pleaded facts to support a claim of false imprisonment. A2i Mot. at 14-15; Bankers Mot. at 21. However, Plaintiffs have offered detailed factual allegations about the practices that Defendants, including A2i and Bankers, employed to kidnap and improperly hold principals against their will.

False imprisonment is the "unlawful and total restraint of the liberty of the person." *Kelly v. W. Cash & Carry Bldg. Materials Store*, 99-0102 (La. App. 4 Cir. 10/20/99); 745 So. 2d 743, 750. It consists of two elements: (1) detention of a person; and (2) the unlawfulness of such detention. *Fontenot v. Lavergne*, 365 So. 2d 1168 (La. Ct. App. 3 Cir. 1978). Louisiana courts have held that detaining and handcuffing a person without lawful cause constitutes false imprisonment. *See Trahan v. City of Scott*, 00-1246 (La. App. 3 Cir. 3/14/01); 802 So. 2d 24, 27. For the reasons set forth *supra* at Section III(C)(2)(b), Plaintiffs have alleged sufficient facts to support a claim for false imprisonment.

---

[23] Bankers also inaccurately states that Plaintiffs allege that ankle monitoring fees are charged by and paid to Defendant A2i. Bankers Mot. at 24, n. 18. In fact, the Amended Complaint states that ankle monitoring fees were both collected by Blair's and its agents, as well as paid directly to A2i. Am. Compl. ¶¶ 72, 85.

A2i incorrectly argues that "it is legal for bonding agents to detain clients who are in violation of their bonds."  A2i Mot. at 15.  As discussed in Section III(C)(2)(c), *supra*, sureties may arrest defendants for the sole purpose of surrendering them to jail.  Seizing and detaining principals to extort them for money is illegal, and constitutes false imprisonment under state law.  The only argument Bankers makes as to why Plaintiffs have failed to state a claim for false imprisonment is that the Amended Complaint does not specifically identify any individual Bankers entity.  Bankers Mot. at 21.  As discussed in Section III(A), grouping defendants when making allegations does not run afoul of the pleading standard unless it deprives each defendant of notice of the claims against it.  Here, the Bankers entities are aware that they each face false imprisonment claims for unlawfully seizing and detaining Mr. Egana and other similarly situated principals.  Bankers' argument thus lacks merit.

## G.       Plaintiffs Properly State a Claim for Conversion

A2i argues that Plaintiffs have failed to state a claim for conversion because it is not a bail bond producer and thus is not subject to the 12% limit on bail bond premiums.  Conversion is an intentional tort consisting of an act in derogation of the plaintiff's possessory right or any wrongful exercise or assumption of authority over another's goods, depriving him of permanent or indefinite possession.  *Chrysler Credit Corp. v. Whitney Nat'l Bank,* 51 F.3d 553 (5th Cir. 1995); *Gaunt v. La. Citizens Prop. Ins. Corp.*, 512 F. Supp. 2d 493, 498 (E.D. La. 2007); *Bernofsky v. Tulane University Med. Sch.,* 962 F. Supp. 895, 906 (E.D. La. 1997).  To prevail on a claim of conversion, the plaintiff must prove that (1) she owned or had the right to possess; (2) the defendant's use was inconsistent with the plaintiff's right of ownership; and (3) the defendant's use constituted a wrongful taking.  *Gaunt*, 512 F. Supp. 2d at 498.  Fault, intent, negligence, knowledge, ignorance, and good faith are not pertinent in actions for tortious conversion.  *Labbe v. Premier Bank*, 618 So. 2d 45, 46 (La. Ct. App. 3 Cir. 1993).

Plaintiffs' allegations sufficiently state a claim of conversion.  As the Amended Complaint sets forth, A2i works in collusion with Bankers and Blair's to require and charge for ankle monitoring even when no court has ordered such monitoring.  Am. Compl. at ¶ 40.  A2i, whose officers and agents are also bail bond agents knowledgeable of the statutory restrictions on charges for bail bond services, nevertheless contracted with principals to require illegal payments.  Am. Compl. ¶¶ 40-44, 82.  A2i accepted payments received from principals and indemnitors by Blair's as well as payments made to A2i directly.  *Id*. ¶¶ 72, 85.  These allegations meet the elements of conversion.  First, Plaintiffs had the right to possess the funds used to pay A2i's ankle monitoring fees.  Second, A2i's taking of these amounts was inconsistent with Plaintiffs' ownership of those funds.  Third, A2i's taking, either directly or via Blair's, was done in violation of the statutory restriction on charges associated with the provisioning of bail bonds and was thus wrongful, regardless of A2i's intent, knowledge, or good faith.  *Labbe*, 618 So. 2d at 46.

