UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RONALD EGANA ET AL. | CIVIL ACTION |
| VERSUS | NO: 17-5899 |
| BLAIR'S BAIL BONDS INC. ET AL. | SECTION "H" |

## ORDER AND REASONS

Before the Court are a Motion to Dismiss filed by Bankers Insurance Company, Inc., Bankers Surety Services, Inc., and Bankers Underwriters, Inc. (the "Bankers Defendants") (Doc. 43); a Motion to Dismiss filed by Blair's Bail Bonds, Inc. and New Orleans Bail Bonds, LLC (the "Blair's Defendants") (Doc. 44); and a Motion to Dismiss filed by A2i LLC, Alternative to Incarceration NOLA, Inc., and Alternative to Incarceration, Inc. (the "A2i Defendants") (Doc. 45). For the following reasons, the Motions are GRANTED IN PART.

## BACKGROUND

In June 2016, Plaintiffs, Ronald Egana, his close friend Tiffany Brown, and his mother Samantha Egana, signed a contract and payment agreement with the Blair's Defendants in order to secure bail for Mr. Egana. The

1

agreement provided that the Blair's Defendants would post bail in exchange for a $3,275.00 premium to be loaned to Plaintiffs and paid back in installments. Plaintiffs were also required to consent to having their payments applied to the preexisting balance that Mr. Egana owed to Defendants, which amounted to about $3,800.00. The Bankers Defendants acted as surety on the bonding agreement.

As a condition of the loan, Defendants required Mr. Egana to wear an ankle monitor, and he was charged a fee of $10 per day by the A2i Defendants in connection with the use of the ankle monitor. Although Plaintiffs allege that they were initially told that the ankle monitor would be removed after they paid $3,000.00, they were later told that the insurance company, the Bankers Defendants, had "changed its mind" and would require that Mr. Egana wear the ankle monitor longer.

Plaintiffs' First Amended Complaint (hereinafter "Complaint") alleges that following the agreement, Defendants threatened, harassed, and kidnapped Mr. Egana in an effort to extort payments from him and the other Plaintiffs. They allege that Defendants employed bounty hunters to threaten and coerce payments of bail bonding fees and ankle monitoring fees. For instance, Plaintiffs allege that on three seperate occasions, bounty hunters picked Mr. Egana up, handcuffed him, brought him to the Blair's office, and called his mother threatening that he would be brought to jail if she did not immediately bring payment of some amount owed pursuant to the bonding agreement. Plaintiffs allege that Mr. Egana would not be released by the bounty hunters until his mother tendered payment. Plaintiffs allege that Mr. Egana was even detained on his way to a court hearing in an unrelated

2

criminal matter. Plaintiffs ultimately paid more than $6,000 to the Defendants, and Mr. Egana was nonetheless surrendered to the court. Plaintiffs allege that they were told that Mr. Egana was surrendered because "the insurance company decided they [didn't] want to have anything to do with [Mr. Egana] anymore."

Plaintiffs contend that the bonding agreement violated state and federal law by failing to disclose key terms of the loan and charging above the limit allowed by state law on bail bond premiums. Plaintiffs bring claims for violations of the Truth in Lending Act ("TILA"), the Racketeer Influenced and Corrupt Organizations Act ("RICO"), the Louisiana Racketeering Act, and for false imprisonment, conversion, breach of state contract laws, and violation of state consumer credit laws. Plaintiffs seek to represent others who are similarly situated and to obtain damages, equitable relief, attorneys' fees, and costs.

The Blair's Defendants have moved for dismissal of Plaintiffs' RICO, Louisiana Racketeering, and TILA claims against them. The Bankers Defendants and A2i Defendants separately move for dismissal of all claims against them. This Court will consider each cause of action in turn.

