**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF LOUISIANA**

| | |
|---|---|
| RONALD EGANA, SAMANTHA EGANA, and TIFFANY BROWN on behalf of themselves and those similarly situated, | Case No. 2:17-cv-5899 |
| Plaintiffs, | **HON. JANE TRICHE MILAZZO SECTION "H" HON. DANIEL E. KNOWLES (M-3)** |
| v. | |
| BLAIR'S BAIL BONDS, INC., et al., | |
| Defendants. | |

**PLAINTIFFS RONALD EGANA, SAMANTHA EGANA, AND TIFFANY BROWN'S OPPOSITION TO DEFENDANTS BLAIR'S AND A2I'S MOTION TO DISMISS PLAINTIFFS' SECOND AMENDED COMPLAINT**

# TABLE OF CONTENTS

I.      TABLE OF AUTHORITIES ........................................................................... ii

I.      INTRODUCTION ........................................................................................1

II.     STATEMENT OF FACTS AND RELEVANT PROCEDURAL BACKGROUND..........1

III.    LEGAL ARGUMENT ...................................................................................4

        A.      Legal Standard for Pleading under FRCP 8...........................................4

        B.      Plaintiffs Have Sufficiently Alleged Continuity to Support a Pattern of
                Racketeering Activity. ......................................................................5

                1.      Plaintiffs have alleged open-ended continuity. ...........................6

        C.      Plaintiffs Have Stated a Claim under RICO for the Collection of Unlawful
                Debt...............................................................................................14

        D.      Plaintiffs Have Properly Alleged that A2i Participated in the RICO
                Enterprise. ....................................................................................16

        E.      Plaintiffs Have Properly Alleged a RICO Conspiracy. ............................20

                1.      Plaintiffs have alleged a conspiracy.......................................20

                2.      Plaintiffs' conspiracy claims under § 1962(d) survive even if
                        Plaintiffs' claims under § 1962(c) do not. ...............................21

        F.      Plaintiffs Have Stated Claims Under the Louisiana Racketeering Act.................22

        G.      A2i is Liable for Conversion...............................................................22

IV.     CONCLUSION...........................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*5-Star Premium Fin., Inc. v. Wood*, CIV.A.99-3705, 2000 WL 533941 (E.D. La. May 2, 2000) 11

*Abraham v. Singh*, 480 F.3d 351 (5th Cir. 2007) ................................................................ 5, 12, 14

*Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015) ...................................................... 18

*Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, 2:17-CV-00053, 2017 WL
  2126593 (E.D. Wash. May 16, 2017) ........................................................................................ 9

*Ashcroft v. Iqbal*, 556 U.S. 662 (2009) .......................................................................................... 4

*Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) ...................................................................... 4, 5

*Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364 (W.D.N.Y. 2012) ........................................ 9

*Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480 (5th Cir. 1986).............. 24

*Chrysler Credit Corp. v. Whitney Nat. Bank*, 798 F. Supp. 1234 (E.D. La. 1992)................. 24, 25

*Conry v. Daugherty*, 10-4599, 2011 WL 2473959 (E.D. La. June 22, 2011).............................. 11

*Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392 (7th Cir. 2009)................................................ 19

*CVLR Performance Horses, Inc. v. Wynne*, 524 F. App'x 924 (4th Cir. 2013) ........................... 13

*Edwards v. First Nat'l Bank*, 872 F.2d 347 (10th Cir. 1989) ...................................................... 11

*Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12 (1st Cir. 2000) .................................. 12

*Egana v. Blair's Bail Bonds Inc.*, CV 17-5899, 2018 WL 2463210 (E.D. La. June 1, 2018).... 5, 6

*ePlus Technology Inc. v. Aboud*, 313 F.3d 166 (4th Cir. 2002).................................................... 10

*Erickson v. Pardus*, 551 U.S. 89 (2007) ....................................................................................... 5

*First Capital Asset Mgmt., Inc. v. Satinwood, Inc.*, 385 F.3d 159 (2d Cir. 2004) ....................... 18

*Gamboa v. Velez*, 457 F.3d 703 (7th Cir. 2006) ......................................................................... 11

*Gaunt v. La. Citizens Prop. Ins. Corp.*, 512 F. Supp. 2d 493 (E.D. La. 2007)........................... 24

*GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463 (2d Cir. 1995) .................................... 8

*Goren v. New Vision Int'l, Inc.*, 156 F.3d 721 (7th Cir. 1998) .................................................... 19

*H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229 (1989).................................................................. 6, 11

*Harold H. Huggins Realty, Inc. v. FNC, Inc.*, 634 F.3d 787 (5th Cir. 2011) ................................ 5

*Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580 (E.D. Mich. 2015)............................................ 19

*Labbe v. Premier Bank*, 618 So. 2d 45 (La. Ct. App. 3 Cir. 1993).......................................... 24, 25

*Luxpro Corp. v. Apple Inc.*, C 10-03058, 2011 WL 3566616 (N.D. Cal. Aug. 12, 2011) ............ 9

*Magiera v. City of Dallas*, 389 F. App'x 433 (5th Cir. 2010) ...................................................... 9

*McCaleb v. Peerless Ins. Co.*, 250 F. Supp. 512 (D. Neb. 1965) .................................................. 9

*Metcalf v. Lynch*, 4:11-CV-127, 2011 WL 13087090 (M.D. Pa. Oct. 31, 2011) ....................... 13

*Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926 (5th Cir. 2002) ............................ 21

*Reves v. Ernst & Young*, 507 U.S. 170 (1993)........................................................................... 17

*Rogers v. McDorman*, 521 F.3d 381 (5th Cir. 2008)............................................................. 16, 19

*Safeco Ins. Co. of Am. v. Burr*, 551 U.S. 47 (2007)................................................................... 15

*Salinas v. United States*, 552 U.S. 52 (1997) .............................................................................. 22

*Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512 (5th Cir. 2016).................................. 16

*State v. Touchet*, 99-146 (La. App. 3 Cir. 4/5/00); 759 So. 2d 194 ............................................ 22

*Swistock v. Jones*, 884 F.2d 755 (3d Cir. 1989)......................................................................... 13

*United States v. Aucoin*, 964 F.2d 1492 (5th Cir. 1992).............................................................. 14

*United States v. Biasucci*, 786 F.2d 504 (2d Cir. 1986).............................................................. 14

*United States v. Bright*, 550 F.2d 240 (5th Cir. 1977)................................................................ 16

*United States v. Browne*, 505 F.3d 1229 (11th Cir. 2007) .......................................................... 22

*United States v. Busacca*, 936 F.2d 232 (6th Cir. 1991)........................................................ 10, 12
*United States v. Eufrasio*, 935 F.2d 553 (3rd Cir. 1991) ............................................................ 14
*United States v. O'Connor*, 910 F.2d 1466 (7th Cir. 1990)........................................................ 10
*United States v. Posada-Rios*, 158 F.3d 832 (5th Cir. 1998)...................................................... 18
*United States v. Richardson*, 167 F.3d 621 (D.C. Cir. 1999) .................................................... 10
*United States v. Velasquez*, 881 F.3d 314 (5th Cir. 2018) ......................................................... 21
*United States v. Walker*, 348 F. App'x 910 (5th Cir. 2009) ...................................................... 10
*US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312 (4th Cir. 2010) .................................... 11
*Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132 (D.C. Cir.
  1989)......................................................................................................................................... 10
*Zilbert v. Sasol N. Am., Inc.*, 2:11 CV 00862, 2012 WL 1950144 (W.D. La. May 29, 2012) ..... 22

## Rules

Fed. R. Civ. P. 8 .......................................................................................................................... 4, 8
Fed. R. Civ. P. 9 ............................................................................................................................... 8
Fed. R. Evid. 801 ............................................................................................................................. 9

