UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

| | |
|---|---|
| RONALD EGANA, SAMANTHA EGANA, and TIFFANY BROWN, on behalf of themselves and those similarly situated,<br><br>　　　　Plaintiffs,<br><br>vs.<br><br>BLAIR'S BAIL BONDS, INC., NEW ORLEANS BAIL BONDS, L.L.C., BANKERS INSURANCE COMPANY, INC., BANKERS SURETY SERVICES, INC., BANKERS UNDERWRITERS, INC., A2i, L.L.C., ALTERNATIVE TO INCARCERATION, INC., and ALTERNATIVE TO INCARCERATION NOLA, INC.,<br><br>　　　　Defendants. | CIVIL ACTION NO. 2:17-cv-5899<br><br>HON. WENDY VITTER<br><br>SECTION "D"<br><br>HON. DANA M. DOUGLAS (M-3) |

**BANKERS' MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SANCTIONS AGAINST PLAINTIFFS' COUNSEL, SOUTHERN POVERTY LAW CENTER, UNDER 28 U.S.C § 1927 AND THE COURT'S INHERENT AUTHORITY**

Defendants, Bankers Insurance Company, Inc. and Bankers Surety Services, Inc. (collectively, "Bankers") moves for the entry of an order imposing sanctions against the Southern Poverty Law Center (the "SPLC") under title 28 United States Code section 1927 and the Court's inherent authority.

I.　　INTRODUCTION

On May 13, 2019, Judge Jane Triche Milazzo entered an order denying a prior motion for sanctions that Bankers filed in this matter (the "May 13 Order"). At the time of her ruling, neither Judge Milazzo nor Bankers was aware that the SPLC had fabricated discovery answers to legitimize an otherwise frivolous set of claims brought against Bankers. After the entry of the May 13 Order, Bankers targeted its efforts in this case to investigate the truthfulness of the SPLC's

contentions that were used to defeat Bankers' sanction motion and to keep Bankers identified as a member of the so-called "RICO enterprise." Bankers would learn over the year following the entry of the May 13 Order that the SPLC had misled the parties and the Court as part of its successful effort to defeat sanctions.

Once it was revealed that the SPLC had perpetuated a false narrative about Bankers' involvement in this dispute, the SPLC swiftly settled. The settlement, however, was not the typical kind where a defendant (here, Bankers) pays money to a plaintiff (here, the Eganas and Ms. Brown) or modifies its business practices. Bankers' business practices did not change in any way and it paid nothing to the Plaintiffs. Further, the SPLC dismissed its claims against Bankers with prejudice *and* agreed that Bankers could seek sanctions against the SPLC so long as Bankers agreed to forego sanctions against the named Plaintiffs and the other law firms representing the Plaintiffs.[1]

In a highly unusual move, the SPLC (as lead counsel for a group of Plaintiffs who were seeking significant monies and to alter the bail industry) also issued a formal public apology letter to Bankers for naming it in the lawsuit in the first instance (the "SPLC Apology Letter" or "Apology Letter" attached hereto as **Exhibit A**). By its Apology Letter, the SPLC admitted that the allegations they asserted against Bankers "***were not supported by the evidence*** . . . .'"" and apologized for "any expense and collateral reputational damage that Bankers may have suffered" as a result of those allegations. It is, however, too late to simply say "sorry," for the "expense and collateral reputational damage" the SPLC caused.

---

[1] In addition to the SPLC, Plaintiffs were represented in this action by the National Consumer Law Center, and Wilmer Cutler Pickering Hale and Door LLP. By this Motion, however, Bankers seeks sanctions against only the SPLC because it is apparent to Bankers that it was the SPLC that: (1) had the direct contact with the named Plaintiffs; (2) purported to have conducted the factual investigation; (3) took lead on arguments before the Court; (4) was the only counsel to represent the named Plaintiffs at the settlement conference before Magistrate Judge Douglas; and, (5) attempted to renege on their own agreements made part of the settlement.

Bankers is now able to conclusively show that the SPLC engaged in sanctionable conduct by falsifying interrogatories to perpetuate its frivolous claims against Bankers and by attempting to renegotiate terms of a settlement that was conclusively reached before Magistrate Judge Dana Douglas.[2]  As shown below, courts have awarded sanctions under Section 1927 in similar circumstances.  This Court should likewise do so here.

II.  **The SPLC Acted in Bad-faith and Unreasonably and Vexatiously Multiplied These Proceedings as to Bankers.**

The right to commercial money bail is guaranteed by the Louisiana Constitution.  LA. CONST. ART. 1, § 18(A).  Nevertheless, the SPLC desired to use this litigation as a catalyst to end commercial money bail in Louisiana and, indeed, the entire United States.  Here, to try to accomplish its goals, the SPLC asserted salacious and scandalous allegations of kidnapping, extortion, false imprisonment, and RICO act violations.  [*See* Complaint (ECF No. 1); First Amended Complaint (ECF No. 26); Second Amended Complaint (ECF No. 128); Third Amended Complaint (ECF No. 188)].  And, to ensure the claims the SPLC was pursuing in this action would reach beyond the greater New Orleans area, the SPLC decided to sue Bankers, one of the largest bail sureties in the country.[3]  To this end, the SPLC broadcast its allegations around the United

---

[2] As summarized in the final section of this Memorandum, the SPLC engaged in other bad-faith litigation tactics and conduct, including maintaining against Bankers claims for which there is no private right of action and seeking summary judgment on claims that the SPLC claimed in another action before this Court were not even pleaded in this action..  While those tactics demonstrate the pervasiveness of the SPLC's bad-faith conduct, Bankers is not basing its request for sanctions on those specific tactics.