In addition, A2i argues that it is not a producer and is thus not subject to the 12% limit on bail bond premiums.  A2i Mot. at 15.  However, as discussed *supra* at Section III(D), the provisions of La. Rev. Stat. § 22:855 apply not just to producers, but also insurers, their officers, employees, and *other representatives* (emphasis added).  And state statute outlaws charging any amounts as consideration for insurance other than the premium and specifically delineated fees, which do not include the GPS monitoring fees.  La. Rev. Stat. § 22:855.  Even if A2i is not a producer, it cannot benefit from an agreement that it set up through a producer, knowing the terms violate Louisiana statute.  Once again, Bankers' only argument is that the allegations group the Bankers entities together.  Bankers Mot. at 9-10, 21.  As discussed in Section III(A), this argument lacks merit because the Bankers entities have sufficient notice of claims against them.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Defendants' motions to dismiss.

Dated: October 24, 2017

Respectfully submitted,

/s/ Ivy Wang

Ivy Wang
*On behalf of Plaintiffs' Counsel*

Ivy Wang
SOUTHERN POVERTY LAW CENTER
1055 St. Charles Avenue, Suite 505
New Orleans, LA 70130
P:  504-228-7279
F:  504-486-8947
E:  ivy.wang@splcenter.org

Caren E. Short*
Sara Zampierin*
Samuel Brooke*
SOUTHERN POVERTY LAW CENTER
400 Washington Avenue
Montgomery, AL 36104
P:  334-956-8200
F:  334-956-8481
E:  caren.short@splcenter.org
E:  sara.zampierin@splcenter.org
E:  samuel.brooke@splcenter.org

Charles M. Delbaum (MA Bar No. 543225)*
NATIONAL CONSUMER LAW CENTER
7 Winthrop Square, Fourth Floor
Boston, MA 02110-1245
P: (617) 542-8010
F: (617) 542-8028
E: cdelbaum@nclc.org

Noah A. Levine*
Ryanne E. Perio*
Ilya Feldsherov†
William Roth*
Kevin J. Holt*
WILMER CUTLER PICKERING HALE AND
    DORR LLP
7 World Trade Center
250 Greenwich Street
New York, NY 10007
(212) 230-8800 (t)
(212) 230-8888 (f)
noah.levine@wilmerhale.com
ryanne.perio@wilmerhale.com
ilya.feldsherov@wilmerhale.com

william.roth@wilmerhale.com
kevin.holt@wilmerhale.com

*admitted pro hac vice*

†*application for admission pro hac vice forthcoming*

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served via e-mail on all counsel of record, including on the following:

Walter F. Becker, Jr.
CHAFFE MCCALL, LLP
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300
becker@chaffe.com
*Counsel for Blair's Bail Bonds, Inc. & New Orleans Bail Bonds, L.L.C.*

Ethan J. Loeb
Allison C. Doucette
E. Colin Thompson
SMOLKER, BARTLETT, LOEB, HINDS & SHEPPARD, P.A.
100 N. Tampa Street, Suite 2050
Tampa, Florida  33602
ethanl@smolkerbartlett.com; allisond@smolkerbartlett.com; colint@smolkerbartlett.com
*Counsel for Bankers Insurance Company, Inc., Bankers Surety Services, Inc. & Bankers Underwriters, Inc.*

Stephen D. Marx
Preston L. Hayes
CHEHARDY, SHERMAN, WILLIAMS, MURRAY, RECILE, STAKELUM & HAYES, LLP
One Galleria Boulevard, Suite 1100
Metairie, Louisiana 70001
*Counsel for Bankers Insurance Company, Inc., Bankers Surety Services, Inc. & Bankers Underwriters, Inc.*

Gary W. Bizal
639 Loyola Avenue, Suite 1820
New Orleans, Louisiana 70113
piblaw@bellsouth.net
*Counsel for A2I, LLC, Alternative to Incarceration, Inc. & Alternative to Incarceration NOLA, Inc.*

Dated this October 24, 2017.                    /s/ Ivy Wang
                                                Ivy Wang