## LEGAL STANDARD

To survive a Rule 12(b)(6) motion to dismiss, a plaintiff must plead enough facts "to state a claim for relief that is plausible on its face."[1] A claim is "plausible on its face" when the pleaded facts allow the court to "draw

---

[1] Ashcroft v. Iqbal, 556 U.S. 662 (2009) (quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 547 (2007)).

reasonable inference that the defendant is liable for the misconduct alleged."[2] A court must accept the complaint's factual allegations as true and must "draw all reasonable inferences in the plaintiff's favor."[3] The court need not, however, accept as true legal conclusions couched as factual allegations.[4] To be legally sufficient, a complaint must establish more than a "sheer possibility" that the plaintiff's claims are true.[5] If it is apparent from the face of the complaint that an insurmountable bar to relief exists and the plaintiff is not entitled to relief, the court must dismiss the claim.[6] The court's review is limited to the complaint and any documents attached to the motion to dismiss that are central to the claim and referenced by the complaint.[8]

## LAW AND ANALYSIS

### A. RICO Claims

Plaintiffs bring three claims alleging violations of RICO and Louisiana's racketeering laws: (1) a RICO claim based on collection of unlawful debt, (2) a RICO claim based on kidnapping, extortion, and extortionate extension of credit, and (3) a racketeering claim under Louisiana law. "In order to state a claim under 18 U.S.C. § 1962, a plaintiff must allege: 1) the conduct; 2) of an enterprise; 3) through a pattern; 4) of racketeering activity."[9] All Defendants

---

[2] *Id.*

[3] Lormand v. U.S. Unwired, Inc., 565 F.3d 228, 232 (5th Cir. 2009).

[4] *Iqbal*, 556 U.S. at 678.

[5] *Id.*

[6] *Lormand*, 565 F.3d at 255–57.

[8] Collins v. Morgan Stanley Dean Witter, 224 F.3d 496, 498 (5th Cir. 2000).

[9] Elliott v. Foufas, 867 F.2d 877, 880 (5th Cir. 1989). The Louisiana Racketeering Act was "modeled after the federal 'RICO' legislation," and courts therefore look to "federal

4

allege that Plaintiffs' Complaint fails to establish an enterprise or a pattern of racketeering activity.

*1. An Enterprise*

RICO defines "enterprise" as "any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity."[10] Therefore, "a RICO 'enterprise' can be either a legal entity or an 'association in fact' enterprise."[11] Plaintiffs allege that Defendants have formed an association-in-fact enterprise. The Supreme Court has held that, "From the terms of RICO, it is apparent that an association-in-fact enterprise must have at least three structural features: a purpose, relationships among those associated with the enterprise, and longevity sufficient to permit these associates to pursue the enterprise's purpose."[12] It reiterated that "an association-in-fact enterprise is 'a group of persons associated together for a common purpose of engaging in a course of conduct.'"[13]

Defendants argue that Plaintiffs' Complaint fails to allege sufficient facts to establish an association-in-fact enterprise among the Blair's Defendants, Bankers Defendants, and A2i Defendants. Specifically, they complain that Plaintiffs have failed to identify the hierarchical structure of the enterprise. The Supreme Court has, however, expressly held that RICO does not require

---

interpretations for guidance." State v. Nagi, 2017-1257 (La. App. 1 Cir. 2018); *see* State v. Davenport, 2017 WL 4700652 (La. App. 4 Cir. 2017).

[10] 18 U.S.C. § 1961.

[11] *In re* McCann, 268 F. App'x 359, 365–66 (5th Cir. 2008) (internal quotations omitted).

[12] Boyle v. United States, 556 U.S. 938, 946 (2009).

[13] *Id.* (quoting United States v. Turkette, 452 U.S. 576, 583 (1981)).