## Statutory Authorities

18 U.S.C. § 1962 ................................................................. 1, 5, 14, 17, 19, 20, 21, 22
La. Code Crim. Proc. Ann. art. 331 ................................................................................................ 9
La. Stat. Ann. § 13:718 .................................................................................................................. 23
La. Stat. Ann. § 15:351 .................................................................................................................... 1
La. Stat. Ann. § 22:855 .................................................................................................................. 23
La. Stat. Ann. § 22:1542 ........................................................................................................... 22, 23
La. Stat. Ann. § 22:1585 .................................................................................................................. 9
La. Stat. Ann. § 22:1443 ................................................................................................................ 23

## Other Authorities

Pub. L. 91-452, § 904 (1970)........................................................................................................... 5

## I.  INTRODUCTION

Ronald Egana, Samantha Egana, and Tiffany Brown (collectively, "Plaintiffs") filed this action on behalf of themselves and all others whose rights were violated when they contracted with Defendants for a bail bond to secure their own or their loved ones' release from jail. The Second Amended Complaint ("SAC") alleges that Defendants Blair's Bail Bonds, Inc. and New Orleans Bail Bonds, L.L.C (collectively, "Blair's") and A2i, L.L.C., Alternative to Incarceration, Inc., and Alternative to Incarceration NOLA, Inc. (collectively, "A2i") work in concert with Bankers Insurance Company, Inc., Bankers Surety Services, Inc., and Bankers Underwriters, Inc. (collectively, "Bankers"). Together, they overcharge Plaintiffs and proposed class members far beyond the legal amount for bail bonds by requiring ankle monitoring when none has been ordered by a court, billing $10 per day or $300 per month on top of the bail premium for this service, and threatening surrender to jail without refund of any previous payments if the principal or indemnitors protest this requirement. Defendants contract with bounty hunters to threaten, arrest and hold principals against their will to coerce payment of these illegally charged amounts, often using the GPS monitoring capabilities of the ankle monitor to locate principals. This conduct violates, *inter alia*, the Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1962 ("RICO"), the Louisiana Racketeering Act, La. Stat. Ann. § 15:351, and Louisiana state law prohibiting conversion. As discussed in greater detail below, Plaintiffs have sufficiently pled these claims, and A2i and Blair's motions to dismiss should be denied.

## II.  STATEMENT OF FACTS AND RELEVANT PROCEDURAL BACKGROUND

Blair's is a bail bonding company operating in the Greater New Orleans area. It arranges for the provision of bail bond services to jailed individuals. SAC, ¶ 28. Blair's works with Bankers, the surety on bail bonds arranged by Blair's, and A2i, which provides ankle monitoring services, to

1

charge and collect money from principals and indemnitors who seek their help in obtaining a bail bond. They routinely charge far above the amount allowed under Louisiana statute, largely in the form of ankle monitoring fees of $10 per day and requirements on principals and indemnitors to repay prior existing balances of the principal, even if the indemnitors were not party to the contracts for the earlier balances. SAC, ¶ 40-45, 69. They also routinely resort to extortion and kidnapping to coerce payment. They either directly employ or have ongoing contracts with bounty hunters who threaten, seize, and detain individuals against their will until their friends and family pay to the defendants' satisfaction. *Id*., ¶ 53.

These practices are borne out by the experiences of Plaintiffs and multiple proposed class members. On June 17, Ms. Brown and Ms. Egana went to Blair's office to obtain a bail bond to secure the release pretrial of their son and friend, Mr. Egana. *Id*., ¶ 55-57. They signed form contract documents and were charged a fee of $3,275, which consisted of a 12% premium, a $25 administration fee, and $130 of undisclosed charges. *Id*., ¶ 57, 61. They could not cover the full fee, and were left with a remaining balance of $1,660. *Id*., ¶ 60-61. Blair's extended credit to Plaintiffs for the balance and told them they would have to either post real property as collateral or submit to ankle monitoring, but did not mention any additional charges for the ankle monitor. *Id*., ¶ 62. On June 20, after his release from jail, Mr. Egana went to Blair's office and signed the contract documents, which stated that Blair's "shall have control and jurisdiction over [Mr. Egana] during the term for which the bond is executed. . ." and, in small letters on an addendum, that "any money paid on behalf of this defendant shall be applied to any and all outstanding or previous balances owed on this bond or any previous bonds posted for this defendant[.]" *Id*., ¶¶ 64, 68-69. He was also told that he had to wear an ankle monitor until he had paid $3,000 and, for the first time, that it would cost $10 per day. Alroy Allen, an employee of Blair's and an agent of A2i,

installed the ankle monitor, which had been provided by A2i. *Id*., ¶ 64. All told, the additional fees charged above the 12% premium, which included A2i's $10 daily fee and the requirement to pay down previous balances, resulted in an interest rate far above the 24% annual interest allowed under Louisiana statute on the unpaid balance of a credit sale. *Id*., ¶ 75.

Mr. Egana was subsequently kidnapped by agents working on Defendants' behalf three times: on September 27, 2016, while doing contracting work at a private residence, on December 26, 2016, while sleeping at home, and on March 31, 2017, while entering the Orleans Parish courthouse to appear for a hearing. *Id*., ¶¶ 77-91. Each time, he was seized by armed bounty hunters, handcuffed, and taken to Blair's office. Each time, he was forced to call his mother and tell her that unless she brought hundreds or thousands of dollars, he would be brought to the jail. *Id*. Contrary to A2i's assertion otherwise, when Mr. Egana was finally surrendered by Blair's agents on May 23, 2017, there was no warrant for his arrest. *Id*., ¶¶ 99, 102. Plaintiffs ultimately paid at least $6,000—well above the $3,275 balance they had originally agreed to pay. *Id*., ¶ 104. Substantial portions of these payments went to A2i. *Id*., ¶ 79, 92.

Others also suffered from defendants' scheme. Chad Lightfoot was also forced to wear and pay for an ankle monitor. He was told of this requirement only after he and his wife had already made a down payment of $6,800. When he protested, he was told by Blair's that if he refused, he would be surrendered and his down payment would not be returned. *Id*., ¶ 109. Mr. Lightfoot received numerous threats from A2i agents and employees claiming that he had not paid A2i enough money and threatening that if he did not pay more, they would surrender him to jail. *Id*., ¶¶ 110, 114. A2i also sent four bounty hunters to his home where they handcuffed and refused to release him until he called his brother, who made a payment directly to A2i. *Id*., ¶ 112. After this, Mr. Lightfoot met with Blair Boutte, the owner of Blair's, who threatened that if Mr. Lightfoot did

3

not sign a new contract raising his monthly payments to A2i from $100 to $300, he would be surrendered to jail. *Id.*, ¶ 113.

Reynaud Variste also fell prey to the Defendants' practices. Like Mr. Egana and Mr. Lightfoot, Mr. Variste was extended credit on a bail bond and required to pay on prior outstanding balances. *Id.*, ¶ 107. As with Mr. Egana, Blair's threatened Mr. Variste and his aunt with arrest if they did not pay. *Id.*, ¶ 106. Like Mr. Egana and Mr. Lightfoot, Mr. Variste was arrested by bounty hunters and forced to pay for his release. His freedom was also conditioned on his agreement to wear, pay for, and sign a contract for an ankle monitor, though this had not been a part of his original agreement with Blair's. *Id.*, ¶ 108. In addition, the SAC describes two other people who were held by A2i bounty hunters until they made payments, *id.*, ¶¶ 115-16, and two others who were threatened or seized by Blair's to coerce payment. *Id.*, ¶ 116.

On June 16, 2017, Plaintiffs brought this action on behalf of themselves and all others who have been victimized by Defendants' practices. Doc. 1. After an amendment to the complaint, Doc. 26, and the Court's ruling on a first round of motions to dismiss, Doc. 122, on June 21, 2018, Plaintiffs filed their Second Amended Complaint with renewed allegations of violations of RICO, the Louisiana Racketeering Law, and conversion under state law.