[3] In addition to Bankers, the Defendants targeted in this action were Blair's Bail Bonds, Inc. and New Orleans Bail Bonds, Inc., a company Plaintiffs alleged was related to Blair's and, like Blair's wrote bail bonds in the greater New Orleans area (collectively, "Blair's"), as well as A2i, LLC, Alternative to Incarceration, Inc., and Alternative to Incarceration NOLA, Inc., companies Plaintiffs allege are related and supply GPS ankle monitors and monitoring services for defendants on bail in the greater New Orleans area (collectively, "A2i").  Blair's is the local bail bond company that wrote bail bonds for named Plaintiff Ronald Egana.  A2i supplied and was to be paid for an ankle monitor Mr. Egana agreed to wear in connection with the last bail bond Blair's wrote to secure his release from jail.  Bankers is the insurance company that secured the bail bonds written by Blair's.

States, including on its website (**Exhibit B**) and in a front-page article in the New York Times (**Exhibit C**).

But the SPLC's social and policy goals do not justify the means that it utilized in this lawsuit.  As a sister court has stated when considering similar litigation tactics by the SPLC: "failing to punish sanctionable misconduct encourages further sanctionable misconduct, and no lawyer owns a license to freely commit sanctionable misconduct, no matter the nobility the lawyer attributes to the litigation's goals**.**" *Hughes v. Judd*, 2015 WL 5155041 (M.D. Fla. Sept. 1, 2015).[4] Sanctions are due to be awarded to deter the SPLC from engaging in conduct like it did in the present dispute.

### A. The SPLC Previously Avoided Sanctions Based, at Least in Part, on Alleged Facts That Bankers Proved Through Discovery Were Fabricated by the SPLC.

After receiving a letter from the undersigned advising that Bankers intended to pursue Rule 11 sanctions against Plaintiffs and their attorneys for making frivolous claims against Bankers, the SPLC sought leave of Court to file a Third Amended Complaint by which it would drop as against Bankers, without prejudice, all but Plaintiffs' purported "Louisiana State Contract Law" claim. [ECF No. 18].  In their Motion to Amend, the SPLC admitted "**the discovery taken to date** . . . **has contradicted the factual allegations on which those Claims [against Bankers] are based**", and explained that "**Plaintiffs have concluded that, on balance, future discovery is unlikely to**

---

[4] Despite this admonition in 2015 from the Court in *Hughes*, the SPLC continued to believe it possessed a license to commit sanctionable misconduct.  Little more than two years later, the SPLC railed for over a year against Maajid Nawaz and his foundation labeling them "Anti-Muslim Extremists" without having conducted any reasonable factual investigation to support such claims.  Ultimately, after being sued for defamation and being presented facts to counter its egregious accusations, the SPLC settled the claims, agreeing to pay $3.375 million dollars and, as it has in this case, issued an apology to Nawaz and his foundation.  *See* https://www.splcenter.org/news/2018/06/18/splc-statement-regarding-maajid-nawaz-and-quilliam-foundation; https://lawandcrime.com/lawsuit/southern-poverty-law-center-must-3-3-million-payout-after-falsely-naming-anti-muslim-extremists/.

**produce additional evidence that would support Plaintiffs' Claims against Bankers**." [ECF No. 168-1 at pp. 5, 12 (emphasis supplied)].[5]  However, the SPLC still kept Bankers in the case.

Armed with no more evidence than it had when filing the Second Amended Complaint including salacious claims against Bankers,[6] on December 12, 2018, Plaintiffs filed their Third Amended Complaint [ECF No. 188] and Third Amended RICO Statement [ECF No. 189]. Although Plaintiffs no longer named Bankers as a defendant to their most scandalous claims, Plaintiffs continued to mar Bankers' reputation in court filings by alleging that Bankers (now ostensibly as an unnamed co-conspirator) was a member of and participated in a RICO enterprise. [ECF No. 188 at ¶¶ 137-146; ECF No. 189 at pp. 4, 5, 6, 17, 19, 20, 22]. The SPLC did not simply allege that Blair's employees made statements about direction from the "insurance company," but rather, purposefully and directly implicated Bankers by alleging "[u]pon information and belief the insurance company referenced was Bankers" [ECF No. 188 at ¶¶ 88, 93, 96, 100, 113], and that "Bankers [is a ] member of the [RICO] enterprise." [ECF No. 189 at p. 17].