5

such. An association-in-fact enterprise "need not have a hierarchical structure or a 'chain of command'; decisions may be made on an ad hoc basis and by any number of methods—by majority vote, consensus, a show of strength, etc."[14] Plaintiffs' Complaint alleges that:

> 118. Blair's meets with potential clients to extend bail bonds and credit for bail bonding fees. Working in part through its alter ego New Orleans Bail Bonds, Blair's requires principals and indemnitors to sign the contract documents, and requires principals to wear and sign contracts for ankle monitors. Blair's employs and/or contracts with bounty hunters who seize and detain principals to coerce payment of bail bonding fees and ankle monitoring fees in violation of state law and regulation. Blair's communicates how much money is necessary to secure their release, tells them to call friends and family to bring the money, collects the money, and releases the person once it is paid. Blair's then distributes the money to the other enterprise members and others. . . .
>
> 120. Bankers provides the insurance used to secure the bond with the court. It participates in setting the terms of the contracts signed by principals and indemnitors, identifying individuals who are behind in payments and need to pay, deciding how much money must be collected from individuals to avoid jail, deciding when to install or remove ankle monitors, and determining when to surrender principals to jail. . . .
>
> 122. A2i provides the GPS ankle monitoring services used to monitor the location of defendants and find them to be seized. It also determines the ankle monitoring fees that will be collected by Blair's and A2i and employs and/or contracts with bounty hunters who seize and detain principals to coerce payment of ankle monitoring fees in violation of state and federal law.[15]

---

[14] *Id.*
[15] Doc. 26.

Plaintiffs' allegations are sufficient to allege an association-in-fact between the Defendants. The facts alleged support a continuing relationship with the common purpose of providing bail bonds and collecting exorbitant fees through threats and coercion. The Bankers Defendants are alleged to participate in the decision-making of the enterprise, while the Blair's Defendants, with the help of the ankle monitors supplied by the A2i Defendants, kidnap and hold clients to extort payments owed to both the Blair's and A2i Defendants. These allegations, viewed in a light most favorable to the Plaintiffs, are sufficient to establish an enterprise under RICO.

2. *A Pattern*

Defendants next argue that Plaintiffs have failed to establish a pattern of racketeering activity or threat of future conduct. In support of this argument, Defendants point out that Plaintiffs' Complaint only details the facts relating to one bail bond issued for Ronald Egana. In order to establish a pattern of racketeering activity, Plaintiff must show "two or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity."[16]

Plaintiffs have alleged that the Bankers Defendants, directly and through their agent the Blair's Defendants, and the A2i Defendants have engaged in the predicate acts of kidnapping, extortion, and the collection of an unlawful debt. Defendants argue, however, that Plaintiffs' allegations fail to show continuity. "Continuity is both a closed- and open-ended concept, referring either to a closed period of repeated conduct, or to past conduct that by its

---

[16] Jones v. Liberty Bank & Tr. Co., 461 F. App'x 407, 409 (5th Cir. 2012).

nature projects into the future with a threat of repetition."[17] "A party alleging a RICO violation may demonstrate continuity over a closed period by proving a series of related predicates extending over a substantial period of time. Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this requirement."[18] If a substantial period of time cannot be established, "liability depends on whether the threat of continuity is demonstrated."[19] "[T]he threat of continuity may be established by showing that the predicate acts or offenses are part of an ongoing entity's regular way of doing business."[20]

All of the predicate acts alleged by Plaintiffs occurred in relation to a single bail bond for Plaintiff Ronald Egana and took place over only six months.[21] This time frame is insufficient to establish continuity. Plaintiffs' Complaint also fails to establish a threat of continuity. There is no continued threat as to Mr. Egana, as the Complaint alleges that he was surrendered to jail. Despite making conclusory allegations, Plaintiffs have also not alleged any facts that would suggest that the predicate acts are a regular way of conducting business or that any other customers of Defendants were subjected to similar acts of kidnapping, extortion, or collection of unlawful debts. Accordingly, Plaintiffs have not sufficiently alleged an element of their RICO and Louisiana

---

[17] H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 241 (1989).
[18] *Id.* at 242.
[19] *Id.*
[20] *Id.*
[21] Plaintiffs allege unlawful arrests on September 2016, December 2016, and March 2017. "Predicate acts extending over a few weeks or months and threatening no future criminal conduct do not satisfy this [continuity] requirement." *Id.*

8

Racketeering law claims against the Defendants, and those claims are dismissed.