## III. LEGAL ARGUMENT

### A.  Legal Standard for Pleading under FRCP 8.

"When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief." *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). A complaint simply needs to contain enough factual allegations to render the claims "plausible." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007) (citing *Iqbal*, 556 U.S. at 679). The Supreme Court has clarified that "Federal Rule of Civil Procedure 8(a)(2) requires only 'a short and plain statement of the claim showing that the pleader is entitled to relief.'" *Erickson v.*

*Pardus*, 551 U.S. 89, 93 (2007) (citing *Twombly*, 550 U.S. at 555). The facts pleaded "need only

'give the defendant fair notice of what the . . . claim is and the grounds upon which it rests.'" *Id.*

Moreover, "[t]he plausibility standard is not akin to a 'probability requirement.'" *Iqbal*, 556 U.S.

at 678. As the Fifth Circuit has observed, under *Iqbal*, "[a] claim for relief is plausible on its face

'when the plaintiff pleads factual content that allows the court to draw the reasonable inference

that the defendant is liable for the misconduct alleged.'" *Harold H. Huggins Realty, Inc. v. FNC,*

*Inc.*, 634 F.3d 787, 795-96 (5th Cir. 2011) (citations omitted). This is particularly the case for

claims brought under the Racketeering Influenced and Corrupt Organizations Act (RICO). In

enacting RICO, Congress directed that the "provisions of this title shall be liberally construed to

effectuate its remedial purposes." Pub. L. 91-452, § 904 (1970).

### B.  Plaintiffs Have Sufficiently Alleged Continuity to Support a Pattern of Racketeering Activity.

Pleading a claim under RICO for a pattern of racketeering activity requires three elements:

"(1) a person who engages in (2) a pattern of racketeering activity, (3) connected to the acquisition,

establishment, conduct, or control of an enterprise." *Abraham v. Singh*, 480 F.3d 351, 355 (5th Cir.

2007). A pattern of racketeering activity consists of "two or more predicate criminal acts that are

(1) related and (2) amount to or pose a threat of continued criminal activity." *Id*. The Court

previously found that Plaintiffs properly pled the existence of an enterprise. *Egana v. Blair's Bail*

*Bonds Inc.*, No. CV 17-5899, 2018 WL 2463210, at *3 (E.D. La. June 1, 2018). In the SAC,

Plaintiffs allege further facts regarding Defendants' extortionate tactics for collecting money from

putative class members.

A2i and Blair's argue that Plaintiffs have failed to allege the continuity required to show a

pattern of racketeering activity. Doc. 137-1 at 7; Doc. 139-1 at 3-7. Their arguments are wrong. To

demonstrate a pattern of racketeering, Plaintiffs must allege Blair's and A2i's participation in "two

or more predicate criminal acts that are (1) related and (2) amount to or pose a threat of continued criminal activity." *Egana*, 2018 WL 2463210 at *3. Continuity of racketeering activity may be either closed- or open-ended. *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 230 (1989). As discussed below, Plaintiffs have adequately alleged both kinds of continuity.

     1.  <u>Plaintiffs have alleged open-ended continuity.</u>

Plaintiffs have alleged open-ended continuity. Open-ended continuity can be demonstrated either by establishing "a specific threat of repetition extending indefinitely into the future" or "that the predicates are a regular way of conducting defendant's ongoing legitimate business." *Id*. at 242-43. The allegations of the SAC demonstrate both a threat of repetition and that the predicates are Defendants' regular way of conducting business.

The SAC alleges that Defendants routinely seized principals against their will to coerce them and their friends and relatives to pay amounts that Defendants claimed to be owed. This happened to Named Plaintiff Ronald Egana on numerous occasions. First, Mr. Egana was arrested by bounty hunters employed by Blair's on September 27, 2016, kept in handcuffs at Blair's office and forced to call his mother, and held until she made an $800 and $1500 payment in exchange for his freedom. SAC ¶ 77. He was next seized on December 26, 2016—having been located with the use of A2i's ankle monitor—handcuffed in front of his family, again forced to call his mother to ask for money in exchange for his release, and again held at the Blair's office. *Id*. ¶ 81-82. Mr. Egana was seized yet again on March 31, 2017, on his way into the Orleans Parish courthouse and dragged down the courthouse steps and into the Blair's office by Blair's and A2i's agent, Mr. Allen, while being told, "We're going to see how much money you can bring today." *Id*. ¶ 86. He was held there in handcuffs until his mother brought $1500 to buy his release. *Id.* ¶ 87. Mr. Allen told Mr. Egana he would have to pay an additional $600, which included A2i's $100 installation

fee, two days later or risk being arrested again. *Id*. ¶ 91. On May 16, 2017, Mr. Allen again threatened Mr. Egana with arrest. *Id*. ¶ 98. Mr. Egana was finally picked up and surrendered to the jail by Blair's employees, including Mr. Allen, on May 23, 2017, even though there was no outstanding warrant for his arrest at this time. *Id*. ¶ 99.

These practices extend beyond Mr. Egana. The SAC details other individuals who were kidnapped or otherwise coerced into making payments by Defendants. For instance, Reynaud Variste contracted for a bail bond with Blair's in 2013 and again in 2016. *Id*. ¶¶ 106-07. Like Mr. Egana, Mr. Variste agreed to pay the balance on the premium in installments. *Id*. ¶ 107. Like Mr. Egana, when Mr. Variste did not make payments to Defendants' satisfaction, he was handcuffed and held at Blair's office, who demanded that he pay thousands of dollars to be set free. *Id*. ¶ 108. Mr. Variste called his father, who paid $1500 for his son's freedom. *Id*. On this occasion, Mr. Variste was, like Mr. Egana, forced to sign a contract to pay $10 per day for an ankle monitor, though none had been ordered by the court. *Id*. ¶ 108. On numerous other prior occasions, Marcel Compass, a Blair's employee, also threatened Mr. Variste's aunt, telling her that her nephew would be arrested if payments were not made. *Id*. ¶ 106.

Chad Lightfoot experienced this same type of coercion. When he contracted with Blair's for a bail bond, he was told after his release from jail, and after he had made a down payment on the premium, that he would have to wear and pay for an ankle monitor and that, if he refused, he would be surrendered to the jail and his down payment would not be returned. *Id*. ¶ 109. He, too, was later seized and held against his will by bounty hunters—ones working on behalf of A2i—until a family member paid for him to be released. *Id*. ¶ 111. Mr. Lightfoot was also repeatedly threatened with imprisonment unless he made payments to A2i. *Id*. ¶ 110. Eventually, Blair Boutte, the owner of Blair's, compelled Mr. Lightfoot to sign a new contract for ankle

monitoring that cost $200 per month more than he had agreed originally. Mr. Lightfoot was told

that if he refused to sign, he would be surrendered back to jail. *Id.* ¶ 113.

Other individuals who remain anonymous for fear of reprisal from defendants have

suffered the same harms. One individual was detained outside their home by A2i agents until they

made a payment, and was also threatened by a Blair's agent with jail unless payments were made.