To finally put an end to the SPLC's baseless attacks, Bankers moved the Court to strike the remaining scandalous allegations against Bankers [ECF No. 197] and requested sanctions pursuant to 28 U.S.C. § 1927 and the Court's inherent authority.  [ECF No. 202].  The SPLC opposed Bankers' Motion, writing: "After Plaintiffs filed the instant suit, more individuals came forward to corroborate the involvement of the 'insurance company,' thus supporting Plaintiffs'

---

[5] Bankers opposed Plaintiffs' Motion for Leave to Amend by which the SPLC sought to drop claims against Bankers without prejudice and with no ramifications, two months after the deadline to amend had passed, and to avoid a ruling on Bankers' then-pending Motion to Dismiss Plaintiffs' Second Amended Complaint.  [ECF No. 176].  The Court granted Plaintiffs' Motion by Order dated December 10, 2018.  [ECF No. 186].

[6] The SPLC never should have sued Bankers in the first place.  That is because the claims were impermissibly entirely based on unverified hearsay statements (which were proven to be false anyway).  *See Chapman & Cole v. Itel Container Intern. B.V.*, 865 F.2d 676, 685 (5th Cir. 1989) (imposing sanctions, concluding that "unverified hearsay" is "*not a sufficient basis upon which to 'subject one to the burdens of complex litigation and heavy legal costs.'*" (internal citation omitted)).

allegations that Bankers were [sic] acting illegally on a class wide-basis." [*See* ECF No. 207 at p. 7]. The only two additional individuals the SPLC specifically identified in their Opposition were Chad Lightfoot and Joseph Winzy. *Id.* The SPLC contended that Messrs. Lightfoot and Winzy provided to Plaintiffs information that Blair's had told each of them about the role of the "insurance company." *Id.*

The SPLC cited and attached to their Opposition to Bankers' Motion for Sanctions Supplemental Answers to Interrogatories by named Plaintiff Ronald Egana, [ECF No. 207-11 (a copy of which is attached hereto as **Exhibit D**)], and a letter from SPLC Staff Attorney Ivy Wang to Defendants, [ECF No. 207-12, a copy of which is attached hereto as **Exhibit E**], each relaying information allegedly provided by Mr. Winzy about what he was told by Blair's about the "insurance company." As Bankers discovered later, and as detailed in the section below, these accounts of information purportedly provided by Messrs. Lightfoot and Winzy were false!

Judge Milazzo entered her May 13 Order because she could not find that the SPLC acted in "bad-faith" in relying on the hearsay statements about the "insurance company" to assert claims against Bankers. [ECF No. 245]. However, after Judge Milazzo declined to impose sanctions, Bankers discovered that the SPLC embellished and fabricated the experiences of Chad Lightfoot and Joseph Winzy and their interactions with the Defendants to support their claims and avoid sanctions. The SPLC's attempt to make its claims against Bankers appear as though they had merit multiplied these proceedings and is quintessential unreasonable, vexatious litigation. *See Gonzalez v. Fresenius Med. Care of N. Amer.*, 689 F. 3d 470, 481 (5th Cir. 2012) ("No multiplication of proceedings would be more vexatious than one which gave a frivolous claim the appearance of trial-worthy merit.").

B. ***The Answers to Interrogatories and Accounts of Messrs. Lightfoot's and Winzy's Experiences Were Fabricated by the SPLC.***

The SPLC relied on purported facts obtained from Messrs. Lightfoot and Winzy not only to avoid sanctions, but also in support of the one remaining claim they continued to assert against Bankers in the Third Amended Complaint and Third Amended RICO Statement. [*See* ECF No. 188 at ¶¶ 109-115, 146; ECF No. 189, at pp. 10-13, 15-16]. Plaintiffs incorporated each of their allegations regarding Messrs. Winzy and Lightfoot into their remaining "Louisiana State Contract Law" claim against Bankers and Blair's. [ECF No. 188 at ¶203]. In denying Bankers' Motion to Strike these allegations from the Third Amended Complaint, Judge Milazzo concluded the allegations were "relevant not only to Plaintiffs' RICO claims against Blair's but also to their remaining claims against the Bankers Defendants." [ECF No. 245 at p. 5].

The SPLC drafted, and named Plaintiffs verified, Answers to Interrogatories identifying Chad Lightfoot and/or Joseph Winzy as having provided to them information about their experiences that allegedly implicated Bankers' direct involvement in the wrongs the SPLC alleged.[7]  [*See* **Exhibit F**].  **However, the Answers identifying Chad Lightfoot and Joseph Winzy that Plaintiffs verified and that the SPLC suborned were fabrications.**

---

[7] Specifically, Bankers requested Plaintiffs to identify support for their allegations that any Bankers entity:
1) "directs Blair's . . to collect money from individuals who are behind in payments and need to pay:'
2) "decides how much money Blair's must collect from individuals to avoid being surrendered to jail;"
3) "decides when to install or remove ankle monitors;"
4) "determines when to surrender principals to jail;"
5) "is associated with the provision of ankle monitoring services to principals with bail contracts;"
6) "generally require principals who enter deferred payment agreements to wear an ankle monitor provided by A21i;"
7) "directs Blair's employs (sic) or bounty hunters to 'routinely threaten to, and . . . arrest principals, transport them to the Blair's office, and refuse to release them to force the principal, his indemnitors, or both, to pay money to Blair's;" and,
8) "'receive[s] money' 'collected pursuant to [the alleged] arrangement' by which ' Bankers . . .directs Blair's to collect money from principals and indemnitors, decides how much money is required to avoid being surrendered to jail, decides when to install or remove ankle monitors, and decides when to surrender principals to jail. [Exhibit F].