## B. TILA Claims

Plaintiffs next bring claims under the Truth in Lending Act against the Blair's Defendants and the Bankers Defendants. These Defendants move for dismissal of Plaintiffs' TILA claims under several theories. First, they argue that Plaintiffs' TILA claims are preempted by the McCarran-Ferguson Act. Second, they argue that TILA does not apply to the transaction at issue here. Finally, the Bankers Defendants argue that they are not a "creditor" under the terms of TILA.

### 1. MFA Preemption

Defendants argue that Plaintiffs' TILA claims should be dismissed because they are preempted by the McCarran-Ferguson Act ("MFA"). TILA is a disclosure statute requiring the disclosure of certain credit terms in credit transactions.[22] The MFA is a federal law that exempts the business of insurance from federal regulation.[23] The MFA states that "[n]o Act of Congress shall be construed to invalidate, impair, or supersede any law enacted by any State for the purpose of regulating the business of insurance."[24] The parties agree that under the MFA, "a state law reverse preempts federal law only if: (1) the federal statute does not specifically relate to the 'business of insurance;' (2) the state law was enacted for the 'purpose of regulating the business of

---

[22] 15 U.S.C. § 1601.
[23] 15 U.S.C. § 1012.
[24] *Id.*

9

insurance;' and (3) the federal statute operates to 'invalidate, impair, or supersede' the state law."[25]

The parties agree that it is well-settled that TILA does not specifically relate to the business of insurance.[26] They disagree, however, as to the second two prongs. The fundamental disagreement here is whether Defendants' activities constitute the "business of insurance." Defendants argue that Louisiana law provides a comprehensive statutory scheme regulating the business of bail bonding in its insurance code. They therefore argue that the bail bonding business is the "business of insurance," and the MFA therefore preempts TILA's application. Plaintiffs argue that Defendants' activities at issue here—namely the extension of credit for the bail bonding premium—do not constitute the "business of insurance," and rather, constitute the financing of insurance premiums.

The Fifth Circuit has held that "premium financing by an insurance company in connection with the sale of an insurance policy is not the 'business of insurance' for McCarran Act purposes, and that TIL is thus applicable to such a loan transaction."[27] Defendants argue that this holding is inapplicable here where they are not in the business of financing or extending credit.[28] The Fifth Circuit also expressly stated, however, that "[t]he appropriate focus is . .

---

[25] Am. Bankers Ins. Co. of Fla. v. Inman, 436 F.3d 490, 493 (5th Cir. 2006).
[26] *See* Edwards v. Your Credit Inc., 148 F.3d 427, 433 (5th Cir. 1998); Cochran v. Paco, Inc., 606 F.2d 460, 464 (5th Cir. 1979).
[27] Cody v. Cmty. Loan Corp. of Richmond Cty., 606 F.2d 499, 502 (5th Cir. 1979); *see* Perry v. Fid. Union Life Ins. Co., 606 F.2d 468, 471 (5th Cir. 1979).
[28] In addition, the case relied upon by Defendants, *Buckman v. Am. Bankers Ins. Co. of Fla.*, 924 F. Supp. 1156, 1157 (S.D. Fla. 1996), is wholly inapplicable here where the premium therein had been paid in full and was not financed.

. the nature of the activity itself, not the type of business that is conducting it."[29] It further noted that, "It would be anomalous to hold that [an insurance company's] premium financing activities are the 'business of insurance' but that the identical activities of the finance company . . . are not."[30] Here too, it does not make sense that Defendants' financing activities should be immune from TILA merely because they are conducted in the context of bail bonding. Further, Defendants have pointed to no provision in Louisiana's bail bond regulations that governs the financing of bail bond premiums or the extension of credit in bail bond transactions. Therefore, no law would be "invalidated, impaired, or superseded" by the application of TILA's disclosure requirements. Accordingly, the MFA does not preempt Plaintiffs' claims under TILA.