*Id.* ¶ 116. An indemnitor for another individual was told by Dawn Baptiste, a Blair's employee,

that if their payment was late, the principal would be arrested. *Id.* A different principal was taken

from their home by bounty hunters working on Blair's behalf to the Blair's office. The Blair's

agents demanded over a thousand dollars. Once this payment was made, the principal was

nevertheless surrendered to jail. *Id.*[1] The statements of Blair's and A2i's agents and employees

also demonstrate the regularity with which defendants arrested indemnitors. Alroy Allen, the

Blair's employee who kidnapped Mr. Egana on multiple occasions, told one principal that he had a

"couple of names" of people whom he planned to arrest for nonpayment. *Id.* at ¶ 115. An A2i agent

---

[1] Though these allegations come from anonymous sources, Plaintiffs need not identify each source in the complaint. Plaintiffs must merely provide a plausible explanation and a short, clear statement. *Compare* Fed. R. Civ. P. 8 (pleading must contain "a short and plain statement of the claim") to Fed. R. Civ. P. 9 (requiring pleading "with particularity" time, place, and circumstances for special matters). Contrary to Blair's assertion, *GICC Capital Corp. v. Tech. Fin. Grp., Inc.*, 67 F.3d 463, 468 (2d Cir. 1995), is clearly distinguishable from Plaintiffs' allegations in the Second Amended Complaint on behalf of individuals who fear being named, SAC ¶ 116. The plaintiff in *GICC Capital Corp.* made a general allegation that "defendants' activities affected multiple victims, . . . [but did] not identify any other victims, nor state in anything but general terms the nature of their purported injuries." *Id.* ("Plaintiff attempts to allege that the defendants' activities affected multiple victims, including investors whose residual interests were purchased at a discount and other creditors."). In contrast, in addition to the Named Plaintiffs, Mr. Variste, Mr. Winzy, and Mr. Lightfoot, Plaintiffs have enumerated specific factual allegations on behalf of three individuals who had direct experience with the conduct at issue, withholding only their identity for fear of being retaliated against by the defendants. *See* SAC ¶ 116.

boasted of detaining a client until he paid $800 or $900. *Id*. An A2i employee informed Mr.

Lightfoot via text message that he kept an "active list for.surrender [sic]." *Id*. ¶ 114.[2]

In other words, the experiences of numerous individuals show this was a regular way of

doing business for Defendants sufficient to show open-ended continuity. Arresting people and

holding them against their will, and using the threat of future arrests, to coerce payment or compel

agreement with illegal contract terms such as expensive ankle monitoring, were methods that

defendants repeatedly and routinely employed against principals and indemnitors.[3]

Moreover, these practices were not isolated to one or two "bad apples." Instead, the SAC

alleges that multiple employees, officers, and agents of Defendants participated in kidnapping and

threatening to kidnap putative class members to extract payment. These include Alroy Allen,

---

[2] These statements are not hearsay because they are admissions of a party opponent under Federal Rule of Evidence 801. *See Magiera v. City of Dallas*, 389 F. App'x 433, 439 (5th Cir. 2010) (admissions by a party-opponent are not hearsay if "[t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship") (quoting Fed. R. Evid. 801(d)(2)(D)). Even if such statements are hearsay, a court may consider allegations based on hearsay to determine whether sufficient facts have been pleaded to allow a "reasonable inference that the defendant is liable for the misconduct alleged." *See, e.g., Amalgamated Transit Union Local 1015 v. Spokane Transit Auth.*, No. 2:17-CV-00053, 2017 WL 2126593, at *3, *5 (E.D. Wash. May 16, 2017) ("the fact the Complaint relies on hearsay is immaterial in a motion to dismiss"); *Campanella v. Cty. of Monroe*, 853 F. Supp. 2d 364, 378 (W.D.N.Y. 2012); *Luxpro Corp. v. Apple Inc.*, No. C 10-03058, 2011 WL 3566616, at *3 (N.D. Cal. Aug. 12, 2011).

[3] Blair's argues the arrests and handcuffing of Mr. Egana and Mr. Variste were "reasonable and proper under Louisiana law" and "prompted by the men's failure to appear in court." Doc. 139-1 at 6. This argument fails. While a bail bondsman may arrest a principal to surrender him, *see* La. Code Crim. Proc. Ann. art. 331; La. Stat. Ann. § 22:1585, nothing in the law permits bondsmen to make an arrest for purposes *other than surrender*, and certainly not to hold a principal until he pays a sum of money. *See, e.g., McCaleb v. Peerless Ins. Co.*, 250 F. Supp. 512, 515 (D. Neb. 1965) ("The bondsman has the right to arrest, but only for the purpose of surrender and exoneration of his bond."). Further, to Blair's argument that the arrests were made because Mr. Egana had failed to appear in court, this argument is undermined by Blair's conduct. Each time that Mr. Egana was arrested and told to pay money to be released, and *not surrendered* to court by Blair's agents, there was an outstanding bench warrant. SAC ¶¶ 77-102. When Mr. Egana was finally surrendered, the warrant had been resolved. *Id*.¶ 102. Thus, failures to appear matter little to Blair's and its decision to surrender a principal; what matters is how much a principal or their loved ones can pay.

Marcel Compass, Dawn Baptiste, and Blair Boutte, as well as at least two independent contractors, MIO Recovery Services, LLC and WC Bryant Enterprizes.

A2i and Blair's attempt to argue that continuity has not been shown because the predicate acts extend over an insufficient period of time. Doc. 137-1 at 10; Doc. 139-1 at 5. As abundant case law demonstrates, their argument fails. Multiple circuits, including the Fifth Circuit, have found periods much shorter than the time span alleged here to be sufficient to establish open-ended continuity. The Fifth Circuit has found that predicate acts committed over just two and a half months were sufficient to satisfy the continuity requirement of RICO, where it could be reasonably inferred that those acts would project into the future with a threat of repetition. *United States v. Walker*, 348 F. App'x 910, 911-12 (5th Cir. 2009). Other courts have found continuity over similar periods of time. *See, e.g.*, *United States v. Richardson*, 167 F.3d 621, 626 (D.C. Cir. 1999) (finding continuity where four predicate acts "spanned only thirty-four days, and the entire crime spree only three and one-half months" because there was threat of future repetition); *United States v. Busacca*, 936 F.2d 232, 238 (6th Cir. 1991) (open-ended continuity shown by six checks written over period of two and a half months); *Yellow Bus Lines, Inc. v. Drivers, Chauffeurs & Helpers Local Union 639*, 883 F.2d 132, 144 (D.C. Cir. 1989), *overruled en banc on other grounds*, 913 F.2d 948 (D.C. Cir. 1990) (four threats during four-day strike period were sufficient to allege pattern of racketeering activity); *United States v. O'Connor*, 910 F.2d 1466, 1468 (7th Cir. 1990) (continuity found where police officer committed several acts of extortion over two-month period); *ePlus Technology Inc. v. Aboud*, 313 F.3d 166, 182-83 (4th Cir. 2002) (three examples of looting companies of assets prior to filing for bankruptcy established open-ended continuity); *5-Star Premium Fin., Inc. v. Wood*, No. CIV.A.99-3705, 2000 WL 533941, at *4 (E.D. La. May 2,

10

2000) (continuity sufficiently alleged though conduct did not exceed one year). Here, the allegations cover a longer time-span than those contemplated in these cases.

Moreover, both A2i and Blair's cite to case law that discusses closed-ended continuity, which, unlike open-ended continuity, requires "proving a series of related predicates extending over a substantial period of time." *H.J. Inc. v. Nw. Bell Tel. Co.*, 492 U.S. 229, 242 (1989). For instance, Blair's cites to *H.J. Inc.* to assert that "[p]redicate acts extending over a few weeks or months and threatening no future criminal conduct" do not satisfy continuity, Doc. 139-1 at 5, but cut off the sentence that immediately follows, which states that because "RICO action[s] will [often] be brought before continuity can be established in this way," liability can instead "depend[] on whether the *threat* of continuity is demonstrated." *Id.* (emphasis in original). A2i relies on *Conry v. Daugherty* to assert that predicate acts must extend over a period longer than one year, though that case discussion is explicitly about closed-ended continuity. No. CIV.A. 10-4599, 2011 WL 2473959 (E.D. La. June 22, 2011), at *5. Blair's reliance on *Edwards v. First Nat'l Bank* is also misguided, as the allegations of predicate offenses detailed in Plaintiffs' SAC greatly exceed the three threats of jailing that were made to two individuals in the same family in that case. 872 F.2d 347, 352 (10th Cir. 1989).