### 1. The Answers to Interrogatories as to Mr. Lightfoot Were Fabricated.

Mr. Egana and Ms. Egana each testified during their depositions that they did not know and had never spoken with Chad Lightfoot, even though they swore in Answers to Interrogatories that Mr. Lightfoot provided to them information implicating Bankers. [*See e*xcerpts of deposition transcript of Ronald Egana ("R. Egana Dep."), 215:23-216:2, attached hereto as **Exhibit G** (testifying "I don't even know who that is."); excerpts of deposition transcript of Samantha Egana ("S. Egana Dep."), at 128:4-129:3, attached hereto as **Exhibit H** (testifying that she is not "even aware of who that is, honestly.")].

On October 10, 2019, Bankers took the deposition of Mr. Lightfoot. **He testified that he never provided any of the named Plaintiffs with any information they swore he provided, and testified that he did not even have such information**. [*See* excerpts of deposition transcript of Chad Lightfoot ("Lightfoot Dep."), 41:8-43:2; 45:4-14, attached hereto as **Exhibit I**]. Mr. Lightfoot testified that he did not know, and had never spoken with Ronald Egana, Samantha Egana or Tiffany Brown. *Id.* at 41:8-19.[8]  Bankers' counsel went on to ask Mr. Lightfoot whether he even had any of the information that Ms. Brown and Ms. Egana swore that he provided to them. To each question, Mr. Lightfoot responded that he did not have any such information and he,

---

[8] Perhaps Mr. Lightfoot had provided the information contained in the Answers to one of Plaintiffs' attorneys at the SPLC rather than to Plaintiffs themselves. He did not. Bankers' counsel attempted to ask Mr. Lightfoot whether he had provided to "*any of the Southern Poverty Law Center attorneys*" any of the information Ms. Brown and Ms. Egana swore he had. *Id.* at 42:09-43:02, 44:02-45-03. Mr. Neil Sawhney, an attorney for the SPLC who purported to represent Mr. Lightfoot during the deposition, directed Mr. Lightfoot not to answer any questions as to what information he did or did not provide to the SPLC. *Id.*

therefore, could never have provided such information to anyone. *Id.* at 45:09-14,[9] 45:15-18, 46:01-04,[10] 46:05-08,[11] 46:09-13,[12] 46:14-18,[13] 46:19-22,[14] 46:23-47:01[15].

### 2. The Answers to Interrogatories as to Mr. Winzy (like with Mr. Lightfoot) Were Fabricated.

The SPLC also fabricated the information regarding Joseph Winzy on which they relied to support their claims and to avoid being sanctioned. [ECF No. 188 at ¶ 115; No. 207-11, 207-12] First, on December 11, 2018, the day before the SPLC filed Plaintiffs' Third Amended Complaint, the SPLC served "Supplements" to their answers to Bankers' Interrogatories that requested Plaintiffs to identify all facts supporting Plaintiffs' contention "that Bankers participates in . . . deciding how much money must be collected from individuals to avoid jail." [*See* Exhibit D (Supplement verified by Ronald Egana) at No. 1.c[16]; and, **Exhibit J** (Supplement verified by Samantha Egana and Tiffany Brown), at No. 2]. In each of those verified Supplements, the named Plaintiffs swore that "a woman working at Blair's told Joseph Winzy that after a few months, she might be able to work with 'the insurance company' to lower the amount he needed to pay towards his bond premium each month." *Id.* (emphasis supplied).

---

[9] Responding "no, ma'am" when asked whether he had "any information [of] any Bankers entity . . . deciding when to install or remove ankle monitors on Blair's clients?"

[10] Responding "no, ma'am" when asked whether he had "any information that any Bankers entity determines when to surrender principals" or "client" "to jail?"

[11] Responding "no, ma'am" when asked whether he had "any information that Bankers is associated with providing ankle monitor services to Blair's clients?"

[12] Responding "no, ma'am" when asked whether he had "any information that Bankers requires people who enter into payment arrangement agreements with Blair's to wear an ankle monitor?"

[13] Responding "no, ma'am" when asked whether he had "any information that Bankers directs Blair's or its employees or bounty hunters or anyone affiliated with Bankers to threaten to arrest its clients if it doesn't pay?"

[14] Responding "no, ma'am" when asked whether he had any "information on Bankers directing Blair's with respect to transporting its clients to its office to have them make payments?"

[15] Responding "no, ma'am" when asked whether he had "any information that Bankers receives money from Blair's clients regarding ankle monitors?"

[16] The SPLC attached a copy of Mr. Egana's verified Supplement to its Opposition to Bankers' Motion for Sanctions. [ECF No. 207-11].

During his deposition, however, Mr. Egana testified that he never had any communications whatsoever with Joseph Winzy. [R. Egana Dep. at 216:027-08]. Likewise, Ms. Egana testified that she does not know who Joseph Winzy is, never spoke with him, has never seen any documents where Joseph Winzy provided any information, and that she was never provided any information by her attorneys (the SPLC) that would have allowed her to provide her answer to her interrogatory specifically identifying Joseph Winzy has having provided to her information implicating Bankers. [S. Egana. Dep. at 131:06-19, 132:19-23]. Mr. Winzy, during his deposition on November 21, 2019, confirmed that he did not know and had never spoken with any of the named Plaintiffs. [*See* excerpts of the deposition of Mr. Winzy ("Winzy Dep."), 43:13-21, attached hereto as **Exhibit K**].