2. *Applicability of TILA*

Defendants next argue that Plaintiffs cannot succeed on their TILA claims because they have not plead sufficient facts to establish that Defendants extended credit as required under the Act. TILA applies to each individual or business that offers or extends credit when four conditions are met: "(i) The credit is offered or extended to consumers; (ii) The offering or extension of credit is done regularly; (iii) The credit is subject to a finance charge or is payable by a written agreement in more than four installments; and (iv) The credit is primarily for personal, family, or household purposes."[31] "A person regularly extends consumer credit only if it extended credit . . . more than 25 times . . . in the preceding calendar year."[32]

---

[29] *Perry*, 606 F.2d at 470.
[30] *Id.*
[31] 12 C.F.R. § 1026.1(c)(1).
[32] 12 C.F.R. § 1026.2.

11

Defendants first argue that they are not subject to the provisions of TILA because they are not "in the business of extending credit." Defendants cite to two cases to support this proposition. In the first, *In re Gibbs*, the court noted, in dicta, that the Defendant was not in the business of extending credit and that the transaction at issue bore "no resemblance [to] transactions truth-in-lending laws were intended to cover."[33] It based its decision, however, on the fact that the transaction was not subject to any finance charge.[34] It held that the alleged finance charge was actually a late fee pursuant to a lease provision.[35] The second case, *Bonfiglio v. Nugent*, held only that TILA does not apply to debts owed pursuant to a court order because such is not the extension of consumer credit.[36] The Court does not find, as Defendants suggest, that these cases stand for the proposition that TILA does not apply to situations where a company is not involved in a lending-type business. Rather, these cases are simply situations in which a transaction did not satisfy the four conditions required for TILA to apply.

Next, Defendants argue that Plaintiffs cannot succeed on the TILA claims against them because the extension of credit was not subject to a finance charge. Plaintiffs argue that the ankle monitoring fees, other unexplained fees, and the bundling of outstanding balances constitute financing charges. Plaintiffs allege that they would not have been allowed to enter into the bail payment arrangement without these charges, and they are therefore charges incident to the extension of credit.

---

[33] 9 B.R. 758, 765 (Bankr. D. Conn. 1981).
[34] *Id.*
[35] *Id.*
[36] 986 F.2d 1391, 1393 (11th Cir. 1993).

TILA defines a "finance charge" as "the sum of all charges, payable directly or indirectly by the person to whom the credit is extended, and imposed directly or indirectly by the creditor as an incident to the extension of credit. The finance charge does not include charges of a type payable in a comparable cash transaction."[37] Without considering whether the ankle monitoring fees or bundling of Mr. Egana's prior balances constitutes finance charges, this Court finds that Plaintiffs have alleged facts sufficient to establish that the credit transaction may have been subject to a finance charge. Plaintiffs' Complaint alleges that as part of the bail bond transaction they were charged an additional $130.00 for which no explanation was given. Viewing the Complaint in the light most favorable to Plaintiffs, this Court finds that such a charge could constitute a finance charge under TILA. Accordingly, this argument for dismissal of Plaintiffs' TILA claims fails.

Finally, the Bankers Defendants argue that they cannot be liable under TILA because they are not "creditors" as defined in the act. TILA defines a "creditor" as:

> [A] person who both (1) regularly extends, whether in connection with loans, sales of property or services, or otherwise, consumer credit which is payable by agreement in more than four installments or for which the payment of a finance charge is or may be required, and (2) is the person to whom the debt arising from the consumer credit transaction is initially payable on the face of the evidence of indebtedness or, if there is no such evidence of indebtedness, by agreement.[38]

---

[37] 15 U.S.C. § 1605(a).
[38] 15 U.S.C. § 1602(g).

The Bankers Defendants argue that the face of the bail bond agreement, attached to the Complaint, in no way indicates that the amounts are payable to them. Rather, the form merely states "Blair's Bail Bonds, LLC" at the top. Plaintiffs argue that this document does not represent the entirety of the agreement between the parties, and that regardless, it does not indicate to whom payments are due. Plaintiffs argue that the Blair's Defendants acted as an agent for the Bankers Defendants and that it is plausible that the Bankers Defendants also agreed to extend credit for the premium through their agent.