Moreover, Plaintiffs' allegations clearly demonstrate a threat of repetition. As Plaintiffs allege in the SAC, Defendants rely on arrests and the threat of arrest to coerce payment towards amounts they claim are owed to them for bail bond premiums and ankle monitoring fees. Courts refuse to find a threat of continued racketeering activity if the alleged scheme has a "built-in ending point." *US Airline Pilots Ass'n v. Awappa, LLC*, 615 F.3d 312, 318 (4th Cir. 2010). Examples of built-in ending points include a "one-time endeavor to wreak havoc upon all matters linked to a single murder investigation," *Gamboa v. Velez*, 457 F.3d 703, 708 (7th Cir. 2006), and

11

an alleged attempt by defendants to squeeze several individuals out of a business partnership, *Efron v. Embassy Suites (Puerto Rico), Inc.*, 223 F.3d 12, 20 (1st Cir. 2000). Such is not the case here. Defendants' racketeering acts are not confined to their dealings with a single principal or contractual relationship. Instead, Defendants engaged in the predicate acts of kidnapping and extortionate collection of extension of credit in order to coerce payment from numerous principals and indemnitors. Their motivation—to maximize collections—applies to any client with outstanding balances. Thus, there is no "built-in ending point" that would militate against a finding of open-ended continuity.

Because Defendants continue to do business in arranging bail bonds and requiring ankle monitoring and continue to employ the same individuals and contract with bounty hunters, there is a threat of repetition extending indefinitely into the future. Indeed, the fact that the multiple incidents alleged in the Second Amended Complaint occurred within the span of roughly a year suggests that these practices were widespread, and therefore threaten repetition unless Defendants are held to account by this Court. This ongoing threat is highlighted by the fact that multiple individuals insisted on maintaining anonymity out of fear of arrest or surrender by Defendants. SAC ¶ 116.

However, even if Defendants' practices had ceased, open-ended continuity would still be satisfied because the "threat of continuity must be viewed at the time the racketeering activity occurred." *United States v. Busacca*, 936 F.2d at 238. Open-ended continuity is adequately alleged when the conduct would have continued but for the filing of a lawsuit. *Abraham v. Singh*, 480 F.3d at 356 ("[T]here is no reason to suppose that this systematic victimization . . . would not have continued indefinitely had the Plaintiffs not filed this lawsuit.").

In addition, the threat of continuity exists even if the specific individuals alleged to have been harmed in the complaint are no longer at risk. In *CVLR Performance Horses, Inc. v. Wynne*, the Fourth Circuit overturned the district court's finding that continuity had not been alleged "because all of the victims identified in the Amended Complaint 'have been bilked' and, presumably, know better than to do more business with Appellees." 524 F. App'x 924, 929 (4th Cir. 2013). The Fourth Circuit disagreed, finding that "at the time the Appellees' acts occurred, the conduct projected into the future with a threat of repetition . . . and there was no other indication that [the] conduct was to be limited to only the identified victims." *Id.* (internal quotations and citations omitted). Therefore, the court found that the complaint established open-ended continuity. Here, similarly, there is no indication that Defendants' conduct is limited to only the victims that have thus far been identified. Moreover, at the time that the predicate acts occurred, Plaintiffs and the other identified victims had reason to fear that the conduct would continue into the future. Therefore, the SAC has sufficiently alleged open-ended continuity.

At a minimum, Plaintiffs have alleged facts sufficient to warrant further discovery on the issue. *See Swistock v. Jones*, 884 F.2d 755, 759 (3d Cir. 1989) ("Treating all the allegations in the pleadings as true, as we must at this juncture, plaintiffs may be able to establish either the existence of a closed-end period of repeated conduct of sufficient length or a threat of continuity by showing that the predicate acts . . . are part of an ongoing entity's regular way of doing business . . . .") (internal citations and quotations omitted); *Metcalf v. Lynch*, No. 4:11-CV-127, 2011 WL 13087090, at *10 (M.D. Pa. Oct. 31, 2011), *on reconsideration in part sub nom. Metcalf v. Merrill Lynch*, No. 4:11-CV-127, 2012 WL 12817019 (M.D. Pa. Feb. 10, 2012) ("[W]e agree that Plaintiffs should be afforded the opportunity to conduct discovery regarding the length of time the alleged racketeering activity persisted . . . we are loath to dismiss Plaintiffs' § 1962(c) claim

13

without providing them the opportunity to substantiate the length of time of Defendants' alleged racketeering activity."). The Fifth Circuit has cautioned that district courts "err[] in turning the Supreme Court's explanation of the continuity prong into a stringent pleading requirement." *Abraham v. Singh*, 480 F.3d at 355.

     Accordingly, Plaintiffs have sufficiently alleged a threat of continued criminal activity.

### C.  Plaintiffs Have Stated a Claim under RICO for the Collection of Unlawful Debt.

     A2i argues that Plaintiffs have failed to state a claim for the collection of unlawful debt. Doc. 137-1 at 12-14.[4] This is also untrue. To state a claim for collection of unlawful debt, "all that RICO requires is proof that a debt existed, that it was unenforceable under [state] usury laws, that it was incurred in connection with the business of lending money at more than twice the legal rate, that the defendant aided collection of the debt in some manner, and that the defendant acted knowingly, willfully and unlawfully." *United States v. Biasucci*, 786 F.2d 504, 513 (2d Cir. 1986). A claim for collection of unlawful debt does *not* require a showing of a pattern of racketeering activity. The Fifth Circuit has found that Congress, in drafting the RICO statute, "intentionally created a statutory scheme where proof of the collection of unlawful debt is a '*substitute* for a showing that appellants engaged in two or more predicate acts forming a pattern of racketeering activity." *United States v. Aucoin*, 964 F.2d 1492, 1496-97 (5th Cir. 1992) (quoting *United States v. Eufrasio*, 935 F.2d 553, 564 n.12 (3rd Cir. 1991) (emphasis in original).

     Plaintiffs have satisfied each of these elements. First, Plaintiffs have alleged the existence of a debt both for themselves and the putative sub-class members with claims for collection of unlawful debt. SAC ¶¶ 61, 124-25. Plaintiffs have alleged the debt to be unenforceable under state usury laws and that the debt was incurred in connection with the business of lending money at

---

[4] Blair's has not moved for dismissal of this claim. Doc. 139-1.

more than twice the legal rate. *Id.* ¶¶ 42, 45, 157-63. Plaintiffs have also alleged that A2i aided in the collection of this debt. *Id.* ¶¶ 53, 92. Finally, as discussed *infra*, Plaintiffs have alleged that A2i acted knowingly, willfully, and unlawfully.

A2i claims that it lacks guilty knowledge about this violation, apparently making the argument that it did not act "knowingly" or "willfully." Doc. 137-1 at 13. A willful violation of a federal statute encompasses reckless disregard. See, e.g., *Safeco Ins. Co. of Am. v. Burr,* 551 U.S. 47, 68 (2007) (Recklessness is an "action entailing 'an unjustifiably high risk of harm that is either known or so obvious that it should be known.'") A2i claims that it does not have knowledge of any debt owed on Plaintiffs' and proposed class members' bail bond fees, and merely charges a flat daily rate and standard installation fees. *Id.* A2i's claims of ignorance are belied by its actual methods. First, Plaintiffs have alleged that they and others paid Blair's for both outstanding balances on bail bond premiums and ankle monitoring fees at the same time, relying on Blair's to funnel the ankle monitoring fees to A2i. SAC ¶¶ 48, 79, 108, 115. Plaintiffs and other proposed class members would have no reason to make payments to Blair's when A2i offers its own direct payment options if not for the fact that they had to pay outstanding balances on their premiums to Blair's. Therefore, A2i's reliance on Blair's as its primary channel for fee collection allows for the reasonable inference that A2i knew of its clients' outstanding debts.

Second, the SAC alleges that A2i works with the other Defendants to require GPS monitoring and to install ankle monitors, and that A2i receives updates from Blair's agents about when payments are collected, including through an "A2i Agency Portal" that allows Blair's agents and employees to enter regular updates electronically. *Id.* ¶¶ 42, 46. Moreover, the SAC alleges that Mr. Allen works as both an agent of Blair's and A2i, and therefore knew of and collected on

balances owed to both. *Id.* ¶¶ 64, 91. These regular channels of communication between Blair's and A2i further support that A2i knew of outstanding balances owed to Blair's.