The SPLC also relayed alleged experiences of Mr. Winzy in a letter they sent to Defendants' counsel on March 13, 2018, which letter the SPLC relied on for and attached to its Opposition to Bankers' Motion for Sanctions. [ECF No. 207-12, attached as Exhibit E]. The SPLC originally sent that letter on behalf of Mr. Winzy, who the SPLC purported to represent. In the letter, the SPLC asserted that Mr. Winzy had been unlawfully surrendered through the efforts of all three defendants on December 19, 2017. The SPLC alleged that "[w]hen asked why he was arrested, Mr. Winzy was told that the insurance company had indicated that he was behind on payments, though Mr. Winzy had recently made a payment to Blair's." *Id.*

Mr. Winzy's deposition testimony reveals that this statement by the SPLC was also false. In addition to confirming he never provided any information to the named Plaintiffs, **Mr. Winzy testified that he did not recall any instance of "anyone at Blair's ever mention[ing] the quote, 'insurance company.'"** *Id.* at 43:09-11. There can thus be no question that Plaintiffs' Supplements to their Interrogatory Answers and the March 13, 2018 letter that the SPLC drafted, perpetuated, and previously relied on to avoid sanctions, are absolutely false.

The SPLC's "carefully crafted answers" to interrogatories, and its March 13, 2018 letter, which provided false information to support the claims the SPLC pursued, "constitutes an enormity that no court and no litigant should suffer, regardless of the immense stakes in the litigation." *Odyssey Marine Exploration, Inc. v. Unidentified Shipwrecked Vessel*, 979 F. Supp. 2d 1270, 1276 (M.D. Fla. 2013) (identifying "Odyssey's bad-faith interrogatory answers and the attendant papers and hearings" as "a telling and vivid episode" of "Odyssey's continuous, core campaign of bad-faith deception, and deflecting that pervaded this litigation from the start"). Indeed, suborning sworn statements, and representing to the Court witness accounts of "fabricated testimony" through a "deceptive style used to mask its shortcomings" is quintessential bad-faith conduct warranting severe sanctions. *See Avirgan v. Hull*, 932 F.2d 1572, 1581 (11th Cir. 1991)(affirming award of fees and costs as sanctions); *see also Gonzalez*, 689 F.3d 470 (affirming sanctions against counsel under Section 1927 where counsel exerted "improper influence" in drafting and having plaintiff sign an errata sheet to change her deposition testimony to support the claims and in drafting for plaintiff and attaching to the complaint a letter to support the asserted claims).

In *Avirgan*, similar to here, a public interest law firm represented a plaintiff and brought RICO claims against multiple defendants. 932 F.2d 1572. Plaintiffs' lead counsel submitted an affidavit outlining the testimony of a witnesses who counsel stated had factual knowledge that the defendants engaged in activity that supported the claims against each of them. *Id.* at 1581. Detailing the facts on which it based its order awarding sanctions under Section 1927, the district court stated:

> Several of the disclosed witnesses later stated under oath that they did not know [the plaintiffs' counsel], had never spoken to him, or flatly denied the statements he had attributed to them in his affidavit. The remaining witnesses did not furnish any statements that would be admissible. Much of the testimony of these witnesses

involved conversations they had with other people, which is the hearsay testimony inadmissible at trial.

*Id.*

Similarly here, the SPLC relied on fabricated information and suborned false interrogatory answers to make it appear that the Plaintiffs' claims against Bankers had merit, and to successfully avoid an initial motion for sanctions. However, contrary to the Plaintiffs' interrogatory answers, Messrs. Lightfoot and Winzy have now stated under oath they did not even know any of the Plaintiffs, had never spoken to them, and "flatly denied the statements [the plaintiffs] had attributed to them in [Plaintiffs' Answers to Interrogatories]." *See Avirgan*, 932 F.2d at 1581. The SPLC has engaged in bad-faith conduct and should be sanctioned.

### C. As Plaintiffs' Counsel's Swan Song, the SPLC Attempted to Renege on Settlement Terms to Which it Agreed Before Magistrate Judge Douglas and to Renegotiate the Settlement.

After Bankers spent months conducting discovery to show that the allegations and witness accounts the SPLC alleged against Bankers were false, Plaintiffs and the SPLC were forced to finally accept that they had no evidence and no legitimate path to succeed on their claims against Bankers. Accordingly, with the Court-ordered settlement conference before Magistrate Judge Douglas looming, the SPLC began discussing with Bankers' counsel a way to put an end to the SPLC's charade against Bankers.

On the virtual eve of trial, Magistrate Judge Douglas presided over two days of settlement discussions between the parties. The parties agreed to settle this case. The terms and conditions of the agreement reached were clear and read onto the record on January 22, 2020. [*See* transcript of January 22, 2020 proceeding, excerpts of which are attached hereto as **Exhibit L**]. The terms of the Settlement included the SPLC agreeing to write to Bankers' CEO an apology letter. [*Id.* 4:10-13; 11:11-25]. The precise language of the apology letter was agreed to with the assistance of Magistrate Judge Douglas. All lawyers agreed to the terms announced and represented that they

had the authority to bind their clients to such terms. [*Id*., 14:12-19]. Immediately after the terms of the full settlement were read onto the record, the SPLC lawyers e-mailed to Bankers' counsel the language for the apology letter. [**Exhibit M**].