Even accepting Plaintiffs' arguments as true, however, their TILA claim against the Bankers Defendants cannot prevail. There are no facts in Plaintiffs' Complaint that would support an inference that the installment payments on the bail bond premium were initially payable to the Bankers Defendants. Even if the Bankers Defendants also extended credit and those amounts were ultimately owed to Bankers, the Complaint expressly alleges that the Blair's Defendants initially collect the payments.[39] Accordingly, the Bankers Defendants cannot be said to be creditors under the terms of TILA.[40] Plaintiffs' TILA claim against the Bankers Defendants is dismissed.

### C. False Imprisonment and Conversion

Plaintiffs bring claims against all Defendants for false imprisonment arising out of their allegations that Mr. Egana was detained until additional bail payments were tendered. In addition, Plaintiffs claim that all Defendants are liable for state law conversion for the bail bond and ankle monitoring

---

[39] Doc. 26, ¶118.
[40] *See* Riviere v. Banner Chevrolet, Inc., 184 F.3d 457, 460 (5th Cir. 1999) ("If an obligation is initially payable to one person, that person is the creditor even if the obligation by its terms is simultaneously assigned to another person.") (quoting 12 C.F.R. pt. 226).

charges that exceed those allowed by law. The Bankers Defendants and the A2i Defendants each seek dismissal of these claims against them. Defendants allege that the Complaint fails to set forth facts showing that any Bankers or A2i entity directly participated in those acts.

The Complaint contains an allegation that the bounty hunters alleged to have kidnapped Mr. Egana also collected fees on behalf of the A2i Defendants. Viewed in a light most favorable to the Plaintiffs, this allegation is sufficient to state a claim of false imprisonment against the A2i Defendants.

However, the Complaint is devoid of an allegation that the A2i Defendants were involved in the overcharging of Plaintiffs. According to the Complaint, A2i set a fee for its ankle monitoring service, which the Blair's Defendants then forwarded on to Plaintiffs as part of its bail bond agreement. This allegation does not support an inference that the A2i Defendants were involved in intentionally charging Plaintiffs in excess of the statutory rate.

As to the Bankers Defendants, the Complaint alleges that the Blair's Defendants acted as agents of the Bankers Defendants in committing the intentional torts of false imprisonment and conversion against Mr. Egana. Under Louisiana law, however, a principal/agent relationship is alone insufficient to sustain a claim against the principal for the wrongful acts of the agent.[41] "A principal is liable for the torts of its agent '[o]nly when the relationship of the parties includes the principal's right to control physical details of the actor as to the manner of his performance which is characteristic of the relation of master and servant."[42] Plaintiffs have not alleged any facts

---

[41] Pinero v. Jackson Hewitt Tax Serv. Inc., 638 F. Supp. 2d 632, 640 (E.D. La. 2009).
[42] *Id.* (quoting Rowell v. Carter Mobile Homes, Inc., 500 So. 2d 748, 751 (La. 1987)).

suggesting that the Bankers Defendants exerted physical control over the Blair's Defendants. Indeed, there is not even an allegation that the Bankers Defendants instructed the Blair's Defendants to detain or overcharge Mr. Egana. Accordingly, Plaintiffs' claims for false imprisonment and conversion against the Bankers and A2i Defendants are dismissed.

### D. Violation of Contract Law

Plaintiffs bring a claim alleging that the Blair's and Bankers Defendants have violated Louisiana contract law by overcharging in fees and premiums for the bail bonds they issue. Louisiana law provides for a bail bond premium of 12% or 12.5% of the total value of the bond and limits agency fees to $25.00.[43] Plaintiffs allege that the ankle monitoring fees, unexplained fees, and the bundling of Mr. Egana's prior balance exceed these allowable fees. Louisiana Revised Statutes § 22:855 provides that,

> No insurer or its officer, employee, producer, or other representative shall charge or receive any fee, compensation, or consideration for insurance which is not included in the premium quoted to the insured and the premium specified in the policy delivered to the insured, . . . except for an agency fee.