Finally, the SAC alleges that A2i's officers and agents are also bail bond agents and that A2i operates out of the same office and shares a web address with a bail bond company and markets its services towards bail bond companies. *Id.* ¶ 45. Blair's clients are primarily low-income individuals who must enter into installment payment agreements. *Id.* ¶ 41. By Blair's own admission, nearly all agreements it enters are with people who cannot pay the full amount of the premium up front. Doc. 121 at 9. A2i's familiarity with the bail bond industry, including the industry's reliance on extending credit to allow for the payment of the premium, further supports the inference that A2i knew of the outstanding debts of its clientele. A2i cannot claim ignorance—or even "passive acquiescence"—here. Accordingly, A2i's citation to *Rogers v. McDorman*, 521 F.3d 381, 389 (5th Cir. 2008) is contrary to its position because Plaintiffs have clearly alleged that A2i was more than a "passive participant in the . . . scheme giving rise to the lawsuit, but an active one."[5]

Thus, Plaintiffs have adequately alleged that A2i acted knowingly and willfully, in addition to adequately alleging the other elements of the collection of unlawful debt.

### D.  Plaintiffs Have Properly Alleged that A2i Participated in the RICO Enterprise.

A2i insists that it cannot be held accountable for its role in charging, collecting, and extorting ankle monitoring fees in the RICO enterprise because it claims that it did not operate or manage the affairs of the enterprise. Doc. 137-1 at 11. This argument ignores the allegations of the SAC and the standard for participation in a RICO enterprise.

---

[5] Additional cases cited by A2i mislead the Court because they do not relate to any of the elements required in an unlawful debt claim under civil RICO. The quoted portion of *Snow Ingredients, Inc. v. SnoWizard, Inc.*, 833 F.3d 512, 524 (5th Cir. 2016) discusses the elements of the predicate acts of obstruction of justice and witness tampering, neither of which are alleged here.  *United States v. Bright*, 550 F.2d 240, 242 (5th Cir. 1977) discusses criminal conspiracy under Florida law, and there is no mention of RICO in this case.

The RICO statute makes it unlawful "for any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). In *Reves v. Ernst & Young*, the Supreme Court clarified the "narrow question" of the meaning of the phrase "to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs." 507 U.S. 170, 177 (1993). The Court found that, while "one must have some part in directing [the enterprise's] affairs,"

> the word 'participate' makes clear that RICO liability is not limited to those with primary responsibility for the enterprise's affairs, just as the phrase 'directly or indirectly makes clear that RICO liability is not limited to those with a formal position in the enterprise, but *some* part in directing the enterprise's affairs is required.

*Id*. at 179. When confronted with the concern that the "operation or management" test that the Court upheld would limit RICO liability to upper management and that RICO was intended to reach "any person employed by or associated with [the] enterprise," the Court reassured that:

> An enterprise is 'operated' not just by upper management but also by lower rung participants in the enterprise who are under the direction of upper management. An enterprise also might be 'operated' or 'managed' by others 'associated with' the enterprise who exert control over it . . . .

*Id*. at 184.

A2i meets this standard. The SAC describes several ways in which A2i actively supervises and directs the affairs of the alleged enterprise. It exercises its discretion in contracting with and supervising bounty hunters who collect unlawful debt from, threaten, and arrest Blair's clients. SAC ¶¶ 49-50, 145. These bounty hunters thus work on A2i's behalf and under A2i's supervision, on contract terms set by A2i. A2i also determines the ankle monitoring fees to be collected by its own and Blair's agents. *Id*. ¶¶ 45, 145. With Blair's and Bankers, A2i requires principals to wear GPS monitors after their release from jail, even when there is no court order mandating location

monitoring. *Id.* ¶ 42. A2i both supervises individuals who are required to wear GPS monitors and enforces payment of monitoring fees. *Id.* ¶ 44. A2i further participates in the enterprise by collecting payments funneled through Blair's. *Id.* ¶ 48.

The experiences of individual principals bear out these allegations. Mr. Allen, an employee of Blair's who also contracted and worked on behalf of A2i, installed an ankle monitor on Mr. Egana and threatened him to induce payment. *Id.* ¶¶ 64, 91. Mr. Egana, Mr. Variste, and Mr. Lightfoot were forced to wear and pay for an ankle monitor and sign a contract with A2i by Mr. Compass, an employee of Blair's. *Id.* ¶¶ 64, 88-89, 108-09. Mr. Allen and Mr. Compass kidnapped and/or threatened and coerced payments from Mr. Egana on behalf of A2i. *Id.* ¶¶ 77, 79. A2i's agents threatened and seized Mr. Lightfoot to coerce payment of their fees. *Id.* ¶¶ 110-12, 14. A2i's management and supervisory role is evidenced by the "A2i Agency Portal," a system it created for monitoring and collecting information on its clients that is utilized by its agents, employees, and Blair's agents. *Id.* ¶ 46.

A2i simply ignores these allegations, insisting that "there are no allegations that A2i directed anyone to do anything." Doc. 137-1 at 11. However, these allegations easily clear the "relatively low hurdle" for pleading operation or management of an enterprise. *First Capital Asset Mgmt.*, *Inc. v. Satinwood, Inc.*, 385 F.3d 159, 176 (2d Cir. 2004) (citations omitted). Indeed, A2i's involvement resembles that of the defendants in *Allstate Ins. Co. v. Plambeck*, 802 F.3d 665 (5th Cir. 2015). In that case, the Fifth Circuit found that defendants who managed only limited parts of a larger RICO scheme to defraud insurance companies could be held liable for participating in the enterprise's affairs. *Id.* at 674-75 ("It is evident that Toca and Friedman participated in managing the enterprise with their supervisory roles in their respective parts of the scheme, even if Plambeck was in charge."); *see also United States v. Posada-Rios*, 158 F.3d 832, 856 (5th Cir. 1998) ("RICO

only requires that a defendant 'take part in' the operation of the enterprise, not that he direct its affairs."). Like those defendants, A2i directs a portion of the enterprise's affairs by managing and supervising its employees and third-party bounty hunters, setting the terms and price of ankle monitoring, coordinating with Blair's agents and employees, and setting up methods of payment collection.

The cases on which A2i relies are inapposite. A2i has not merely engaged in the "passive acquiescence" referenced in *Rogers*, 521 F.3d at 389, in its discussion of whether a common law tort defense could be applied to RICO violations.[6] Rather, the SAC alleges that A2i actively contracted with and supervised bounty hunters to collect on unlawful debt and threaten and seize principals, and details multiple specific instances of these predicate acts. For this reason, A2i also cannot claim that it merely supplied services or engaged in a normal business relationship like the parties in *Crichton v. Golden Rule Ins. Co.*, 576 F.3d 392, 399 (7th Cir. 2009) (complaint alleged defendant drafted bylaws, set and collected dues, and controlled content of promotional materials), *Goren v. New Vision Int.'l, Inc.*, 156 F.3d 721, 728 (7th Cir. 1998) (no participation where defendants merely engaged in marketing and promoting activities with respect to the RICO enterprise), and *Kerrigan v. ViSalus, Inc.*, 112 F. Supp. 3d 580, 603 (E.D. Mich. 2015) (no participation where plaintiffs alleged Corporate Promoter Defendants were merely vehicles into which other defendants deposited proceeds because they made no decisions on behalf of enterprise). Instead, the SAC alleges that A2i directed illegal activity, engaging in the type of "affirmative wrongdoing," *Rogers*, 521 F.3d at 524, that triggers RICO liability.

Thus, Plaintiffs have sufficiently alleged A2i's participation in the enterprise's affairs.