Nevertheless, days later, the SPLC sought to renege on terms of the Settlement and rewrite the letter. Mr. Samuel Brooke, Deputy Legal Director of the SPLC, asserted that "upon further reflection" the agreed upon apology letter should be refined and redrafted, changing the fundamental meaning of the letter, and demanded that it remain strictly confidential unless a new form was drafted. [**Exhibit N**]. Bankers sought Court intervention to prevent the SPLC from attempting to alter or renege on the settlement terms to which it agreed. [A copy of Bankers' correspondence to Magistrate Douglas, and Plaintiffs' Counsel's reply, are attached hereto as **Exhibit O**].

Magistrate Judge Douglas ordered an in-person status conference to occur on February 10, 2020. [ECF No. 405]. At the conference, the SPLC continued its refusal to execute the settlement and apology letter, as negotiated and placed on the record. Ultimately, the Court entered its Minute Entry [ECF No. 409], observing that "Plaintiffs object to certain aspects of the settlement, but this Court will not alter the terms of the settlement as read into the record on January 22, 2020." [ECF No. 409]. Only after the Court's proclamation at the in-person status conference that the SPLC could face sanctions for its actions did the SPLC relent and agree to execute and perform on the settlement reached on January 22, 2020. As Magistrate Judge Douglas concluded, the SPLC clearly agreed to the terms of the settlement, including the language of their apology letter, and their attempt to renege on it was unreasonable. Such conduct by the SPLC, to the very end, constitutes vexatious litigation for which the SPLC should be sanctioned. *See, e.g. Farmer v. Banco Popular of N. Amer., 2014 WL 4627705*, at \*2 (D. Colo. Sept. 16, 2014) (awarding fees and

costs attributable to attorney/party's conduct in refusing to sign settlement agreement and instead delaying and attempting to renegotiate deal, requiring involvement of court), *aff'd* 791 F.3d 1246 (10th Cir. 2015).

> **D. The SPLC's Litigation Strategy and Tactics Throughout This Matter Further Demonstrates the SPLC's Bad Faith and the Vexatiousness of These Proceedings as Against Bankers.**

As set out above, the SPLC egregiously attempted to support its one remaining claim against Bankers with falsified evidence, and then attempted to renege on a settlement finally dropping that meritless claim against Bankers. Those facts are enough for the Court to sanction the SPLC under 28 U.S.C. § 1927. To provide the Court additional context, and show the lengths to which the SPLC has gone to try to ensure that Bankers remained a defendant in this action to further the SPLC's social justice mission, Bankers briefly summarizes below additional vexatious conduct in which the SPLC has engaged in this action:

- **The SPLC pursued on behalf of Plaintiffs a claim against Bankers for which Plaintiffs had no private right of action.** After being forced to drop its most salacious claims, the only remaining claim the SPLC pursued against Bankers was one purportedly for violations of "Louisiana State Contract Law." [ECF No. 188, Seventh Claim for Relief]. That claim, however, was nothing more than a disguised breach of contract claim challenging "fees" Plaintiffs alleged Bankers charged in excess of what is allowed by the Louisiana Insurance Code which. However, the Louisiana "Insurance Code does not provide for a private right of action for violations." *Taxicab Ins. Store, LLC v. Amer. Svc. Co., Inc.*, 224 So. 3d 451, 457 (La. App. 4th Cir. 2017).[17]

---

[17] The legal insufficiency of Plaintiffs' "Louisiana State Contract Law" claim against Bankers is addressed more thoroughly in Bankers Memorandum in Law in Support of [its] Motion for Summary Judgment, at ECF No. 340-1.

- **The SPLC attempted to shoehorn into this action, and moved for summary judgment on, a claim it admittedly did not plead.** The SPLC asked this Court in the SPLC's summary judgment motion to declare unconstitutional an Act of the Louisiana Legislature making clear that it was not illegal to charge a 13% premium for bail bonds issued in Orleans Parish. The SPLC, however, did not allege in any iteration of Plaintiffs' Complaint that Plaintiffs were charged 13% for any bond, or otherwise assert a claim regarding the 13% premium allegedly charged for bonds issued in Orleans Parish. [*See* ECF Nos. 1, 26, 128, 188]. Indeed, in a related case that was removed to this Court, *Morgan v. Blair's Bail Bonds, Inc. et al.,* Case No. 19-12379—in which the plaintiff was represented by the SPLC, among others—the plaintiff argued to this Court that his and the *Egana* action were *not* "parallel actions, because, among other things, "the constitutionality of Act 54—the core claim at issue in Morgan's state declaratory judgment action—is not the basis for any claim in Egana," [Case No. 19-12379 at ECF No. 22 p. 9] and that "Morgan's claims for declaratory judgment about **the constitutionality of Act 54 were not pled in Egana,**" [*id.* at ECF No. 26-3 p. 1, fn. 1 (emphasis supplied)].[18]

Each of the above actions vexatiously and unreasonably multiplied these proceedings and likely could support sanctions against the SPLC under 28. U.S.C. § 1927. At a minimum, however, these actions further demonstrate the SPLC's bad-faith, including the egregious conduct addressed in the above sections.