At a minimum, Plaintiffs' Complaint clearly alleges that they were charged an unexplained fee of $130.00 in excess of the statutorily allowed premium and agency fee. Plaintiffs have properly alleged that if this amount is not a finance charge then, in the alternative, the charge may be a violation of state contract law as an excessive fee or premium. The statute clearly states that both insurers, here the Bankers Defendants, and producers, here the Blair's

---

[43] *See* La. Rev. Stat. §§ 22:1443, 22:855(B)(2)(b), 13:718(I)(2)(a).

Defendants, can be liable for overcharges. Accordingly, Defendants' argument for the dismissal of this claim fails.

### E. Louisiana Consumer Credit Law

Finally, Plaintiffs allege that the Blair's and Bankers Defendants violated Louisiana consumer credit law by charging a usurious interest rate, above that which is allowed on consumer credit sales.[44] The Bankers Defendants argue that this claim should be dismissed because the extension of credit on a bail bond premium is not a consumer credit sale. Louisiana law defines a "consumer credit sales" as:

> [T]he sale of a thing . . . or immovable property, in which a credit service charge is charged and the purchaser is permitted to defer all or part of the purchase price or other consideration in two or more installments excluding the down payment when the thing is purchased primarily for personal, family, or household purposes, and the purchaser is a person other than an organization.[45]

Specifically, the Bankers Defendants argue that bail bonding services are not a "thing." The law further defines a "thing," however, to include "movable and immovable property and rights therein, goods, or services."[46] Certainly then, bail bond services fit within this definition of a "thing," and the Bankers Defendants' argument therefore fails. Indeed, the Louisiana Consumer Credit Law expressly states that, "[T]he sale of insurance by an insurance agent in which such agent charges a credit service charge and the insured is permitted

---

[44] *Id.* § 9:3520.
[45] *Id.* § 9:3516.
[46] *Id.*

17

to defer all or part of the amount due such agent in two or more installments excluding the down payment . . . constitutes a 'consumer credit sale.'"[47]

The Bankers Defendants also argue that they cannot be liable for violation of Louisiana's consumer credit law because Plaintiff has not alleged any relationship between them and the usurious interest rate. Plaintiffs rebut that the Blair's Defendants acted as the agent of the Bankers Defendants in setting the usurious rate and that the Bankers Defendants were involved in the decision to require Mr. Egana to wear an ankle monitor. Even so, there is no allegation in the Complaint that the Bankers Defendants extended credit to Plaintiffs. Certainly, then, they cannot be liable for charging a usurious interest rate on the extension of credit.[48]

## **CONCLUSION**

For the foregoing reasons, the Blair's Defendants' Motion is GRANTED IN PART. Plaintiffs' RICO claims against them are DISMISSED. All other claims remain.

The Bankers Defendants' Motion is GRANTED IN PART. Plaintiffs' claims for RICO violations, TILA violations, false imprisonment, conversion,

---

[47] *Id.* § 9:3512.
[48] *See* La. Rev. Stat. §§ 9:3552 (discussing penalties for violation of the Consumer Credit Law by the "extender of credit"); § 9:3516(18) (defining "extender of credit" or "creditor" as "a seller in a consumer credit sale, revolving charge account, or transaction made with the use of a seller credit card or otherwise, or a lender in a consumer loan, a revolving loan account, or a lender credit card transaction. 'Creditor' also includes a subsequent assignee or transferee of the consumer's obligation, but does not include a bona fide pledgee.").

18

and consumer credit law violations against the Bankers Defendants are DISMISSED. Only Plaintiffs' claim for violation of state contract law remains.

The A2i Defendants' Motion is GRANTED IN PART. Plaintiffs' claims for RICO violations and conversion against the A2i Defendants are DISMISSED. Only Plaintiffs' claim for state law false imprisonment remains.

Plaintiffs may amend their Complaint within 20 days of this Order to the extent that they can remedy the deficiencies identified herein.

New Orleans, Louisiana this 1st day of June, 2018.

_____
**JANE TRICHE MILAZZO**
**UNITED STATES DISTRICT JUDGE**