---

[6] A2i attempts to argue that because it collected money on its own behalf, and "not for the benefit of any other alleged participant in the enterprise," it should be shielded from RICO liability. Doc. 137-1 at 11. A2i points to no authority to support this argument.

### E.  Plaintiffs Have Properly Alleged a RICO Conspiracy.

A2i asserts that the Court should dismiss Plaintiffs' conspiracy claims because (1) the Second Amended Complaint fails to allege a conspiracy and (2) the underlying RICO counts for unlawful debt, kidnapping, and extortionate collection of extension of credit should be dismissed, and therefore the conspiracy claims must be dismissed as well. For the reasons discussed herein, both arguments fail.

### 1.  Plaintiffs have alleged a conspiracy.

A2i and Blair's maintain that the SAC has not sufficiently alleged a conspiracy to violate RICO. Doc. 137-1 at 15; Doc. 139-1 at 7-8. This argument fails, as the SAC sets forth factual bases that establish the necessary elements of a conspiracy to violate RICO under § 1962(d). Plaintiffs fully brief the elements of a civil RICO conspiracy in their Combined Opposition to Defendants' Motion to Dismiss Plaintiffs' First Amended Complaint. Doc. 61 at 28-29. Plaintiffs hereby incorporate that discussion.

Plaintiffs have alleged that A2i conspired to violate RICO by furthering the endeavor's goals and doing so with knowledge of and agreement with the offenses. Indeed, A2i directly participated in the commission of the RICO offenses. Plaintiffs have alleged a common purpose of the enterprise to charge and collect exorbitant, illegal fees in connection with providing bail bonds. SAC ¶ 137. A2i has knowledge of this goal and furthers it by providing ankle monitors, supervising individuals who wear ankle monitors, setting and charging fees of $10 per day or $300 per month for use of the monitors, and employing bounty hunters to collect these fees. *Id*. ¶ 145. Its participation in this scheme enables its own and Blair's bounty hunters to locate principals in order to seize them to coerce payments, and allows the enterprise to charge above the statutory limit for bail bond premiums. Further, A2i directly commits many of the RICO offenses by hiring its own

20

bounty hunters to collect the unlawful debt and seize and detain principals until they or their loved ones hand over money. *Id.*

The SAC also adequately alleges that Blair's conspired to violate RICO. Far from conclusory, the SAC is rife with allegations of Blair's knowledge of and agreement with the offenses. To name just a few examples: bounty hunters brought Mr. Egana and Mr. Variste to Blair's office in handcuffs and held them there for extended periods of time in the presence of and with active participation from Blair's employees like Mr. Compass while they called and then waited for family members to bring money to buy their freedom. ¶¶ 77, 82, 87, 108. Blair's employees and officers forced principals to sign ankle monitoring contracts that allowed the enterprise to collect unlawful debt. ¶¶ 88-89, 108, 113. Blair's conferred with Bankers to undertake these actions. ¶¶ 93-97, 100, 113. These allegations demonstrate Blair's knowledge of the RICO offenses of kidnapping, extortionate collection of extension of credit, and collection of unlawful debt, and that Blair's had adopted the goal of facilitating the enterprise. Thus, the SAC has adequately alleged a RICO conspiracy under § 1962(d).

      2.  <u>Plaintiffs' conspiracy claims under § 1962(d) survive even if Plaintiffs' claims under § 1962(c) do not.</u>

A2i is mistaken in asserting that if claims brought under § 1962(c) are dismissed, then conspiracy claims based on the same wrongdoing must fail. *Nolen v. Nucentrix Broadband Networks Inc.*, 293 F.3d 926, 930 (5th Cir. 2002), on which A2i relies, has been superseded by the more recent holding in *United States v. Velasquez*, 881 F.3d 314 (5th Cir. 2018). In *Velasquez*, the Fifth Circuit reasoned that "[u]nlike § 1962(c), which requires a showing of two predicate acts constituting a 'pattern of racketeering activity,' a § 1962(d) conspirator 'need not have committed or agreed to commit . . . two predicate acts.'" 881 F.3d at 332. This holding is in line with the Supreme Court, which has held that "the interplay between subsections (c) and (d) [of § 1962]

does not permit us to excuse from the reach of the conspiracy provision an actor who does not himself commit or agree to commit the two or more predicate acts requisite to the underlying offense." *Salinas v. United States*, 552 U.S. 52, 65 (1997); *see also United States v. Browne*, 505 F.3d 1229, 1263 (11th Cir. 2007) ("Because there are fewer proof requirements under § 1962(d) than under the substantive RICO offenses . . . the conspiracy offense reaches a wider range of conduct. . . . A defendant may be guilty of conspiracy even if he did not commit the substantive acts that could constitute violations of §§ 1962(a), (b), or (c).") (internal citations omitted). Thus, A2i is incorrect that a dismissal of Plaintiffs' claims under § 1962(c) necessitates a dismissal of its conspiracy claims brought under § 1962(d).

### F.  Plaintiffs Have Stated Claims Under the Louisiana Racketeering Act.

A2i argues that Plaintiffs' claim under the Louisiana Racketeering Act should be dismissed for the same reason that its claims under the federal RICO statute should be dismissed. Doc. 137-1 at 16. For the reasons set forth *infra*, this argument should be rejected. Louisiana racketeering laws are modeled upon federal RICO legislation. *Zilbert v. Sasol N. Am., Inc.*, No. 2:11 CV 00862, 2012 WL 1950144, at *2 (W.D. La. May 29, 2012). Given the "parallel between the RICO and Louisiana's statutes," and the limited Louisiana jurisprudence, "federal decisions in this area are persuasive." *Id.* (citing *State v. Touchet*, 99-146 (La. App. 3 Cir. 4/5/00); 759 So. 2d 194, 197). Thus, for the reasons Defendants' motions fail under federal law, they also fail under Louisiana state law.

### G.  A2i is Liable for Conversion.

A2i argues for dismissal of Plaintiffs' conversion claim, asserting that the 12% cap on bail bond premiums only applies to "producers" as defined in La. Stat. Ann. § 22:1542(6). In doing so, A2i states disingenuously that the Court "has already ruled that A2i cannot be liable for conversion because it is not a bail bond producer under Louisiana law, and it is therefore not subject to the

12% limit." Doc. 137-1 at 16. This mischaracterizes the Court's Order, which made no such finding and did not reach this issue as to A2i. *See* Doc. 122 at 15.

Such misrepresentations notwithstanding, A2i's argument finds no support in Louisiana statute. The definition in Section 22:1542 that A2i relies on applies only to its own subpart, which is in a separate chapter of the Louisiana Insurance Code than those on which Plaintiffs' claims are based. *See* La. Stat. Ann. § 22:1542 (contained in Chapter 5, Part I, Subpart A). Limitations on bail bond premiums are found in Chapter 4 of the code and cap the premium at 12% of the total value of the bail bond, La. Stat. Ann. §22:1443, and 12.5% in Jefferson Parish, *id.* § 13:718(I)(2)(a), and require no more than $25 in agency fees to be charged, *id.* § 22:855(B)(2)(b). These limitations explicitly apply not only to producers but also to "other representative[s.]" *Id.* § 22:855(B)(1) ("No insurer or its officer, employee, producer, *or other representative* shall charge or receive any fee, compensation, or consideration for insurance which is not included in the premium quoted to the insured.") (emphasis added). Read as a whole, these statutes forbid insurers, producers, and all other representatives from charging or collecting any amounts for insurance other than the premium and specifically delineated fees, which do not include the ankle monitoring fees charged and collected by A2i.

Even if the Court determines that A2i is not directly subject to the laws that limit the rate and fees associated with bail bond premiums, A2i is *still* liable for the tort of conversion because, as alleged in the Second Amended Complaint, they were directly involved in charging and collecting money from Plaintiffs that was beyond the legally allowed amount. A2i cannot benefit from an agreement it set up and enforced through an entity that writes bail bonds, where the terms violate Louisiana law, simply because it is not directly regulated by the law forbidding excessive fees on bail bond premiums.