---

[18] The impropriety of the SPLC's attempt to move for summary judgment on Plaintiffs' unpleaded claim is addressed more thoroughly in Bankers Opposition to Plaintiff's Motion for Summary Judgment at ECF No. 368.

### III. THE COURT HAS THE AUTHORITY TO SANCTION THE SPLC FOR ITS BAD-FAITH LITIGATION TACTICS AND CONDUCT.

#### A. *The Court Should Sanction the SPLC Under 28 U.S.C. § 1927.*

"[S]ince 1980, 28 U.S.C. § 1927 has taken a harder line against abusive litigation tactics, broadening lawyers' personal financial exposure to include expenses and attorneys' fees" incurred as a result of the lawyer's vexatious and unreasonable multiplication of legal proceedings.[19] *Morrison v. Walker*, 939 F.3d 633, 635 (5th Cir. 2019). Choosing to pursue a claim without evidence, or in the face of evidence that there is no such claim, constitutes unreasonable and vexatious conduct that multiplies proceedings sufficient to award sanctions under Section 1927. *Mercury Air Group, Inc. v. Mansour*, 237 F.3d 542, 549 (5th Cir. 2001). Indeed, as the Fifth Circuit reminded litigants and courts just last year: "Incentives matter. For more than a generation now, pocket-conscious parties have sought hefty § 1927 sanctions, and docket-conscious courts have granted them." *Morrison*, 939 F.3d at 635.

Whether to impose sanctions under §1927, and in what amount, is left to the sound discretion of the Court. *Morrison*, 939 F. 3d at 637.[20] Before a court may sanction attorneys for unreasonable and vexatious multiplication of proceedings, however, the court must find "'evidence of bad-faith, improper motive, or reckless disregard of the duty owed to the court.'" *Id*. (quoting

---

[19] 28 U.S.C. § 1927, titled: "Counsel's liability for excessive costs," states:

> Any attorney or other person admitted to conduct cases in any court of the United States or any Territory thereof who so multiplies the proceedings in any case unreasonably and vexatiously may be required by the court to satisfy personally the excess costs, expenses, and attorneys' fees reasonably incurred because of such conduct.

[20] The court may under 28 U.S.C. § 1927 shift the "entire cost of defense" where the claimant proves by "clear and convincing evidence, that every facet of the litigation was patently meritless . . ." *Morrison*, 939 F. 3d at 637 n. 13. The "clear and convincing standard should not be applied," however, "when §1927 sanctions are shifting only the partial cost of defense—anything less than 'all costs associated with an action.'" *Id*. (quoting *Walker v. City of Bogalusa*, 168 F. 3d 237, 240 (5th Cir. 1999)). Here, Bankers is not requesting that the Court award sanctions of the "entire defense cost"—that is, all the costs incurred by all the defendants—nor even all of the fees and costs Bankers incurred in defending Plaintiffs' meritless claims against Bankers. Rather, upon the Court's entry of an Order sanctioning the SPLC and entitling Bankers to recover fees and costs for the SPLC's vexatious and bad faith conduct outlined herein, Bankers will present evidence of and move the Court to award the fees and costs Bankers incurred as a result of that conduct.

*Edwards v. Gen. Motors Corp.*, 153 F. 3d 242, 246 (5th Cir. 1998)). That standard is met here and the evidence of the SPLC's bad-faith warranting sanctions abounds and includes:

- Suborning false Answers to Interrogatories and other evidence in an attempt to support the claim against Bankers it continued to pursue and to avoid sanctions for having brought their salacious claims against Bankers in the first place, *see Gonzalez*, 689 F. 3d 470 (imposing sanctions under §1927 against attorney who exerted "improper influence" in drafting and having plaintiff sign an errata sheet to change her deposition testimony to support the claims and in drafting for plaintiff and attaching to the complaint a letter to support the asserted claims); *Avirgan*, 932 F.2d at 1581 (imposing sanctions under §1927 against attorney who submitted affidavits purporting to provide accounts of witnesses who later testified they never provided such information and never spoke with the affiants); *Odyssey Marine Exploration, Inc.* (identifying "Odyssey's bad-faith interrogatory answers and the attendant papers and hearings" as "a telling and vivid episode" of "Odyssey's continuous, core campaign of bad-faith deception, and deflecting that pervaded this litigation from the start");

- Pursuing claims based on alleged violations of the Louisiana Insurance Code for which there is no private right of action and attempting to disguise the claim as one "violation of Louisiana State Contract Law", *see Sheifls v. Shetler*, 120 F.R.D. 123, 128 (D. Colo. 1998) (imposing sanctions for maintaining litigation where no private right of action existed under statutes);