23

To prevail on a claim of conversion, the plaintiff must prove that (1) she owned or had the right to possess; (2) the defendant's use was inconsistent with the plaintiff's right of ownership; and (3) the defendant's use constituted a wrongful taking. *Gaunt v. La. Citizens Prop. Ins. Corp.*, 512 F. Supp. 2d 493, 498 (E.D. La. 2007). Although the Court found that Plaintiffs' allegations in the First Amended Complaint were insufficient to support an inference that A2i *intentionally* charged Plaintiffs in excess of the statutory rate, intent is not a required element of a conversion claim. *Labbe v. Premier Bank*, 618 So. 2d 45, 46 (La. Ct. App. 3 Cir. 1993) ("Fault, intent, negligence, knowledge, ignorance, and good faith are not pertinent in actions for tortious conversion."); *see also Chrysler Credit Corp. v. Perry Chrysler Plymouth, Inc.*, 783 F.2d 480, 484 (5th Cir. 1986) ("The intent required is not necessarily a matter of conscious wrongdoing. It is rather an intent to exercise a dominion or control over the goods which is in fact inconsistent with the plaintiff's rights. . . . Persons . . . exercise acts of ownership over them at their peril, and must take the risk that there is no lawful justification for their acts. Thus, the focus is on the act committed in order to determine whether it constitutes a tort; whether the act was done intentionally or negligently is of no moment." (citations omitted)); *Chrysler Credit Corp. v. Whitney Nat. Bank*, 798 F. Supp. 1234, 1237 (E.D. La. 1992) ("It is generally not required that a plaintiff prove any intent, malice, etc. on the part of the defendant in a conversion action."), *amended*, 824 F. Supp. 605 (E.D. La. 1993).

Plaintiffs sufficiently state a claim of conversion. As alleged in the SAC, A2i does substantially more than merely set a fee for the ankle monitor that is passed on to Blair's clients. On the contrary, A2i works in collusion with the other Defendants to require and charge for ankle monitoring as a condition of the bail bond, even when no court has ordered such monitoring, and threaten surrender for those who refuse. SAC ¶¶ 42, 49-50, 108-09. A2i agents install ankle

24

monitors and enter into contracts with Blair's clients for ankle monitoring services. *Id.* ¶¶ 43, 49. A2i charges fees to each client required to wear an ankle monitor. *Id.* ¶ 45. A2i enforces and collects payment by monitoring clients required to wear an ankle monitor, collecting payments directly from clients or through Blair's, recording client payments and information in an electronic portal, and threatening to surrender the client for nonpayment of the fees. *Id.* ¶¶ 44, 46, 48, 50-51, 53, 91. A2i markets its services to bail bond companies even when no monitoring has been ordered by the court. *Id.* ¶ 45. Its officers and agents are also bail bond agents who are required to know the statutory restrictions on bail bond premiums. *Id.* A2i provides its services to Blair's clients knowing that its charges are excessive and contrary to law.

These facts sufficiently support Plaintiffs' conversion claim. First, Plaintiffs had the right to possess the money used to pay the ankle monitoring fees charged and collected by A2i. Second, A2i's taking of these funds was inconsistent with Plaintiffs' ownership because it permanently deprived them of the money and applied it to the ankle monitoring fees, which were non-refundable once paid to A2i. Third, A2i's taking—either directly from Plaintiffs and class members, or through Blair's—was done in violation of the statutory restrictions on charges associated with the issuance of bail bonds and thus constituted a wrongful taking, regardless of A2i's intent, knowledge, or good faith. *See Labbe*, 618 So. 2d at 46; *Chrysler Credit Corp.*, 783 F.2d at 484.[7] Thus, Plaintiffs have stated a claim for conversion against A2i.

## IV. CONCLUSION

For the foregoing reasons, the Court should deny A2i's and Blair's Motions to Dismiss.

---

[7] Though knowledge is *not* a required element of conversion, Plaintiffs have also sufficiently alleged that A2i—whose officers and agents are bail agents—knows that its fees charged to and collected from Plaintiffs and the class members exceed the limits set by law.

Dated: July 31, 2018                              Respectfully submitted,

                                                  /s/ Ivy Wang
                                                  Ivy Wang, La. Bar No. 35368
                                                  *On behalf of Plaintiffs' Counsel*

                                                  Ivy Wang
                                                  SOUTHERN POVERTY LAW CENTER
                                                  201 St. Charles Avenue, Suite 2000
                                                  New Orleans, LA 70170
                                                  P: 504-228-7279
                                                  F: 504-486-8947
                                                  E: ivy.wang@splcenter.org

                                                  Caren E. Short*
                                                  Sara Zampierin*
                                                  Samuel Brooke*
                                                  SOUTHERN POVERTY LAW CENTER
                                                  400 Washington Avenue
                                                  Montgomery, AL 36104
                                                  P: 334-956-8200
                                                  F: 334-956-8481
                                                  E: caren.short@splcenter.org
                                                  E: sara.zampierin@splcenter.org
                                                  E: samuel.brooke@splcenter.org

                                                  Charles M. Delbaum (MA Bar No. 543225)*
                                                  NATIONAL CONSUMER LAW CENTER
                                                  7 Winthrop Square, Fourth Floor
                                                  Boston, MA 02110-1245
                                                  P: (617) 542-8010
                                                  F: (617) 542-8028
                                                  E: cdelbaum@nclc.org

                                                  Noah A. Levine*
                                                  Ryanne E. Perio*
                                                  Ilya Feldsherov*
                                                  William Roth*
                                                  WILMER CUTLER PICKERING HALE AND
                                                       DORR LLP
                                                  7 World Trade Center
                                                  250 Greenwich Street
                                                  New York, NY 10007
                                                  P: (212) 230-8800
                                                  F: (212) 230-8888
                                                  E: noah.levine@wilmerhale.com
                                                  E: ryanne.perio@wilmerhale.com

26

E: ilya.feldsherov@wilmerhale.com
E: william.roth@wilmerhale.com
*admitted pro hac vice*

**Attorneys for Plaintiffs**

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing document was served via the Court's CM/ECF system on all counsel of record, including on the following:

Walter F. Becker, Jr.
Charles P. Blanchard
Nicole C. Katz
CHAFFE MCCALL, LLP
2300 Energy Centre
1100 Poydras Street
New Orleans, Louisiana 70163-2300
becker@chaffe.com; blanchard@chaffe.com; katz@chaffe.com
*Counsel for Blair's Bail Bonds, Inc. & New Orleans Bail Bonds, L.L.C.*

Ethan J. Loeb
Allison C. Doucette
E. Colin Thompson
SMOLKER, BARTLETT, LOEB, HINDS & SHEPPARD, P.A.
100 N. Tampa Street, Suite 2050
Tampa, Florida 33602
ethanl@smolkerbartlett.com; allisond@smolkerbartlett.com; colint@smolkerbartlett.com
*Counsel for Bankers Insurance Company, Inc., Bankers Surety Services, Inc. & Bankers Underwriters, Inc.*

Stephen D. Marx
Preston L. Hayes
CHEHARDY, SHERMAN, WILLIAMS, MURRAY, RECILE, STAKELUM & HAYES, LLP
One Galleria Boulevard, Suite 1100
Metairie, Louisiana 70001
sdm@chehardy.com; plh@chehardy.com
*Counsel for Bankers Insurance Company, Inc., Bankers Surety Services, Inc. & Bankers Underwriters, Inc.*

Gary W. Bizal
639 Loyola Avenue, Suite 1820
New Orleans, Louisiana 70113
piblaw@bellsouth.net
*Counsel for A2I, LLC, Alternative to Incarceration, Inc. & Alternative to Incarceration NOLA, Inc.*

Dated this July 31, 2018.                    /s/ Ivy Wang
                                             Ivy Wang

28