- Attempting to raise mid-case and move for summary judgment on a claim that they admitted in another action was not pleaded in this action, *see Travelers Ins. Co. v. St. Judge Hosp. of Kenner, La., Inc.*, 38 F. 3d 1414, 1418-1419 (5th Cir. 2009) (affirming the district court's reference to related proceedings in a different forum as properly "contribut[ing] to the district court's implicit determination that the 60(b)(6) motion was in bad-faith, or undertaken with an improper motive."); *Payne v. Univ. of Southern Mississippi*, 2015 WL 3549862, at * 8 (S.D. Miss. June 5, 2015) (awarding § 1927 sanctions in part based upon "the attempt to assert new claims in response to Defendants' motions for summary judgment"), *aff'd* 681 F. App'x 384 (5th Cir. 2017); and

- Refusing to abide by, and attempting to substantively renegotiate, the terms of the settlement negotiated between Bankers, Plaintiffs, and the SPLC, and read into the record before Magistrate Judge Douglas, *see Farmer v. Banco Popular of N. Amer., 2014 WL 4627705*, at *2 (D. Colo. Sept. 16, 2014) (awarding fees and costs attributable to attorney/party's conduct in refusing to sign settlement agreement and instead delaying and attempting to renegotiate deal, requiring involvement of court), *aff'd* 791 F.3d 1246 (10th Cir. 2015).

The SPLC's "[s]tatus as a public interest law firm or the nature of a claim does not confer immunity from attorneys' fees for bringing and maintaining frivolous lawsuits." *Avirgan*, 932

F.2d at 1582-83.  "[E]ven the most laudable of motivations cannot provide a proper purpose for having done so, or infuse merit into a groundless claim." *In re Khan*, 488 B.R. 515, 534-535 (Bankr. E.D.N.Y. 2013).

The SPLC barely avoided sanctions in *Hughes*, 2015 WL 5155041, having paid over $3 million for such tactics in the past, [*see* fn. 2, *supra*].  In a harshly worded Order rebuking the SPLC, the district court strongly rejected the SPLC's argument that "a sanction in this action will 'chill' litigation designed 'to protect the under-represented, including vulnerable populations and unpopular groups," stating:

> In all events, with an endowment fund in excess of $300 million and an annual operating fund of over $37 million, the Southern Poverty Law Center will experience no detectable 'chill,' even if required to pay the entire sanction that the Sheriff seeks (although some salutary increment of professional wisdom and discretion might accrue).

*Id.*

Although clearly disturbed by the SPLC's litigation tactics, the *Hughes* court was forced to conclude that "the SPLC's bad-faith was "insufficiently evidenced in the record." *Id.*  (citing *Odyssey Marine Exploration, Inc.*, 979 F. Supp.2d 1270 as "an example of a sanction supported by a 'firm conviction, well-established in the record'")[21].  Here, the newly emerged record evidence of the SPLC's bad-faith abounds.

---

[21] In *Odyssey Marine Exploration,* the Court succinctly summarized when and why sanctions against an attorney will be warranted under 28 U.S.C. § 1927 as follows:

> [A] litigant cannot advance in bad faith – without risk of sanction – any knowingly meritless, false, or frivolous claim or defense or other litigation position (a merely unsuccessful argument, yes; a reasonable argument for a change in the law, yes; a reasoned but novel application of established law, yes; but an assertion advanced in bad faith, based on nothing, and maintained by evasion or deceit, absolutely not). ***In litigation, neither the meritless, nor the false, nor the frivolous, nor the vexatious should progress in safety and for free***.

979 F. Supp. 2d at 1273 (emphasis supplied).

### B. *The Court May Also Sanction the SPLC Under the Court's Inherent Authority.*

In addition to recourse under § 1927, "[f]ederal courts [also] have an inherent power to sanction a party or attorney when necessary to achieve the orderly and expeditious disposition of their dockets." *Terra Partners v. Rabo Agrifinance, Inc.*, 504 Fed. Appx. 288, 290 (5th Cir. 2012) (internal quotations omitted). This inherent authority includes the ability to award fees and costs. *Chambers v. NASCO, Inc.*, 501 U.S. 32, 45 (1991). The record evidence here is equally strong to allow the Court to exercise its inherent authority to sanction the SPLC.

## IV. CONCLUSION

This Court should now finally sanction the SPLC under 28 U.S.C. § 1927 and the Court's inherent authority for vexatiously, unreasonably and in bad-faith multiplying these proceedings as outlined above. Bankers requests that in entering such order, the Court reserve to allow Bankers to present evidence of the fees and costs it incurred as a result of all the SPLC's conduct the Court finds sanctionable under 28 U.S.C. § 1927.

| | | |
|---|---|---|
| CHEHARDY, SHERMAN, WILLIAMS, MURRAY, RECILE, STAKELUM & HAYES, L.L.P. | | SMOLKER BARTLETT LOEB HINDS & THOMPSON, P.A. |
| STEPHEN D. MARX (#17041) PRESTON L. HAYES (#29898) One Galleria Boulevard, Suite 1100 Metairie, Louisiana 70001 Telephone: (504) 833-5600 | and | */s/ Ethan J. Loeb* ETHAN J. LOEB (pro hac vice) E. COLIN THOMPSON (pro hac vice) ALLISON DOUCETTE (pro hac vice) 100 North Tampa Street, Suite 2050 Tampa, FL 33602 (813) 223-3888; Fax: (813) 228-6422 ***Attorneys for Bankers Defendants*** |